IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

JAMES DAVON RICHARDSON,

                                                    Civil Action No.
                                Plaintiff,          9:09-CV-0868 (GLS/DEP)

              v.

DEBORAH G. SCHULT,[1] Ph.D., Warden,
and MR. POIRIER, Officer,

                       Defendants.

_____

APPEARANCES:                        OF COUNSEL:

FOR PLAINTIFF:

JAMES DAVON RICHARDSON, *Pro Se*
42783-037
FCI Fairton
PO Box 420
Fairton, NJ 08320

FOR THE DEFENDANTS:

HON. RICHARD S. HARTUNIAN        CHARLES E. ROBERTS, ESQ.
United States Attorney            Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261-7198

_____

        [1]      In plaintiff's complaint Warden Schult's name is misspelled as "Schultz."
The court's records in the case have been amended to reflect the correct spelling of that
defendant's name.

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff James Davon Richardson, a federal prison inmate who is

proceeding *pro se* and *in forma pauperis,* has commenced this action against

the warden of the correctional facility in which he was housed at the relevant

times as well as a corrections officer also assigned to work there, alleging

deprivation of his civil rights.  Plaintiff's claims arise from an incident during

which, he claims, the defendant corrections officer sprayed him with the

contents of a fire extinguisher while he was in his cell and, following

Richardson's threat to lodge a complaint, engaged in a pattern of harassment

against him.  Plaintiff maintains that when the occurrence was reported to the

warden she failed to take appropriate corrective measures.  As relief, plaintiff

seeks $1 million in compensatory damages and an additional $1 million in

punitive damages against each of the two named defendants.

In response to plaintiff's complaint, both defendants have moved for its

dismissal for failure to state a claim upon which relief may be granted.  In the

alternative, the corrections officer defendant requests the entry of summary

judgment dismissing plaintiff's claims against him based upon additional

record evidence submitted in support of his motion.  For the reasons set forth

2

below, I recommend that both motions be granted, and that plaintiff's

complaint be dismissed, with leave to replead.

I.   BACKGROUND[2]

Plaintiff is a prison inmate entrusted to the care and custody of the

United States Bureau of Prisons ("BOP"); at the times relevant to his claims

Richardson was designated to the Ray Brook Federal Correctional Institution

("FCI Ray Brook"), located in Ray Brook, New York, and was assigned to a

two person cell in the facility's special housing unit ("SHU").[3]  Complaint (Dkt.

No. 1) ¶¶ 1, 5, 12; *see also* Poirier Decl. (Dkt. No. 20-8) ¶¶ 2-3.  At all

relevant times, defendant Deborah G. Schult served as the warden of FCI

Ray Brook.  *See generally* Complaint (Dkt. No. 1).

During the early morning hours of September 26, 2008, while making

_____

[2]      For purposes of defendant Poirier's motion, which as will be seen is being treated as a motion for summary judgment, the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).  The focus of defendant Schult's motion is upon the facts drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion, *see Erickson v. Pardus,* 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964), as supplemented by the materials submitted by the plaintiff in opposition to defendants' motion, Dkt. No. 27, to the extent they are consistent with the allegations set forth in his complaint.  *See Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.).

[3]      At the time of the incident giving rise to plaintiff's claims it does not appear that he had a cell mate.  Poirier Decl. (Dkt. No. 20-8) ¶ 3.

rounds, defendant Jason Poirier, a corrections officer assigned to work in the

FCI Ray Brook SHU, sprayed the plaintiff with liquid contents of a silver fire

extinguisher through the slot of plaintiff's cell door.   Complaint (Dkt. No. 1) ¶

5(A); Poirier Decl. (Dkt. No. 20-8) ¶¶ 2-5.  According to Poirier's version of

the events, his decision to spray the plaintiff stemmed from the fact that his

view was obscured by a sheet hanging from the top bunk "like a curtain",

preventing him from seeing whether plaintiff was in his assigned bunk.[4]

Poirier Decl. (Dkt. No. 20-8) ¶ 3.  After plaintiff complained to Poirier

concerning the incident and asked to see a superior officer for purposes of

making a complaint, defendant Poirier proceeded to harass him both verbally

and by banging and kicking on his cell door throughout the remainder of the

evening.  Complaint (Dkt. No. 1) ¶ 5(A).

    Following the encounter plaintiff complained to prison officials through

the filing of an administrative remedy complaint utilizing a BOP printed form

(BP-9).  Complaint (Dkt. No. 1) ¶ 5(B).  Plaintiff was thereafter examined by a

registered nurse for purposes of making an injury assessment, and six

photographs of him were taken.  Complaint (Dkt. No. 1) ¶ 5(B); Marini Decl.

_____

    [4]    Plaintiff denies that Corrections Officer Poirier's view into his cell was
obscured by the hanging sheet.  *See* Plaintiff's Opposition Memorandum (Dkt. No. 27) ¶
27.

(Dkt. No. 20-6) ¶ 3.  Neither the nurse's examination nor the photographs revealed any objective evidence of injury, although plaintiff reported having difficulty in breathing and of suffering from a rash.[5]  Marini Decl. (Dkt. No. 20-6) ¶¶ 4-8.

A second incident involving plaintiff and Corrections Officer Poirier occurred on or about November 14, 2008 as plaintiff was returning to his housing unit from the facility dining hall.  Complaint (Dkt. No. 1) ¶ 5(D).   On that occasion, as plaintiff was about to enter a metal detector he was instead directed by defendant Poirier to submit to a pat search, a directive plaintiff attributes to continued ongoing harassment stemming from his complaint regarding the earlier incident.[6]  Complaint (Dkt. No. 1) ¶ 5(D).  Plaintiff was later called back to the "shake-down shack" by defendant Poirier, who apologized for his prior conduct, which he acknowledged was unprofessional. Complaint (Dkt. No. 1) ¶ 5(D); Poirier Decl. (Dkt. No. 20-8) ¶ 7.

Defendant Poirier was ultimately suspended for ten days by Warden

---

[5]       The examination did reveal the presence of mild dryness of skin on plaintiff's back.  Marini Decl. (Dkt. No. 20-6) ¶¶ 5, 9.  That condition is attributed to plaintiff's chronicled history of eczema which predated the September 26, 2008 incident, and for which he has been prescribed Triamcinolone cream.  *Id.* at ¶ 9.

[6]       According to defendant Poirier, on that date plaintiff was wearing prohibited head gear which was confiscated.  Poirier Decl. (Dkt. No. 20-8) ¶ 7.  Plaintiff was not charged with any misconduct in connection with the incident.  *Id.*

Schult as a result of the fire extinguisher spraying incident.  Poirier Decl. (Dkt.

No. 20-8) ¶ 6.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on July 30, 2009.  Dkt. No. 1.  Plaintiff's

complaint names Warden Schult and Corrections Officer Poirier as

defendants, and asserts a single cause of action which, while not directly so

stating, appears to allege cruel and unusual punishment, in violation of his

rights under the Eighth Amendment.[7]  *See id.*

Following service of the plaintiff's complaint but prior to any pretrial

discovery in the action, defendants moved on March 17, 2010 to dismiss

plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.  Dkt. No. 20.  Defendant Poirier's motion also requests, in the

alternative, the entry of summary judgment based upon the additional

materials submitted in support of that motion.  *Id.*  Plaintiff has since

responded on July 1, 2010 in opposition to defendants' motion, Dkt. No. 27,

which is now fully briefed and ripe for disposition and has been referred to me

---

[7]    Plaintiff's Eighth Amendment claim is brought pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 407 U.S. 388, 91 S. Ct. 1999 (1971), in which the Court recognized the existence of an analog to 42 U.S.C. 1983 for constitutional claims asserted against federal employees.  *Hartman v. Moore*, 547 U.S. 250, 254 n.2, 126 S. Ct. 1695, 1700 (2006); *see also Chin v. Bowen*, 833 F.2d 21, 24 (2d Cir. 1987).

for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Dismissal Motion Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny.  *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, (2007)).  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S. Ct. at 1950.

7

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, "'but whether the claimant is entitled to offer evidence to support the claims.'" *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 441 (S.D.N.Y. 2001)

8

(quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995))
(citations and quotations omitted).

  B. <u>Summary Judgment Standard</u>

  Summary judgment motions are governed by Rule 56 of the Federal
Rules of Civil Procedure.  Under that provision, summary judgment is
warranted when "the pleadings, the discovery and disclosure materials on
file, and any affidavits show that there is no genuine issue as to any material
fact and that the movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.
2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106
S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion
Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for
purposes of this inquiry, if it "might affect the outcome of the suit under the
governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also
Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing
*Anderson*).  A material fact is genuinely in dispute "if the evidence is such
that a reasonable jury could return a verdict for the nonmoving party."
*Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

  A party moving for summary judgment bears an initial burden of

demonstrating that there is no genuine dispute of material fact to be decided

with respect to any essential element of the claim in issue; the failure to meet

this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4,

106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial

burden is met, the opposing party must show, through affidavits or otherwise,

that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*,

477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at

2511.  Though *pro se* plaintiffs are entitled to special latitude when defending

against summary judgment motions, they must establish more than mere

"metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but

see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting

obligation of court to consider whether *pro se* plaintiff understood nature of

summary judgment process).

When deciding a summary judgment motion, a court must resolve any

ambiguities and draw all inferences from the facts in a light most favorable to

the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d

133, 137-38 (2d Cir. 1998).  The entry of summary judgment is warranted

only in the event of a finding that no reasonable trier of fact could rule in favor

10

of the non-moving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

    C.    <u>Personal Involvement</u>

    In her motion defendant Schult argues that plaintiff's allegations are insufficient to establish her liability in connection with the constitutional violation alleged.  In support of that contention defendant Schult notes that plaintiff's allegations appear to be predicated principally upon a theory of *respondeat superior,* based upon the actions of Corrections Officer Poirier, and his further assertion that she was negligent in her handling of the matter and argues that neither theory would support a claim against her.

    Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages both in a *Bivens* action and under its state action counterpart, section 1983.  *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)); *see also*

*Walker v. Snyder*, No. 9:05-CV-1372, 2007 WL 2454194, at * 5 (N.D.N.Y. Aug. 23, 2007) (Sharpe, J. and DiBianco, M.J.)[8]; *Sash v. United States*, 674 F. Supp. 2d 531, 542 (S.D.N.Y. 2009) .  In order to prevail on either a claim under *Bivens* or section 1983 against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant.  *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Certain of plaintiff's allegations signal that his theory of liability against Warden Schult is predicated, at least in large part, upon *respondeat superior*. In his complaint, for example, plaintiff alleges that "defendant Schult is held accountable and responsible for the actions of her subordinates."  Complaint (Dkt. No. 1) ¶ 6(C).   Such allegations do not provide a basis for finding liability on the part of a supervisory employee; a supervisor cannot be liable for damages under section 1983 or in a *Bivens* setting solely by virtue of being a supervisor, as there is no *respondeat superior* liability in those circumstances.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.   Accordingly, any claims against defendant Schult based solely upon her position as warden and the conduct of her

---

[8]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

subordinates, standing alone, are not cognizable in a *Bivens* setting.  *Walker*,
2007 WL 2454194, at * 5.

On more than one occasion plaintiff's complaint alleges that Warden
Schult was negligent in the performance of her duties.  *See, e.g.,* Complaint
(Dkt. No. 1) ¶¶ 8, 9.  Mere negligence, however, does not rise to a level
sufficient to support a constitutional claim under *Bivens*.  *Davidson v. Canon*,
474 U.S. 344, 347-348, 106 S. Ct. 668, 670 (1986).  Accordingly, any claim
based solely upon plaintiff's assertion that defendant Schult was negligent in
the performance of her duties is similarly without merit.

In this circuit it has historically been generally accepted that culpability
on the part of a supervisory official for a civil rights violation can only be
established in one of several ways, including when that individual 1) has
directly participated in the challenged conduct; 2) after learning of the
violation, such as through a report or appeal, has failed to remedy the wrong;
3) created or allowed to continue a policy or custom under which
unconstitutional practices occurred; 4) was grossly negligent in managing the
subordinates who caused the unlawful event; or 5) failed to act on information
indicating that unconstitutional acts were occurring.  *Colon v. Coughlin,* 58
F.3d 865, 873 (2d Cir. 1995); *see also Richardson v. Goord,* 349 F.3d at 435.

13

More recently, however, the issue of supervisory liability for civil rights violation under *Bivens* was addressed by the Supreme Court in its decision in *Iqbal*.  In that case, the Court made it clear that a governmental official, regardless of title, is accountable only for his or her conduct in such a setting, and that as such the term "supervisory liability" is a misnomer.  *Iqbal*, 129 S. Ct. at 1948.

The Second Circuit has yet to address the impact of *Iqbal* upon the categories of supervisory liability under *Colon*.  Lower courts have struggled with this issue, and specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability.  *See Sash*, 674 F. Supp. 2d at 542-544; *see also Stewart v. Howard*, No. 9:09-CV-0069 (GLS/GHL), 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) ("The Supreme Court's decision in [*Iqbal*] arguably casts in doubt the continued vitality of some of the categories set forth in *Colon*.") (citations omitted), *report and recommendation adopted*, 2010 WL 3907137 (Sept. 30, 2010) . While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, No.07 CIV. 1801, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed. App'x 55 (2d Cir.

2010), others disagree and conclude that whether any of the five categories

apply in any particular case depends upon the particular violations alleged

and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, Nos. 09

Civ. 7283 (JSR), 09 Civ. 9952 (JSR), 2010 WL 2428128, at *5 (S.D.N.Y. Jun.

15, 2010); *Qasem v. Toro*, No. 09 Civ. 8361 (SHS), 2010 WL 3156031, at *4

(S.D.N.Y. Aug. 10, 2010).

I have assumed, for purposes of my analysis, the continued

applicability of the *Colon* factors.  Nonetheless, I conclude in this instance

they do not support a finding of liability based upon the allegations of

plaintiff's complaint.  Plaintiff does not argue that Warden Schult directly

participated in Corrections Officer Poirier's spraying of him using the fire

extinguisher.[9]  Instead, plaintiff appears to be claiming that after learning of

---

[9]        It is true that plaintiff's complaint contains the bald assertion that Warden Schult conspired with Corrections Officer Poirier to harass him.  *See, e.g.,* Complaint (Dkt. No. 1) ¶ 2.  The allegations of plaintiff's complaint, however, are insufficient to plead a plausible conspiracy claim.  To support a claim of conspiracy in a civil rights setting such as this a plaintiff must establish that a defendant acted willfully, resulting in an agreement, or meeting of the minds, to violate rights secured by the constitution.  *Loria v. Butera*, No. 5:09-CV-531, 2010 WL 3909884, at * 6 (N.D.N.Y. Sept. 29, 2010) ( Scullin, S.J.)  *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995).  Conclusory allegations like those contained within plaintiff's complaint do not suffice to establish a plausible claim of conspiracy to deprive him of his constitutional rights.  *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir.1997); *see also Somer v. Dixon*, 709 F.2d 173, 175 (2d Cir.), *cert. denied,* 464 U.S. 857, 104 S. Ct. 177 (1983).  It should also be noted that any claim of conspiracy in this case would likely be doomed to fail as precluded under the intra-agency conspiracy doctrine, which provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances.  *See, e.g., Everson v.*

the violation defendant Schult failed to act to remedy the wrong and to insure that unconstitutional acts were not ongoing under her supervision.[10]

Richardson's Eighth Amendment claim is predicated principally upon a single isolated event. The plaintiff does not assert the existence of an ongoing deprivation of constitutional proportions which, when reported to Warden Schult, went unaddressed. Although a second incident allegedly took place involving Corrections Officer Poirier in the "shake-down shack", that incident does not arise to a level sufficient to support an Eighth Amendment violation. *See Tafari v. Paul*, No. 06CV0603A, 2009 WL 3260075, at * 2 (W.D.N.Y. Oct. 8, 2009); *Murray v. Bushey*, No. 9:04-cv-00805 , 2009 WL 498144, at * 5 (N.D.N.Y. Feb. 26, 2009) (Hurd, J. and Lowe, M.J.).

Having carefully reviewed the allegations set forth in plaintiff's complaint and finding that they do not meet any of the grounds enunciated in

---

*New York City Transit Auth.*, 216 F. Supp. 2d 71, 75-76 (E.D.N.Y. 2002); *Griffin-Nolan v. Providence Washington Ins. Co.*, No. 5:05CV1453, 2005 WL 1460424, at *10-11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.).

[10]     From defendants' submissions we now know that plaintiff is mistaken, and that in fact Warden Schult took action to address Corrections Officer Poirier's conduct by suspending him without pay for a period of ten days. *See* Poirier's Decl. (Dkt. No. 20-8) ¶ 6. Unfortunately, however, due to the procedural posture of the case – defendant Schult not having sought summary judgment as an alternative remedy – the court cannot consider that fact when deciding defendant Schult's motion.

*Colon* for establishing supervisory liability, I conclude that plaintiff has failed to assert a basis for finding liability on the part of Warden Schult, and therefore recommend dismissal of plaintiff's claims against her.

### D.   Plaintiff's Eighth Amendment Claim Against Corrections Officer Poirier

In his motion Corrections Officer Poirier submits that on its face plaintiff's complaint fails to allege a plausible claim of cruel and unusual punishment, in violation of the Eighth Amendment.  Alternatively, he requests that the court consider the additional materials submitted with his motion and determine his entitlement to judgment on that claim as a matter of law.

### 1.   Procedural Posture

Defendant Poirier's pre-answer motion is brought seeking, in the alternative, either dismissal for failure to state a cause of action or summary judgment dismissing the complaint.  As an initial threshold matter, the court must determine whether to consider defendant's motion as seeking dismissal for failure to state a claim from which relief may be granted, limiting the court's review to the four corners of plaintiff's complaint, *see Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006), or instead as a motion for summary judgment, in which case the court would have available to it the entire record, including the extrinsic materials

17

submitted by the parties, for use in deciding the motion.  *See* Fed. R. Civ. P.

12(b) ("[i]f . . . matters outside the pleading are presented to and not

excluded by the court, the motion shall be treated as one for summary

judgment and disposed of as provided in Rule 56 . . . .)*; see also, Friedl v.*

*City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000).

It is ordinarily improper for a court to consider matters outside of a

complaint when resolving a Rule 12(b)(6) motion absent express notice that

the court is converting the motion to one for summary judgment.  *Reliance*

*Ins. Co. v. Polyvision Corp.*, 474 F.3d. 54, 57 (2d Cir. 2007).  Where,

however, the nonmoving party is plainly aware that additional factual matters

are being considered and responds with his or her own evidentiary

submissions, formal notice of the conversion by the court is not required.  *Id.*

In this case plaintiff was notified by defendant Poirier's moving papers that

the motion was made under Rule 12(b)(6) or, in the alternative, Rule 56, and

indeed submitted extrinsic materials of his own in opposition to the motion,

including objections to defendants' declarations and a responding statement

pursuant to Northern District of New York Local Rule 7.1(a)(3).  I therefore

recommend that the court consider defendants' motion as seeking summary

judgment dismissing plaintiff's complaint.

2.    Merits of Plaintiff's Eighth Amendment Claim

Plaintiff's complaint asserts a cause of action brought under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle*).  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain."  *Whitley,* 475 U.S. at 319, 106 S. Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir. 1999).  The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously

19

and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S. Ct. 995, 998-999 (1992) (applying *Whitley* to all excessive force claims); *Whitley*, 475 U.S. at 320-21, 106 S. Ct. at 1085 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom.*, *John v. Johnson*, 414 U.S. 1033, 94 S. Ct. 462 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson,* 503 U.S. at 7-8, 112 S. Ct. at 999 and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).  As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy*, however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. *Wilkins v. Gaddy,* __ U.S. __, 130 S. Ct. 1175, 1178 (2010) (per curiam).  Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are

> violated . . . . This is true whether or not significant injury is
> evident.  Otherwise, the Eighth Amendment would permit any
> physical punishment, no matter how diabolic or inhuman, inflicting
> less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S. Ct. at 1000 (citations omitted); *Velasquez v.*

*O'Keefe*, 899 F. Supp. 972, 973 (N.D.N.Y. 1995) (McAvoy, C.J.) (quoting

*Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000); *see Romaine v. Rewson,* 140 F.

Supp.2d 204, 211 (N.D.N.Y. 2001) (Kahn, J.).  Even a *de minimis* use of

physical force can constitute cruel and unusual punishment if it is "repugnant

to the conscience of mankind."  *Hudson*, 503 U.S. at 9-10, 112 S. Ct. 1000

(citations omitted).

With its focus on the harm done, the objective prong of the inquiry is

contextual and relies upon "contemporary standards of decency."  *Wright*,

554 F.3d at 268 (quoting  *Hudson*, 503 U.S. at 8, 112 S. Ct. at 1000) (internal

quotations omitted)).  When addressing this component of an excessive force

claim under the Eighth Amendment calculus, the court can consider the

extent of the injury suffered by the inmate plaintiff.  While the absence of

significant injury is certainly relevant, it is not dispositive. *Hudson*, 503 U.S. at

7, 112 S. Ct. at 999.  The extent of an inmate's injury is but one of the factors

to be considered in determining a prison official's use of force was

"unnecessary and wanton"; courts should also consider the need for force,

whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force.  *Whitley*, 475 U.S. at 321, 106 S. Ct. at 1085 (citing *Johnson*, 481 F.2d at 1033).  "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated . . . .  This is true whether or not significant injury is evident.'" *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9, 112 S Ct. at 1000).

That is not to say that "every malevolent touch by a prison guard gives rise to a federal cause of action."  *Griffen*, 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir. 1993)); *see also Johnson*, 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"). Where a prisoner's allegations and evidentiary proffers, if credited, could reasonably allow a rational factfinder to find that corrections officers used force maliciously and sadistically, however, summary judgment dismissing an excessive use of force claim is inappropriate.  *Wrigh*t, 554 F.3d at 269 (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence

of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the . . . incident with [that officer] indicated only a slight injury")) (other citations omitted).

Plaintiff's allegations in this case fail to rise to a level cognizable under the Eighth Amendment.  Addressing the "shake-down shack" incident, for example, plaintiff alleges that he was harassed and made to submit to a pat frisk in lieu of passing through a metal detector.  This allegation, even if true, reflects only an inconvenience of a modest nature, and is facially insufficient to support an Eighth Amendment violation, even if true.  *See Boddie v. Schneider*, 105 F.3d 857, 859-861 (2d Cir. 1997) ("The isolated episodes of harassment and touching alleged by Boddie are despicable and, if true, they may potentially be the basis of state tort actions. But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court."); *see also Morales v. Mackalm*, 278 F.3d 126 (2d. Cir.2002) ("Because Morales' allegations do not even rise to the level of those made by the plaintiff in *Boddie*, they do not state a claim for sexual harassment in violation of the Eighth Amendment to the United States Constitution."); *Williams v. Fitch*, No. 04-CV-6440L, 2008 WL 1947024, *2 (W.D.N.Y.2008) (An Eighth

23

Amendment claim under § 1983 will not lie, however, where an inmate

alleges only minor, isolated incidents which are neither singly nor

"cumulatively egregious in the harm they inflicted."); *Davis v. Castleberry*, 364

F. Supp. 2d 319, 321 (W.D.N.Y.2005) (allegation that corrections officer

grabbed inmate's penis during pat frisk is insufficient to state constitutional

claim); *Morrison v. Cortright*, 397 F. Supp. 2d 424, 425 (W.D.N.Y.2005)

(allegations that a corrections officer touched plaintiff's buttocks, and that

another "rubbed up against plaintiff['s] buttocks with [the officer's] private

part" during a strip search describe an isolated incident unaccompanied by

physical injury, and therefore are not sufficiently serious to establish a

constitutional claim); *Montero v. Crusie*, 153 F. Supp. 2d 368, 373, 375

(S.D.N.Y.2001) (allegation that corrections officer squeezed inmate's

genitalia during pat-frisks on several occasions does not show sufficiently

serious deprivation to establish Eighth Amendment violation, particularly

when inmate did not allege that he was physically injured by such conduct).

Similarly, plaintiff's claim that he was subjected to verbal harassment,

including banging on his cell door, at the hands of Corrections Officer Poirier,

if true reflects conduct that is objectionable and unprofessional, but fails to

support a finding of cruel and unusual punishment in violation of the Eighth

Amendment; neither *Bivens* nor its state action counterpart, 42 U.S.C. §

1983, is designed to represent a code of professional conduct for federal,

state and local prison officials.  *Alnutt v. Cleary*, 913 F. Supp. 160, 165-66

(W.D.N.Y. 1996) (citations omitted); *Williams v. United States*, No. 07 Civ.

3018, 2010 WL 963474, at * 16 (S.D.N.Y. Feb. 25, 2010), *report and*

*recommendation adopted*, 2010 WL 963465 (Mar. 16, 2010).   Federal courts

are neither equipped nor in the business of overseeing prison operations and

performing human resource functions within such settings; rather, the

function of the courts in a case such as this is to safeguard the right of prison

inmates to be free of cruel and unusual punishment running afoul to the

Eighth Amendment.  *Estelle*, 429 U.S. at 102, 97 S. Ct. at 291.  Allegations of

verbal abuse, however reprehensible it may be, do not ordinarily rise to the

level of such a constitutional violation, and are not cognizable in a civil rights

action such as this.  *See Moncrieffe v. Witbeck*, No. 97-CV-253, 2000 WL

949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that

corrections officer laughed at inmate not actionable under section 1983)

(citation omitted); *Carpio v. Walker*, No. Civ.A.95CV1502, 1997 WL 642543,

at *6 (N.D.N.Y. Oct. 15, 1997) (Pooler, J. & DiBianco, M.J. ) ("verbal

harassment alone, unaccompanied by any injury, no matter how

inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation").

The sole incident described in plaintiff's complaint that could arguably support an Eighth Amendment claim concerns Corrections Officer Poirier's alleged spraying of Richardson.  According to Corrections Officer Poirier, plaintiff's cell was sprayed with water from a silver fire extinguisher for the purpose of knocking down a hanging sheet allegedly interfering with his view of the plaintiff, and not with intent to cause harm to the plaintiff.  Poirier Decl. (Dkt. No. 20-8) ¶¶ 4 and 5.  A declaration of Phillip J. Hamel, the safety manager at FCI Ray Brook, confirms that the silver fire extinguisher used contains only water.  *See* Hamel Decl. (Dkt. No. 20-7) ¶¶ 6-12.  A physical inspection of the plaintiff by medical officials at FCI Ray Brook shortly following the incident failed to reflect any evidence of injury other than dry skin associated with a pre-existing condition.  Marini Decl. (Dkt. No. 20-6) ¶¶ 3-12.

In his submission in opposition to defendants' motion, plaintiff does not refute defendants' contention that the fire extinguisher contained only water, instead asserting that "[i]t matters not whether the content of the 'fire extinguisher'" was water, milk or acid.  The act within itself constitutes an

Assault/Battery and clearly violates Plaintiff's Right 'To Be Free' from undo [sic] cruel and unusual punishment."  Plaintiff's Opposition Memorandum (Dkt. No. 27) ¶ 20.

Without question Corrections Officer Poirier's actions, however well intentioned as an effort to insure that plaintiff was in his bunk, were contrary to the standards of conduct in effect at FCI Ray Brook, as evidenced by the punishment administered to defendant Poirier stemming from the incident. Nonetheless, accepting as true plaintiff's allegations that he was sprayed for up to ten seconds with what the record establishes was water from a fire extinguisher, no reasonable factfinder could conclude that plaintiff's Eighth Amendment to be free from cruel and unusual punishment was abridged based upon that action.

This is not a case in which the plaintiff alleges that a history of animosity on the part of Corrections Officer Poirier resulted in a malicious spraying of him with a fire extinguisher while asleep.  *Contrast Beckford v. Portuondo,* 151 F. Supp.2d 204, 216 (N.D.N.Y. 2001) (finding that an Eighth Amendment claim could be supported by a finding that defendants sprayed plaintiff with a fire extinguisher "in a malicious and sadistic manner because of their anger with him over his misbehavior.").  Instead, the record now

27

before the court reflects a situation more akin to the circumstances presented

in *Tapia v. Thornton,* No. 3:94-CV-197 RM, 1996 WL 204494 (N.D. Ind. Mar.

19, 1996), in which the court found that the act of squirting the plaintiff with

water from a fire extinguisher "while unprofessional, did not amount to a

constitutional violation."  *Id.* at \*5; *see also Lunsford v. Bennett,* 17 F.3d

1574, 1582 (7th Cir. 1994) (incident in which corrections officers poured a

bucket of water over the head of a prisoner who was already standing in

ankle-deep water while shackled to the bars of his cells characterized as "a

minor use of force that does not offend the conscience.").  I therefore

recommend dismissal of plaintiff's Eighth Amendment claim of cruel and

unusual punishment.

     E.    <u>Dismissal With Or Without Leave To Amend</u>

     Ordinarily a court should not dismiss a complaint filed by a *pro se*

litigant without granting leave to amend at least once if there is any indication

that a valid claim might be stated. *Branum v. Clark*, 927 F.2d 698, 704-05

(2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. P. 15(a) (leave to

amend "shall be freely given when justice so requires"); *see also Mathon v.*

*Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to

replead granted where court could not say that under no circumstances

would proposed claims provide a basis for relief). This holds true even in the event of a finding on a motion for summary judgment that record fails to support a claim set forth in plaintiff's initial complaint. *See Kilgore v. Kaufman*, 374 Fed. App'x (2d Cir. 2010) (vacating, in part, the district court's grant of summary judgment and suggesting that on remand the lower court consider whether plaintiff may amend complaint). The court must next determine whether plaintiff is entitled to the benefit of this general rule, given the procedural history of the case.

Within plaintiff's complaint, which plainly centers upon his claim that defendants subjected him to cruel and unusual punishment, there are indicators suggesting that he may possess other potentially viable causes of action. Plaintiff's complaint, for example, intimates that defendant Poirier's actions may have been taken in retaliation for his having voiced concerns over prisoner abuses at FCI Ray Brook. *See* Complaint (Dkt. No. 1) ¶ 4. As currently constituted, however, plaintiff's complaint contains insufficient information to support a plausible claim of retaliation since it does not provide any indication of a nexus between that conduct and the adverse action taken against him by Corrections Officer Poirier. *See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977); *Dillon v.*

*Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Dawes v. Walker*, 239 F.3d 489,

492 (2d Cir. 2001), *overruled on other grounds*, *Phelps v. Kapnolas*, 308 F.3d

180 (2d Cir. 2002).

        Similarly, though in only a conclusory fashion, plaintiff alleges that he

was subjected to discrimination on the basis of religion or ethnicity, and

additionally was subjected to punishment without due process of law.  *Id.* ¶

13.  While these claims are not now plausibly stated, nor do they appear to

be at the heart of his complaint, plaintiff nonetheless should be given an

opportunity to replead if desired in order to flesh out such potential causes of

action.  When doing so, however, plaintiff is reminded that he must plead

sufficient facts to establish the existence of plausible claims under these

other theories.  It is well-established that "complaints relying on the civil rights

statutes are insufficient unless they contain some specific allegations of fact

indicating a deprivation of rights, instead of a litany of general conclusions

that shock but have no meaning."  *Hunt v. Budd*, 895 F.Supp 35, 38

(N.D.N.Y. 1995) (McAvoy, S.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d

Cir. 1987) (other citations omitted).  Any amended complaint, if permitted by

the court after acting upon this report and recommendation, must therefore

clearly set forth facts demonstrating the existence of one or more plausible

claims and be calculated to replace the existing complaint and constitute a wholly integrated and complete pleading that does not rely on or incorporate by reference in any portion of the pleading currently on file with the court. *See Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir. 1999).

IV.   SUMMARY AND RECOMMENDATION

Plaintiff's complaint, which alleges that he was subjected to cruel and unusual punishment though the conduct of Corrections Officer Poirier on two separate occasions, and that Warden Schult failed to take appropriate action to prevent those occurrences, is legally deficient.  Addressing first plaintiff's claims against Warden Schult, I find that Richardson has failed to demonstrate a plausible basis for finding the requisite degree of personal involvement in the actions taken to support a finding of liability against her, even accepting as true each of the allegations set forth in his complaint. Turning to plaintiff's claims against Corrections Officer Poirier, and considering the full record now before the court, I find that no reasonable factfinder could conclude that the incidents alleged rise to a level sufficient to support a cognizable Eighth Amendment claim.  Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for dismissal and/or for

31

summary judgment (Dkt. No. 20) be GRANTED, and that plaintiff's claims against defendant Schult be DISMISSED for failure to state a claim upon which relief may be granted, and that summary judgment be entered DISMISSING plaintiff's claims against defendant Poirier as a matter of law, both with leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

ORDERED the clerk is also serve a copy of the Report and Recommendation upon the parties in accordance with this court's local

David E. Peebles
U.S. Magistrate Judge

Dated:      January 19, 2011
            Syracuse, NY



Not Reported in F.Supp.2d, 2007 WL 2454194 (N.D.N.Y.)

(Cite as: 2007 WL 2454194 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jeffrey A. WALKER, Plaintiff,

v.

David SNYDER, James Cochran, D.B. Drew, D. Scott Dodrill, Harrell Watts and Harley P. Lappin, Defendants.

No. 9:05-CV-1372 (GLS/GJD).

Aug. 23, 2007.

Jeffrey Walker, FCI Fairton, B-Left, Fairton, NJ, pro se.

Hon. Glen T. Suddaby, Office of United States Attorney, Barbara D. Cottrell, Assistant U.S. Attorney, of Counsel, Albany, NY, for the Defendants.

***MEMORANDUM-DECISION AND ORDER***

GARY L. SHARPE, U.S. District Judge.

**\*1** After Jeffrey Walker filed a § 1983 action alleging violations of his First Amendment rights,[FN1] *see Dkt. No.*

1; *see also* 42 U.S .C. § 1983, his complaint was referred to Chief Magistrate Judge Gustave J. DiBianco for report and recommendation. *See* 28 U.S.C. § 636(b)(1)(A), (B); N.D.N.Y. R. 72.3(c); Gen. Order No. 12, § D(1)(G). Subsequently, Judge DiBianco issued a report recommending that defendants' motion for summary judgment be granted in its entirety. *See Report-Recommendation ("R & R"), Dkt. No. 45.* [FN2]

> **FN1.** Walker asserts that his First Amendment rights were violated when he was denied access to the courts and retaliated against by defendants for filing several legal actions. *See Dkt. No. 1.*

> **FN2.** The Clerk is directed to append Judge DiBianco's Report-Recommendation to this decision, and familiarity is presumed. *See Dkt. No. 45.*

Broadly construing the complaint, Judge DiBianco concluded the following: (1) Walker failed to show actual injury as a result of deficient access to the courts, and (2) he has failed to establish any nexus between his legal actions and defendants' adverse conduct to prove retaliation.

Walker has now filed objections to Judge DiBianco's report. *See Dkt. No. 46.* Although timely, the objections do not specifically address Judge DiBianco's factual and legal conclusions. Instead, Walker has simply repeated the facts and arguments contained in his original petition and motion papers. His objections contain no new analysis or arguments, nor do they cite authority in support of what are otherwise mere conclusory claims. Specifically, Walker claims that there are disputed facts concerning the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454194 (N.D.N.Y.)

(Cite as: 2007 WL 2454194 (N.D.N.Y.))

manner in which he received mail from the Second Circuit while in prison.[FN3] This assertion ignores Judge DiBianco's careful factual analysis explaining why these allegations are either false or fail to amount to a constitutional violation. In sum, Walker has failed to show actual injury as a result of deficient access to the courts.

> FN3. In his objections, Walker claims that the disputed facts are as follows: (1) that an envelope sent by him to the Second Circuit, and the envelope sent back to him from the Circuit do not match; (2) that it is unclear whether mail sent back to him from the Circuit was due to an incorrect address or a problem with forwarding mail to Walker's new address; and (3) that the Second Circuit itself incorrectly forwarded Walker's mail to the wrong address, even though he had properly submitted a change of address form. *See Dkt. No. 46.* Walker maintains that these facts constitute actual injury, but the court disagrees for the reasons articulated by Judge DiBianco.

Given the inadequacy of Walker's objections, he has procedurally defaulted. *See Almonte v. N.Y. State Div. of Parole,* 9:04-CV-484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006). Accordingly, the court has reviewed Judge DiBianco's report and recommendation for clear error. *See Almonte,* 2006 WL 149049, at *6. Having discerned none, the court adopts the report and recommendation in its entirety, and Walker's complaint is dismissed in its entirety.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that; and it is further

**ORDERED** that Judge DiBianco's March 26, 2007 Report-Recommendation (**Dkt. No. 45**) is accepted and adopted in its entirety, defendants' motion for summary judgment is GRANTED (Dkt. No. 32), Walker's cross motion for summary judgment (Dkt. No. 40) is DENIED; and Walker's complaint is dismissed in its entirety; and it is further

**ORDERED** that the Clerk enter judgment in favor of the defendants and close the case; and it is further

**ORDERED** that the Clerk of the Court provide copies of this Order to the parties by mail.

**IT IS SO ORDERED.**

## REPORT-RECOMMENDATION

GUSTAVE J. DI BIANCO, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

**\*2** In this amended civil rights complaint, plaintiff alleges that defendants denied him access to courts, retaliated against him for exercising his First Amendment rights, and subjected him to cruel and unusual punishment in violation of the Eighth Amendment. (Dkt. No. 18). Plaintiff seeks substantial monetary relief.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454194 (N.D.N.Y.)

(Cite as: 2007 WL 2454194 (N.D.N.Y.))

Presently before the court is the defendants' motion to dismiss for failure to state a claim or in the alternative for summary judgment pursuant to FED. R. CIV. P. 12(b)(6) & 56. (Dkt. No. 32). Plaintiff has responded in opposition to defendants' motion and has made a separate motion for summary judgment. (Dkt.Nos.38, 40). Defendants have replied to plaintiff's opposition to their summary judgment motion, (Dkt. No. 39), and have responded to plaintiff's cross-motion for summary judgment. (Dkt. No. 42). For the following reasons, this court agrees with defendants and will recommend dismissal of the complaint in its entirety.

## DISCUSSION

### 1. *Motion to Dismiss or for Summary Judgment*

A court may not dismiss an action pursuant to Rule 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (citing *inter alia Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). The court must accept the material facts alleged in the complaint as true. *Id.* (citing *Cooper v. Pate,* 378 U.S. 546 (1964) (per curiam)). In determining whether a complaint states a cause of action, great liberality is afforded to *pro se* litigants. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (citation omitted).

When considering a motion to dismiss for failure to state a claim, the court may consider the complaint, together with any documents attached as exhibits or incorporated by reference. *See Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 138 (2d Cir.1998). The court may also consider public documents and those of which judicial notice may be taken. *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773-74 (2d Cir.1991). When matters outside the pleadings are presented, the court may either exclude those matters or treat the motion as one for summary judgment under FED.R.CIV.P. 56. FED. R. CIV. P. 12(b).

However, when a plaintiff chooses not to attach or incorporate by reference a document upon which he solely relies and that is integral to the complaint, the court may take the document into consideration without converting the motion. *Internat'l Audiotext Network v. American Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995). In order to be "integral" to the complaint, the complaint must rely heavily on the document's terms and effect." *Young v. Lee,* 432 F.3d 142, 146-47 (2d Cir.2005) (citations omitted). If the court is to consider this type of document, it must be clear that no dispute exists regarding the authenticity or accuracy of the document and that no material dispute exists regarding the relevance of the document. *Falkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006). One of the most important considerations is that when considering the sufficiency of a pro se complaint, the court must afford the plaintiff great liberality and apply less stringent standards than when a party is represented by counsel. *Branham v. Meachum,* 77 F.3d 626, 628-29 (2d Cir.1996).

**\*3** Although in this case, defendants made a motion to dismiss or in the alternative for summary judgment, the plaintiff has cross-moved for summary judgment, and both parties have attached exhibits to their respective motions. Since both parties have moved for summary judgment, this court will consider this as a motion for summary judgment regardless of whether the court could have considered a motion to dismiss based upon documents referenced in plaintiff's amended complaint as well as upon documents of public record.

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454194 (N.D.N.Y.)

(Cite as: 2007 WL 2454194 (N.D.N.Y.))

show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id. See also Burt Rigid Box v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 91 (2d Cir.2002) (citations omitted). However, only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment. *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted).

**2.** *Facts*

Plaintiff names seven defendants in his amended complaint. These defendants are David Snyder, a corrections counselor at Federal Correctional Institution (FCI), Ray Brook, where plaintiff was incarcerated at the time of the incidents in this amended complaint. Plaintiff also names James Cochran, Former Inmate Systems Manager; D.B. Drew, Former Warden at FCI Ray Brook; T.R. Craig, Warden of FCI Ray Brook; D. Scott Dodrill, Regional Director-Northeast Region; Harrell Watts, Administrator-Bureau of Prisons (BOP) Central Office; and Harley P. Lappin, Director of the BOP.[FN1]

FN1. The court notes that it does not appear that defendant Lappin has been served with process in this action. (Dkt. No. 44). The docket sheet indicates that on March 5, 2007, the Summons was returned "Unexecuted" as to Harley P. Lappin. (Dkt. No. 44). However, it is clear that defense counsel has moved for dismissal on behalf of all defendants including defendant Lappin. Defendants' Memorandum of Law at 20. (Dkt. No. 29). Thus, this court will consider the motions as to all defendants.

In his amended complaint, plaintiff alleges that he arrived at Ray Brook in August of 2003 and requested defendant Snyder's assistance in contacting the courts in which plaintiff had pending cases to notify them of his new address and to check the status of these cases. Amended Complaint AC ¶ 15. Plaintiff appears to be stating that he asked defendant Snyder to assist plaintiff in *telephoning* these courts because the next paragraph of the amended complaint states that defendant Snyder asked plaintiff if he had a letter stating that he needed to use the telephone to contact the courts. AC ¶ 16. Plaintiff states that defendant Snyder informed plaintiff that he was not going to assist him in "fight[ing] the government or the B.O.P." *Id.* Plaintiff claims that on September 8, 2003, after he received his property, he was able to send letters to the various courts informing them of his new location and inquiring into the status of his pending cases. AC ¶ 17.

**\*4** Plaintiff then claims that on September 29, 2003, the Second Circuit Court of Appeals sent plaintiff a copy of an order that had been issued in one of plaintiff's cases, but that defendant Cochran "and others" intercepted plaintiff's legal mail and forwarded it to plaintiff's "Unit Team in Genesee-B Housing Unit." AC ¶¶ 18-19. Plaintiff alleges that defendants Snyder and Cochran "along with others" denied plaintiff access to courts by intentionally returning the mail to the Second Circuit as "undeliverable." AC ¶ 20. Plaintiff claims that this action led to plaintiff missing a "deadline to [a]ppeal." *Id.*

The next section of the amended complaint alleges that defendants "retaliated" against plaintiff for the exercise of plaintiff's constitutional right to petition for redress of grievances. Plaintiff states that defendants retaliated against plaintiff for filing an action that was pending in the Third Circuit Court of Appeals, *Walker v. Zenk,* 03-3298. AC ¶ 22. Plaintiff claims that defendants retaliated against him by obstructing his access to the Administrative Remedy Process. AC ¶¶ 24-34. Plaintiff

Not Reported in F.Supp.2d, 2007 WL 2454194 (N.D.N.Y.)

(Cite as: 2007 WL 2454194 (N.D.N.Y.))

also alleges that defendant Snyder destroyed some of plaintiff's legal materials after removing property from plaintiff's cell on September 23, 2005. AC ¶ 39.

Finally, plaintiff alleges that when he was released from the Special Housing Unit (SHU), he was placed in a 12-man cell with one toilet and one sink, also in retaliation for plaintiff's legal activities. AC ¶ 42. Plaintiff claims that the conditions in this housing area were unconstitutional. AC ¶ 42. This court notes that plaintiff states that defendants Snyder and Cochran "started everything." AC ¶ 43. The other defendants are supervisory officials, and their only connections with plaintiff or his claims are the denials of his administrative remedy requests or the affirmances of those denials.

### 3. *Applicable Law*

Plaintiff brings this action pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971). While section 1983 [FN2] is the jurisdictional basis for actions claiming constitutional violations against persons acting "under color of state law," *Bivens* allows for constitutional claims against *federal* defendants, such as those named in this action. *Id.*

FN2. 42 U.S.C. § 1983.

Generally, case law under 42 U.S.C. § 1983 applies to Bivens cases. *Chin v. Bowen,* 833 F.2d 21, 24 (2d Cir.1987) (quoting *Ellis v. Blum,* 643 F.2d 68, 84 (2d Cir.1981)); see also *Butz v. Economou,* 438 U.S. 478, 504 (1978). Therefore, the cases cited by this court may often contain analysis under section 1983, but the analysis is equally applicable to this *Bivens* action.

### 4. *Official Capacity*

Plaintiff has sued defendants in their individual and official capacities. The United States, as a sovereign, is immune from suit unless it consents to be sued, and in that case, only to the extent of its consent. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (citation omitted). A party suing the United States bears the burden of establishing that his or her claims fall within the applicable waiver or consent to be sued. *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000).

**\*5** An action against federal officers in their "official capacities" is essentially a suit against the United States. *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994). There is no waiver of sovereign immunity for *Bivens* actions. *See id.* (dismissing a *Bivens* action against federal officials in their official capacities). Thus, to the extent that plaintiff in this case sues the defendants in their official capacities, the amended complaint may be dismissed in its entirety. The court will proceed to consider the claims as against defendants in their *individual capacities.*

### 5. *Respondeat Superior*

The court notes that *personal involvement* is a prerequisite to the assessment of damages in both section 1983 and *Bivens* actions, and that *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Lonegan v. Hasty,* 436 F.Supp.2d 419, 439 (E.D.N.Y.2006) (discussing *Bivens* ) (citation omitted).

The required personal involvement of a supervisory officer may be established by direct participation of the official; by his or her failure to remedy the violation after hearing of it through a report or appeal; an allegation that the supervisory official had a "policy" that allowed the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454194 (N.D.N.Y.)

(Cite as: 2007 WL 2454194 (N.D.N.Y.))

constitutional violation to occur; by the officer's gross negligence in supervising subordinates who committed the wrongful acts; or by exhibiting deliberate indifference in failing to act on information indicating that unconstitutional actions were occurring. *See Lonegan v. Hasty,* 436 F.Supp.2d at 439 (citing *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 254 (2d Cir.2001)).

In this case, plaintiff sues various supervisory officials. Plaintiff names D.B. Drew, the former warden of Ray Brook; T.R. Craig, the current warden of Ray Brook; D. Scott Dodrill, the Northeast Regional Director; Harrell Watts, the National Inmate Appeals Administrator; and Harley P. Lappin, the Director of the BOP. Clearly, defendant Lappin had absolutely no personal involvement in any of the allegations made by plaintiff. Defendant Lappin is in Washington, D.C. and plaintiff has not alleged that defendant Lappin even knows plaintiff's identity or had any contact with plaintiff or his administrative appeals. Plaintiff states in the amended complaint that he is suing defendant Lappin because he is the "respondeat [sic] superior." AC ¶ 9. As stated above, respondeat superior is an insufficient basis for a *Bivens* claim, and the complaint may be dismissed as to defendant Lappin.

The court does note that defendants Drew, Craig, Dodrill, and Watts did personally sign the denials of plaintiff's administrative remedies. Thus, this court will not recommend dismissal as against these defendants based on lack of personal responsibility but will consider the merits of plaintiff's claims.

**6. *Access to Courts***

**\*6** In *Bounds v. Smith,* 430 U.S. 817 (1977), the Supreme Court held that access to the courts is a fundamental right that requires prison authorities to "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries

or adequate assistance from persons trained in the law." The Supreme Court has also held that an inmate alleging a denial of access to courts must show *actual injury* as a result of the deficient access to courts. *Lewis v. Casey,* 518 U.S. 343 (1996). The *cause of the injury* must be inadequacy of the access. *Id.* at 351. Plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of prison officials. *Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N .Y.1998) (quoting *Lewis v. Casey,* 518 U.S. at 353).

Plaintiff's first claim is that after his arrival at Ray Brook, he asked defendant Snyder to help him inform the courts that plaintiff had a new address and to help him check the status of his pending cases. AC ¶ 15. Plaintiff apparently wished to telephone the courts, and defendant Snyder told plaintiff that he could only use the telephone for this purpose if he had a letter stating that he should call the court. AC ¶ 16. Plaintiff then states that defendant Snyder told plaintiff that he was not going to help him "fight" the government or the Bureau of Prisons.

Plaintiff's own amended complaint shows that he was not "actually injured" by defendant Snyder's alleged refusal to help plaintiff. In the next paragraph of the amended complaint, plaintiff states that after receiving his property, "plaintiff was able to send letters to the different courts," informing them of his new location and inquiring into the status of his cases. Plaintiff alleges no injury as the result of the denial of the telephone calls. Defendant Snyder's comments, whether they were made or not, had absolutely no effect on plaintiff's pending lawsuits.

Plaintiff alleges that on September 29, 2003, the Second Circuit Court of Appeals sent plaintiff a letter, containing an order on "plaintiff's pending appeal." AC ¶ 18. Plaintiff claims that defendant Cochran "intercepted plaintiff's legal mail" and forwarded it to the plaintiff's Unit Team in Genesee-B housing unit. AC ¶ 19. There is no indication in the amended complaint how plaintiff

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454194 (N.D.N.Y.)

(Cite as: 2007 WL 2454194 (N.D.N.Y.))

comes to the conclusion that defendant Cochran, the former Inmate Systems Manager intercepted plaintiff's mail or why he would have sent it to his housing unit. Then plaintiff states that defendants Snyder and Cochran "willfully" returned plaintiff's legal mail to the United States Court of Appeals, stating that the mail was "undeliverable." AC ¶ 20. Plaintiff claims that their actions led to plaintiff missing a deadline to appeal. *Id.*

This court has examined the documents that have been submitted in conjunction with this claim, and finds that there is *no injury* to plaintiff's legal action, *and that plaintiff has misstated the facts.* The court must first note that it has examined the envelope that plaintiff states was sent back to the Second Circuit. Plaintiff's Exs. Attachment B. Defendants contacted the Second Circuit and requested a copy of the document and the envelope that was returned to the Second Circuit. Reply Ex. 3. The Clerk of the Second Circuit sent back the envelope that was returned, together with the address to which it was sent, and the document itself. Defendants' Reply Ex. 4. The envelope sent by plaintiff and the envelope sent by the Second Circuit *do not match.* The court notes that the envelope sent by plaintiff states that the reason for the rejection was "Addressee unknown," while the envelope submitted by defendants *and* the Second Circuit docket sheet *both* state "Unable to Forward."

**\*7** The court also notes that based on the docket sheet and the exhibits submitted by defendants [FN3] it appears that the Second Circuit may have sent the document in error to plaintiff at his former facility, Allenwood, even though the docket sheet clearly shows that plaintiff sent a change of address that was received by the Second Circuit on September 12, 2003. *Id.* at p. 4. *See* Defendants' Reply Ex. 2 (full docket sheet). The order about which plaintiff complains may *never have reached Ray Brook* and may never have been seen or rejected by defendant Snyder. If the document did not go to Ray Brook, defendant Snyder could not have rejected it, and he could not have been responsible either for denying plaintiff access to courts or retaliating against plaintiff. Notwithstanding this fact, the

court also finds that even assuming the letter was sent back from Ray Brook, plaintiff has shown no actual injury to a pending action.

FN3. The exhibit sent to defense counsel by the Second Circuit Clerk's Office contains a copy of the envelope and a second sheet listing the plaintiff's address as "Allenwood." The address on the envelope is illegible. The court also notes that the document entitled "Motion Information Statement" contains plaintiff's address as FCI Allenwood apparently because the document is dated August 7, 2003, when plaintiff was incarcerated at Allenwood.

The Second Circuit case *United States v. Walker,* No. 01-1674 was plaintiff's attempt to appeal the denial of a 28 U.S.C. § 2255 motion to vacate his criminal conviction. Defendants' Reply Ex. 2. The appeal was *not* of plaintiff's criminal conviction. A review of the complete [FN4] Second Circuit docket sheet in this matter shows that plaintiff was actually appealing the denial of a certificate of appealability by the District Court. On November 5, 2002, the United States moved to dismiss the appeal. Defendants' Reply Ex. 2 at p. 6. The Second Circuit dismissed the appeal on *July 8, 2003* and sent notice to counsel and plaintiff at that time. *Id.* at p. 7. On August 7, 2003, plaintiff filed a "motion to recall mandate ('Reconsider'), and on September 12, 2003, plaintiff filed his change of address to Ray Brook. *Id.*

FN4. The Second Circuit docket sheet for *United States v. Walker,* No. 01-1674 has seven pages. Defendants' Reply Ex. 2. Plaintiff submitted only one page of the docket sheet with his papers.

The September 29, 2003 order that plaintiff complains was improperly returned to the Second Circuit

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454194 (N.D.N.Y.)

(Cite as: 2007 WL 2454194 (N.D.N.Y.))

was an order denying the "motion to recall mandate." On September 30, 2003, the notice of the issuance of the mandate was mailed to the parties by the Clerk, and on October 9, 2003, the copy of the September 29 order was returned as "undeliverable." *Id.* at p. 8. Even assuming that the Second Circuit's letter was somehow misdirected, plaintiff's statement that he missed a deadline for appeal is not correct. Plaintiff missed *nothing* since the appeal was dismissed in *July of 2003,* and the *September 29 order was a denial of plaintiff's request for reconsideration.*

Although plaintiff states that he received information on February 20, 2004 from the Second Circuit "lead[ing] plaintiff to believe" that he was denied access to the courts, a review of the docket sheet indicates that nothing was sent from the Second Circuit to plaintiff in February of 2004. The docket sheet shows that on October 28, 2003, the mandate was returned from the district court, and the next entry is for April 7, 2004, stating that the record on appeal was returned to the district court by the Second Circuit. *Id.* It appears from the docket sheet that nothing was sent to plaintiff between October 1, 2003 and May of 2004, when plaintiff requested information from the Second Circuit. The docket sheet shows that, by letter dated May 11, 2004, plaintiff requested a copy of the envelope that the court used to mail the September 29, 2003 order. *Id.*

**\*8** The court also notes that a review of the log of plaintiff's legal and certified mail receipts for September and October of 2003 show that plaintiff received approximately forty (40) pieces of legal mail during this time period. Defendants' Ex. 1(l) at pp. 1-5. This legal mail was sent to plaintiff from various courts, including the Third Circuit Court of Appeals, the Southern, Eastern, and Northern Districts of New York, and a Judge's chambers in Virginia. *Id.* The court also notes that a review of plaintiff's receipts for legal mail shows that on February 20, 2004, he received legal mail from the New York State Supreme Court Chambers and on February 23, 2004, he received legal mail from the United States Court of Appeals in Boston, Massachusetts. Defendants' Ex. 1(l)

at p. 12. Neither of these courts would have had any connection to plaintiff's Second Circuit case. Thus, it is clear that plaintiff suffered no actual injury as the result of plaintiff's legal mail being returned to the Second Circuit.

Plaintiff also alleges later in the amended complaint that on September 23, 2005, defendant Snyder went into plaintiff's cell, packed his belongings, and took them into defendant Snyder's office, where he allegedly sat "reading and destroying a lot of plaintiff's legal files." AC ¶ 39. To the extent that plaintiff is alleging a denial of access to courts in this claim, he has not specified one file or one case that was actually affected by defendant Snyder's alleged actions. Thus, plaintiff's access to courts claim may be dismissed as against *all defendants* (including the supervisory officials) for *failure to establish actual injury to any of his pending lawsuits.*

### 7. *Retaliation*

Any action taken by defendants in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)).

In this case, plaintiff alleges that defendants retaliated

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454194 (N.D.N.Y.)

(Cite as: 2007 WL 2454194 (N.D.N.Y.))

against him because plaintiff had a lawsuit pending in the Third Circuit Court of Appeals. *Walker v. Zink,* No. 03-3298. AC ¶ 22. Plaintiff then relates a history of problems that he has had filing administrative remedy requests, allegedly due to defendant Snyder's actions. Plaintiff apparently claims that Snyder was retaliating against him because of plaintiff's Third Circuit case. Plaintiff may also be attempting to claim that the initial misdirection of mail back to the Second Circuit was also in retaliation for plaintiff's Third Circuit case as was the alleged destruction of plaintiff's legal files.[FN5] Plaintiff also claims that defendants retaliated against plaintiff by placing him in a 12-man cell upon his release from the SHU. AC ¶ 41.

> FN5. The court notes that the misdirection of mail and the destruction of legal files form the basis for two types of claims. One claim is the denial of access to courts, but the other claim is a separate claim for retaliation for the exercise of a constitutional right. As stated above, any adverse action taken in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself may form the basis of a civil rights claim. *Franco, supra.* This court has considered defendants' alleged actions in conjunction with *both* types of claims. Also as stated above, if the legal mail was not sent to Ray Brook, it could not have been sent back by defendant Snyder and thus could not form the basis for either a denial of access to courts or a retaliation claim.

**\*9** Although plaintiff alleges that defendants were retaliating against him because of a particular Third Circuit case, it is unclear upon what plaintiff bases this conclusion. A review of plaintiff's legal mail receipt log shows that during the period after he was transferred to Ray Brook, plaintiff received a great deal of legal mail. Defendants' Exs. 1(l)-1(m). On September 5, 2003, plaintiff received a letter from the Third Circuit. Defendants' Ex. 1(l) at 2. This letter was not even given to

plaintiff by defendant Snyder. There is a different signature in the space for the delivering staff member's signature. Plaintiff received another letter from the Third Circuit on October 1, 2003. *Id.* at p. 3.

It is unclear why defendant Snyder would have chosen to base his alleged retaliation on the action pending in the Third Circuit. Ray Brook is in Northern New York, and the Third Circuit letters came from Philadelphia. Plaintiff's allegation as to the basis for the retaliation and the nexus between the legal action and defendants' allegedly adverse actions against plaintiff are *completely conclusory.* However, the court will proceed to examine plaintiff's allegations further to determine whether a question of fact on the issue of retaliation exists.

A review of the administrative remedy procedure is necessary for an analysis of the plaintiff's claim. The administrative grievance procedures for federal prisoners are contained in 28 C.F.R. §§ 542.10-.19. The regulations provide that prior to filing a formal grievance, an inmate must attempt to resolve his complaint informally with staff. 28 C.F.R. § 542.13(a). In order to do this, an inmate must complete a form known as a BP-8. *See Tyree v. Zenk,* 05-CV-2998, 2007 U.S. Dist. LEXIS 10148, *10-11 (E.D.N.Y. Feb. 14, 2007). The regulations do not refer to this particular form, but it is clear both from the amended complaint and from *Tyree* that this form is referred to as a BP-8.

If the informal resolution is not successful, an inmate may then file a formal request for administrative relief on a form BP-9. 28 U .S.C. § 542.14(a). The inmate must file a BP-9 within twenty calendar days of the date upon which the request is based. *Id.* An inmate "ordinarily" obtains the BP-9 form from his Corrections Counselor. *Id.* § 542.14(c)(1). The regulations provide that when filing a BP-9, the inmate must include only a "single" complaint or a "reasonable number of closely related complaints" on the form. *Id.* 542.14(c)(2). An inmate must contain his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454194 (N.D.N.Y.)

(Cite as: 2007 WL 2454194 (N.D.N.Y.))

complaint to the form plus "one letter-size ... continuation page." *Id.* § 542.14(c)(3).

The twenty-day limit may be extended for good cause, where the inmate demonstrates a valid reason for the delay. *Id.* 542.14(b). The inmate then generally gives the completed BP-9 to his corrections counselor who submits it to the Warden for review. *Id* . § 542.14(c)(4). If the inmate is not satisfied with the Warden's response to the complaint, he may file an appeal on Form BP-10 to the "appropriate Regional Director" within twenty calendar days of the date that the Warden signed the response. *Id* . § 542.15(a). If the inmate is not satisfied with the Regional Director's response, he may file an appeal on Form BP-11 to the General Counsel within thirty calendar days of the Regional Director's signed response. *Id.* Appeal to the General Counsel is the final administrative appeal available to the inmate. *Id.*

**\*10** Appeals to the Regional Director and to the General Counsel must also be properly completed, and may contain only the form and one letter-size continuation page. *Id.* §§ 542.15(b)(1)-(b)(3). At any level of the administrative process, the inmate's submission may be rejected for failure to comply with the regulations or if it is written in a manner that is obscene or abusive. *Id.* § 542.17(a). However, when a submission is rejected, the inmate is provided written notice, explaining the reason for the rejection and if the defect is correctable, the notice will inform the inmate of a reasonable extension of time within which he may resubmit a corrected form. *Id.* § 542.17(b). When an inmate is not afforded the opportunity to resubmit a rejected appeal, he is entitled to appeal the rejection to the next appeal level, and the rejection may be affirmed or the coordinator of the next appeal level may accept the submission for filing. *Id.* § 542.17(c).

When a request or appeal is accepted for processing, the regulations also provide for a response time by the officials. *Id* . § 542.18. Once a request or appeal is filed,

the response shall be made in twenty calendar days by the Warden, in thirty calendar days by the Regional Director, and within forty days by the General Counsel.<sup>FN6</sup> *Id.* Finally, if the time period set forth in the regulations is insufficient for the prison officials to properly respond, the time for response may be extended twenty days at the institutional (facility) level, thirty days at the regional level, and twenty days at the Central Office (General Counsel) level. *Id* . The inmate must be informed in writing of the extension, and staff must respond in writing to requests or appeals. *Id.* Finally, if the inmate does not receive a response within the required time (including any extensions of time), the regulations provide that the absence of a response may be considered a denial at that administrative level. *Id.*

> FN6. There are exceptions to this time period for emergency applications, not relevant to this case. 28 U.S.C. § 542.18.

Plaintiff in this case, appears to allege that defendants retaliated against him by impeding or delaying his ability to pursue the administrative process. First, plaintiff alleges that on February 21, 2004,<sup>FN7</sup> defendant Snyder refused to immediately give plaintiff a BP-8 form for informal resolution of his legal mail issue, instead, he took plaintiff's request and did not give plaintiff the BP-8 for over one week. AC ¶¶ 24, 28. Plaintiff claims that he obtained a BP-8 form from another staff member, and submitted his BP-8 on February 24, 2004. AC ¶¶ 25-26. Plaintiff then claims that on March 11, 2004, he requested a response to his BP-8 from defendant Snyder who allegedly told plaintiff that Snyder was not going to respond to the BP-8 that he received from the other staff member because plaintiff did not complete the BP-8 that Snyder gave to plaintiff. AC ¶ 27.

> FN7. This is the day after plaintiff allegedly determined that the letter from the Second Circuit had been returned in late September or

Not Reported in F.Supp.2d, 2007 WL 2454194 (N.D.N.Y.)

(Cite as: 2007 WL 2454194 (N.D.N.Y.))

early October of 2003.

Plaintiff states that defendant Snyder then told plaintiff that he did "not give a shit," and was "not tracking it or responding to it." AC ¶ 28. Plaintiff claims that it was thus that the "informal resolution" of his legal mail claim failed, and the BP-8 was not signed or dated in violation of "42 U.S.C. § 1997(e), 28 C.F.R. § 542.13(a), and P.S. 3420.8(9)(b)(6)." AC ¶ 29. Plaintiff seems to claim that these actions, including the use of profane language "obstructed justice," impeded access to courts, and rose to the level of retaliation for petitioning the government. *Id.*

**\*11** Verbal abuse or profane language, as inexcusable as it may be, does not rise to the level of a constitutional violation, regardless of whether it might violate a regulation or facility rule. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996). Thus, whether defendant Snyder made these statements or not, and the court is *not* making any finding that these statements were made, there was no constitutional violation as a result.

In addition, this alleged conduct by defendant Snyder did not impede plaintiff's access to courts since plaintiff claims no injury to any pending lawsuit as a result of these statements. Finally, although plaintiff implies that defendant Snyder delayed plaintiff's administrative remedy procedure, it is clear that plaintiff subsequently obtained the BP-9 form (the formal application for relief) and submitted the form. Plaintiff does claim that the BP-9 was rejected several times, but it was ultimately accepted and denied by defendant Warden Drew. AC ¶ 31.

It appears that plaintiff's BP-9 was given a number (328156) and rejected twice for non-compliance with the regulations. Defendants' Ex. 1(b) at 15-16. A review of the

final BP-9 that was accepted for filing, together with the Warden's response has been filed as Defendants' Ex. 1(c). The court notes that the number of the request that was filed is 328156-F3. The "F3" appears to indicate that it is the "Facility" request, and it is the third request. A review of the administrative remedy request shows that plaintiff complained about the legal mail and about defendant Snyder's alleged misconduct. *Id.*

The warden's response was a denial, but the denial is consistent with what this court has observed regarding the plaintiff's legal mail from the Second Circuit. Defendant Warden Drew states that, according to the envelope, the mail was returned to the Second Circuit by the "USPS" (the United States Post Office), indicating that the postal branch returned the mail to the Second Circuit. *Id.* at p. 3. The response also indicates that Program Statements 5800.10 and 5265.11 state that the Warden shall notify an inmate of the rejection of a letter addressed to that inmate, together with the reasons for the rejection. *Id.* An investigation was done of Ray Brook's mail room, and it was determined that the mail room had "no record of receiving and/or rejecting any legal correspondence addressed to you at that time." *Id.* This statement is consistent with this court's finding that the letter appears not to have reached Ray Brook since it appears that the letter went to Allenwood and was returned because the old facility was unable to forward mail to plaintiff's new facility.

Plaintiff's first appeal of defendant Drew's response was rejected for failure to comply with the regulation limiting continuation pages to one page. Defendants' Ex. 1(b) at p. 18. Plaintiff was given the opportunity to resubmit, and the second appeal attempt was accepted. The appeal and defendant Regional Director Dodrill's response have been filed as Defendants' Ex. 1(d). Defendant Dodrill's response restates the finding regarding the legal mail and also mentions plaintiff's complaint that he was not permitted to telephone the courts. *Id* at p. 3. Defendant Dodrill refers to Program Statement 5264.07 regarding telephone regulations for inmates. The Program

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454194 (N.D.N.Y.)

(Cite as: 2007 WL 2454194 (N.D.N.Y.))

Statement states that the inmate must provide documentation to staff in order to support the necessity of a legal call prior to staff approval. *Id.* Since there was no indication that plaintiff had the documentation, the calls were denied. *Id.*

**\*12** Finally, defendant Dodrill denied the plaintiff's claim of misconduct by defendant Snyder in relation to the denial of a BP-8. Defendant Dodrill states that plaintiff was referred to another counselor because plaintiff's counselor was not present on the day that plaintiff requested the form. *Id.* Plaintiff appealed this denial to the General Counsel level, and his appeal was rejected once for failure to properly follow the regulations. Defendants' Ex. 1(b) at p. 21. Plaintiff was given the opportunity to resubmit the appeal and it was later accepted. *Id.* at 23. A copy of plaintiff's appeal and defendant Watts's denial have been submitted by defendants as Ex. 1(e). Defendant Watts affirmed the denial, citing the same findings as the Warden's and Regional Director's decisions below. *Id.* at p. 3.

Thus, although plaintiff seems to cite technical violations of the regulations in relation to this request and its appeals, there is no indication that plaintiff was prevented in any way from filing his grievance. The grievance may have been initially rejected for failure to comply with procedures, but plaintiff was always given the opportunity to resubmit. There is absolutely no basis for plaintiff's claim of "obstruction of justice" or of retaliation for his pending Third Circuit action. Defendants have also submitted copies of the Program Statements to which they refer, one relating to Telephone Regulations and the other regarding Inmate Correspondence. Defendants Exs. 1(j) & 1(k). The Program Statements support the actions taken by defendants.[FN8]

[FN8.] The court assumes that telephone calls to courts are considered as calls to attorneys since there is no reference in the Program Statement to

telephone calls to courts. The Program Statement provides that frequent confidential inmate-attorney calls should be allowed only when an inmate demonstrates that communication with his or her attorney by other means is not adequate. PS 5264.07(12).

Defendants have submitted records of plaintiff's grievance regarding defendant Snyder's alleged destruction of plaintiff's legal materials as well as his plaintiff's placement in the 12-man cell. Defendants' Ex. 1(f). This time, the first grievance was accepted, investigated, and partially granted. *Id.* at 3. Plaintiff had requested placement in a bottom bunk, and by the time that the administrative remedy request was answered, plaintiff was already in that status. *Id.*

Plaintiff appealed this determination, and defendant Regional Director Dodrill stated that plaintiff's claim that his legal property was destroyed had been referred for investigation. Defendant Dodrill also stated that plaintiff was not allowed to possess the legal materials of other inmates in his cell, even if plaintiff had been authorized to assist them. Plaintiff was told that he could submit an administrative claim for loss of property under the Federal Tort Claims Act. Finally, plaintiff was told that he was placed in the twelve-man cell upon release from SHU in accordance with Ray Brook's procedures, and he would remain there, pending the availability of a two-man cell. *Id.* at p. 3. Defendant Dodrill stated that the housing unit cells met the requirements of the American Correctional Association, and that plaintiff had shown no indication of improper or unsanitary living conditions. *Id.*

**\*13** Plaintiff appealed the determination of defendant Dodrill, and by the time that plaintiff's National appeal was decided, he had been moved to another facility, and his request regarding the cell-placement was moot. Defendants' Ex. 1(h). Plaintiff had also complained about the untimeliness of the Warden's response to one of his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454194 (N.D.N.Y.)

(Cite as: 2007 WL 2454194 (N.D.N.Y.))

grievances. *Id*. at p. 2. In the response to the appeal, it was explained to plaintiff that since one of his grievances had been rejected, it was not uncommon for the new grievance to be given a different number. Defendant Watts stated that the 394924-F1 grievance was not answered because it was not properly filed.

There is no indication that plaintiff's grievances were improperly delayed or denied.[FN9] Thus, plaintiff's claims of retaliation are lacking in basis. There is no indication of how the Regional Director or the National Appeals Administrator would be aware of plaintiff's Third Circuit lawsuit or any other lawsuit brought by plaintiff. Their affirmances of plaintiff's administrative remedy denials are justified by the regulations.

> FN9. The court also notes that although plaintiff spends a great deal of time in his response to defendants' motion arguing that defendants were incorrect in arguing that plaintiff did not exhaust his administrative remedies (Dkt. No. 39 at 2-9), defendants did not base their motion on failure to exhaust, and defense counsel makes that clear in her reply. (Dkt. No. 39).

With respect to plaintiff's claim that he was placed in a 12-man cell in retaliation for his legal actions, again, plaintiff fails to provide a basis for finding that the substantial motivation for the placement was plaintiff's legal action or actions. Thus, plaintiff's retaliation claims may be dismissed as to all defendants.

**8. Conditions of Confinement**

As a separate claim, plaintiff seems to allege that the conditions in the 12-man cell violated the Eighth Amendment. The Eighth Amendment does not mandate comfortable prisons, but does guarantee that the conditions in prison will be at least humane. *Gaston v.*

*Coughlin,* 249 F.3d 156, 164 (2d Cir.2001). In order to establish an Eighth Amendment violation, plaintiff must show that the deprivation was objectively, sufficiently serious to deprive plaintiff of the minimal civilized measure of life's necessities, and a sufficiently culpable state of mind on the part of defendant. *Id*. That state of mind is satisfied if defendant has shown deliberate indifference to plaintiffs health or safety. *Id*. (citations omitted).

In this case, plaintiff's main complaint appears to be his belief that the 12-man cell did not contain sufficient space per inmate as required by the American Correctional Association. The court must note that regulatory standards do not set the constitutional minimum for prisons. *See Bell v. Wolfish,* 441 U.S. 520, 543 n. 27 (1979). In this case, plaintiff also seems to claim, without basis, that his assignment to a top bunk, notwithstanding the fact that he had a bottom bunk pass, denied him "essential needs such as sanitation". AC ¶ 42. Plaintiff also alleges that he was subjected to poor ventilation, and bad lighting. Plaintiff does not state how long he was placed in these conditions and for what portion of the day he was forced to stay in the housing area. Plaintiff alleges that these conditions caused him sleeping disorders and diabetes. However, there is absolutely no indication that plaintiff's allegations rise to the level of cruel and unusual punishment. Thus, plaintiff's claim may be dismissed as to all defendants.

**\*14 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 32) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY,** and it is further

**RECOMMENDED,** that plaintiff's cross-motion for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454194 (N.D.N.Y.)

(Cite as: 2007 WL 2454194 (N.D.N.Y.))

summary judgment (Dkt. No. 40) be **DENIED.**

    Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule
72.1(c), the parties have ten days within which to file
written objections to the foregoing report. Such objections
shall be filed with the Clerk of the Court. **FAILURE TO
OBJECT TO THIS REPORT WITHIN TEN DAYS
WILL PRECLUDE APPELLATE REVIEW.** *Roldan
v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v.
Secretary of Health and Human Services,* 892 F.2d 15 (2d
Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e),
72.

N.D.N.Y.,2007.

Walker v. Snyder

Not Reported in F.Supp.2d, 2007 WL 2454194
(N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jesse L. STEWART, Jr., Plaintiff,

v.

Gary HOWARD, D. Monell, N. Marsh, D. Spangenburg, D. Swarts, E. Hollenbeck, J. Edwards, D. Russell, Defendants.

No. 9:09-CV-0069 (GLS/GHL).

April 26, 2010.

Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for Defendants.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Jesse L. Stewart alleges that Defendants, all employees of the Tioga County Jail, violated his constitutional rights by limiting his ability to send legal mail, depriving him of his mattress and bedding during daytime hours, subjecting him to excessive force, denying him medical care after the alleged use of excessive force, and conducting biased disciplinary hearings. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL SUMMARY

This action involves Plaintiff's experiences at Tioga County Jail, where he was incarcerated from August 19, 2008, to January 13, 2009. (Dkt. No. 30-4 at 14:2-11.) The complaint consists almost entirely of copies of grievances and letters that Plaintiff submitted to other individuals and organizations. The "facts" section of the civil complaint form merely directs the reader to "see attached." As such, the precise contours of Plaintiff's claims are difficult to discern. The documents attached to the complaint show that:

On September 22, 2008, Plaintiff requested a grievance form so that he could complain about the facility's legal mail procedures. (Dkt. No. 1 at 41.) A grievance form was issued. *Id.*

On October 27, 2008, Plaintiff requested a grievance form so that he could complain about being denied access to the courts. (Dkt. No. 1 at 44.) Sgt. William "spoke with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

[Plaintiff] but he refuses to sign off. He states he needs these letters to go out to these courts because he's fighting extradition." *Id.*

On October 30, 2008, Defendant Officer Earl Hollenbeck issued an Inmate Rule Infraction Notice to Plaintiff accusing him of sending mail using another inmate's account. (Dkt. No. 1 at 31.)

In a "notice of intention" dated November 30 2008, Plaintiff alleged that, pending disciplinary action against him, staff at the Tioga County Jail deprived him of his mattress, sheets, and blanket when temperatures were as low as fifteen degrees at night and forced him to sit directly on his steel bed for periods up to seventeen hours. (Dkt. No. 1 at 8.) In support of Defendants' summary judgment motion, Defendant Lt. David Monell declares that when inmates are accused of violating a disciplinary rule, they are placed in administrative segregation pending a hearing. During that time, the inmate's bedding is removed during the day. If this was not done, "inmates may intentionally violate rules in order to be assigned to administrative segregation so they could sleep in the cell all day instead of having to adhere to the normal inmate routine." (Dkt. No. 30-11 at 6 ¶ 12.) The parties agree that inmates' mattresses and bedding are returned at night. (Dkt. No. 1 at 10; Dkt. No. 30-11 at 6 ¶¶ 13-15.)

**\*2** In his "notice of intention," Plaintiff alleged that on November 3, 2008, he asked for a grievance form. (Dkt. No. 1 at 8.) Defendant Officer Douglas Swarts told him "if you don't shut the fuck up I'll have a few people shut you up." *Id.* Two or three minutes later, several other officers, including Defendant Sergeant Dennis Spangenburg, arrived and stood in front of Plaintiff's locked cell. *Id.* Plaintiff asked Defendant Spangenburg why he was denying Plaintiff the right to file a grievance. *Id.* at 8-9. Defendant Spangenburg replied "I can deny you anything I want." *Id.* at 9. Defendant Officers Jonathan Edwards and David Russell then entered Plaintiff's cell

and handcuffed Plaintiff so tightly that the handcuffs "stopp[ed] the flow of blood to [Plaintiff's] hands." *Id.* Defendants Edwards and Russell then escorted Plaintiff to the intake area of the facility. Along the way, they used Plaintiff's "head and body as a ram to open the electronically control[l]ed doors," which cut Plaintiff's lip and caused his nose to bleed. *Id.* Attached to Plaintiff's complaint are affidavits from inmates who state that they witnessed this incident. *Id.* at 14-15.

Plaintiff alleged in his "notice of intention" that upon arrival at the intake area, he was placed in a strip isolation cell. (Dkt. No. 1 at 9.) Several officers "entered in behind me, at what time I was hit with closed fist[s] and what felt like kicks from all directions to my head, back, ribs, and groin area several times." *Id.* Plaintiff was punched in the right eye. *Id.* After that, Plaintiff's handcuffs were removed and Defendant Sergeant Nathaniel Marsh entered the cell, grasped Plaintiff around the neck with one hand, held his mace an arm's length away from Plaintiff's face, and repeated "get the fuck up you little asshole" over and over. *Id.*

Defendants Marsh, Spangenburg, Swarts, Edwards, and Russell have submitted notarized affidavits in support of Defendants' motion for summary judgment stating that they did not assault Plaintiff. (Dkt. No. 30-11 at 10, 12, 18, 22, 24.)

At 10:50 a.m., Defendant Swarts issued two Inmate Rule Infraction Notices. The first stated that Plaintiff "refused to lock in his cell after numerous orders to do so. Duress alarm was activated." (Dkt. No. 1 at 32.) The second stated that Plaintiff "disrupted the pod by yelling threats to jail personnel." *Id.* at 33.

In his "notice of intention," Plaintiff alleged that he needed medical attention but was locked in the cell alone

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

without such attention for approximately fourteen hours. (Dkt. No. 1 at 9.) At 11:30 p.m., Plaintiff was escorted back to his usual cell. *Id.* All of his personal property had been removed and he was given only a mattress and a blanket. *Id.* The next morning, officers removed the mattress. *Id.* Plaintiff was told that he could only shower if he remained handcuffed and shackled. *Id.* He was given only two sheets of toilet paper. *Id.* at 9-10. This pattern of being given a mattress at night and having it removed in the morning continued for ten days. *Id.* at 10.

**\*3** On November 6, 2008, Plaintiff submitted an Inmate Request Form asking to "be released from ... restraint and receive my property back today." (Dkt. No. 1 at 45.) His request was denied. *Id.*

In his "notice of intention," Plaintiff alleged that when his property was finally returned to him, he "became submissive" and "did not file any more grievances as I was told not to or the next time it may be worse." *Id.* at 10.

In his "notice of intention," Plaintiff alleged that Defendant Marsh conducted a biased disciplinary hearing and found him guilty "on all of the infractions." (Dkt. No. 1 at 10.) Another attachment to the complaint shows that on November 12, 2008, Defendant Marsh found Plaintiff guilty and sentenced him to twenty-eight days of keeplock with no programs, no commissary, twenty minute hygiene, and legal phone calls only. *Id.* at 34.

In his "notice of intention," Plaintiff alleged that there is no "inhouse mail, or legal outgoing mail system" at Tioga County Jail and that Defendants refused to mail any item that would cost more than eighty-four cents. (Dkt. No. 1 at 10.)

On December 1, 2008, Officer Sean Shollenberger issued an Inmate Rule Infraction Notice stating that Plaintiff used stamps from another inmate to send personal mail. (Dkt. No. 1 at 35.) A hearing was scheduled for December 17, 2008. Plaintiff filed a written request stating that he had been informed of the hearing and requesting "that any decision to be determined may be done so without my participation or presence ... I do not wish to participate in such hearing." (Dkt. No. 1 at 36.) Plaintiff's request was approved. *Id.* At the hearing, Defendant Marsh found Plaintiff guilty and sentenced him to fourteen days of keeplock, no programs, no commissary, twenty minute hygiene, and legal calls only. *Id.* at 37. Defendant Marsh noted that "this is not the first infraction hearing due to [Plaintiff's] abusing the U.S. Postal Service." *Id.* On December 18, 2008, Plaintiff appealed the decision. *Id.* at 38. Plaintiff stated that he had refused to attend the hearing because of Defendant Marsh's previous use of force against him and because the hearing was not recorded. *Id.* at 39. The Chief Administrative Officer denied the appeal on December 23, 2008, because the "sanctions imposed are appropriate." *Id.* at 38.

On December 17, 2008, Plaintiff requested two grievance forms so that he could complain about the lack of bedding and facility disciplinary and hearing procedures. Grievance forms were issued. (Dkt. No. 1 at 46-47.)

On December 18, 2008, Plaintiff submitted a grievance complaining about the lack of bedding, visits, food, medical care, access to courts, and water. (Dkt. No. 1 at 20.) The grievance coordinator denied the grievance because "[d]iscipline is not grievable. There is an appeal process which the inmate can follow." *Id.* at 22. Plaintiff appealed to the Chief Administrative Officer. *Id.*

**\*4** On December 18, 2008, Plaintiff submitted a grievance complaining about Defendant Marsh's conduct during the disciplinary hearing <sup>FN1</sup> and requesting that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

disciplinary hearings be recorded or monitored by another hearing officer. (Dkt. No. 1 at 23-24.) The Grievance Coordinator denied the grievance because "NYS Minimum Standards requires that records be kept of infraction hearings. Records are kept of the infraction hearing. The TCJ does not have more than one officer available to do infraction hearings." *Id.* at 25. Plaintiff appealed to the Chief Administrative Officer. *Id* . On December 22, 2008, Defendant Marsh completed a Grievance Investigation Form stating that he interviewed Plaintiff. Defendant Marsh found that "this facility keeps all hearing records as well as provide a copy of the hearing record to the inmate. This facility has more than one hearing officer available." *Id.* at 26.

> FN1. Although it is not clear, Plaintiff was presumably referring to the November 12, 2008, hearing, which he attended, rather than the December 17, 2008, hearing that he refused to attend.

On December 18, 2008, Plaintiff submitted an Inmate Request Form asking to speak with the Undersheriff or Captain. (Dkt. No. 1 at 48 .)

On December 22, 2008, Plaintiff wrote a letter to the Chairman of the New York Commission of Corrections; the Hon. Thomas J. McAvoy, Senior United States District Judge, and the New York State Attorney General regarding conditions at Tioga County Jail. (Dkt. No. 1 at 16-17.) Specifically, Plaintiff complained about the bedding issue, the grievance and appeal system, and the legal mail system. *Id.*

On December 28, 2008, Plaintiff submitted a grievance complaining about the facility's legal mail procedure. (Dkt. No. 1 at 27.) The Grievance Coordinator denied the grievance because "[t]his facility is not denying

you access to the courts. Minimum standards ha[ve] been and will be controlled by the State of NY, therefore this issue is not grievable. NYSCOC was contacted regarding your reference to a 'new' state directive regarding legal mail. No such directive exists." *Id.* at 28. Plaintiff checked the box indicating that he wanted to appeal to the Chief Administrative Officer and wrote a note that he "was told that Lt. D. Monell is the Chief Officer and that I could not appeal this decision any higher." *Id.*

In his "notice of intention," Plaintiff alleged that on December 31, 2008, he was summoned to the front of the jail for an interview with Defendant Lt. D. Monell. (Dkt. No. 1 at 11.) Defendant Monell questioned Plaintiff about his December 22, 2008, letter to the Commission of Corrections. *Id.* Defendant Monell said that he did not give a damn about federal standards regarding bedding. *Id.* Defendant Monell told Plaintiff he should save his weekly postage allowance until he had enough to send a large document and did not respond when Plaintiff informed him that he was not allowed to do. *Id.* Regarding Plaintiff's complaint that he had received only two sheets of toilet paper, Defendant Monell replied that this was facility policy. (Dkt. No. 1 at 12.) Defendant Monell stated that he had reviewed the videotape of the alleged excessive force incident and did not see anything. *Id.* Defendant Monell asked "in a sarcastic manner" whether Plaintiff wanted protective custody because he felt threatened by the facility's officers. Plaintiff said no. *Id.*

**\*5** On January 1, 2009, Plaintiff filed an Inmate Request Form stating that he had not received responses to his appeals regarding disciplinary hearings. (Dkt. No. 1 at 49.) Defendant Russell responded that "Grievance # 36 was upheld so there is no appeal. Grievance # 35 was not a grievable issue because it regarded disciplinary sanctions." (Dkt. No. 1 at 50.)

On January 1, 2009, Plaintiff wrote to the Commission of Corrections informing them of his

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

conversation with Defendant Monell and requesting an outside investigation. (Dkt. No. 1 at 18.)

On January 5, 2009, Plaintiff filed an Inmate Request Form asking for a grievance form. He stated that "the taking of bedding is not a disciplinary sanction but in fact an illegal practice." (Dkt. No. 1 at 42.) Defendant Monell replied that "removal of bedding is a disciplinary sanction and as such is not a grievable issue. Do not put in any more requests on this matter." *Id.*

On January 5, 2009, Plaintiff filed an Inmate Request Form stating that "the grievant has the right to appeal any decision by the grievance committee to the highest level for confirmation of such determination." (Dkt. No. 1 at 43.) Defendant Monell replied that Plaintiff should "read minimum standards-once the action requested has been met-there is no grounds for appeal. Request for grievance is denied. Do not put in any more requests on this matter ." *Id.*

On January 5, 2009, Plaintiff wrote to the Commission of Corrections again. He stated that he was being illegally denied the right to file grievances and that Defendant Monell "attempted to intimidate me." (Dkt. No. 1 at 19.) In a separate letter, he stated that his "grievance is not in regards to any disciplinary sanctions, but in fact an illegal local procedural practice at Tioga County Jail." (Dkt. No. 1 at 29.) He stated that he had been deprived of bedding, food, medical care, visits, and mail without due process. *Id.* at 29-30.

On January 8, 2009, Plaintiff filed an Inmate Request Form stating that he wanted to file a grievance about "the issue of periodicals and the donation/reading of them." (Dkt. No. 1 at 51.) A sergeant (signature illegible) responded that "this is not a grievable issue-this is a requestable issue which will be denied due to security

problems encountered in the D-pod housing unit involving the newspaper. Donations of books and magazines are allowed-you also are allowed to release property to persons outside of the jail." *Id.* at 52.

Plaintiff filed this action on January 21, 2009. (Dkt. No. 1.) Defendants now move for summary judgment. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) Defendants have filed a reply. (Dkt. No. 36.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

*Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

**\*6** To the extent that a defendant's motion for summary judgment under *Federal Rule of Civil Procedure 56* is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6).* As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a *Rule 56* summary judgment motion to a *Rule 12(b)(6)* motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing *Federal Rule of Civil Procedure 12(b)(6)* motions to dismiss.

A defendant may move to dismiss a complaint under *Federal Rule of Civil Procedure 12(b)(6)* on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed.R.Civ.P. 8(a)(2).* The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added).

"Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under *Rule 12(b)(6),* the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

Defendants argue that they are entitled to summary judgment because (A) Plaintiff refused to cooperate with his deposition; (B) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") regarding the November 3 excessive force incident "and other claims such as lack of toilet paper"; (C) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (D) Plaintiff's allegations regarding the lack of bedding do not state a due process claim; (E) Plaintiff has failed to state a claim that he was denied access to the courts; and (F) Plaintiff has not alleged that Defendants Howard or Hollenbeck were personally involved in any alleged constitutional violation.

**A. Deposition**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

*7 Defendants move, pursuant to Federal Rule of Civil Procedure 37, to dismiss this action because Plaintiff unilaterally ended his deposition before answering any substantive questions. (Dkt. No. 30-12 at 10-11.) In the alternative, Defendants request an order precluding Plaintiff from offering sworn testimony in opposition to any motion brought by Defendants or at trial. *Id.* at 11. I find that Defendants' motion is untimely.

This Court's Mandatory Pretrial Discovery and Scheduling Order, issued on March 31, 2009, granted Defendants permission to depose Plaintiff. The order stated that "[t]he failure of the plaintiff to attend, be sworn, and answer appropriate questions may result in sanctions, including dismissal of the action pursuant to [Rule] 37." (Dkt. No. 21 at 3 ¶ D.) The order also noted that "any motion to compel discovery in the case must be filed not later than ten (10) days after the deadline for completing discovery." [FN3] *Id.* at 4 n. 5. The order set July 29, 2009, as the deadline for completing discovery. *Id.* at 4 ¶ A.

FN3. Effective January 1, 2010, the deadlines in the local rules were amended. The local rule now requires that discovery motions be filed no later than fourteen days after the discovery cut-off date. Local Rule 7.1(d)(8).

On July 2, 2009, Defendants requested permission to depose Plaintiff. (Dkt. No. 22.) The Court denied the motion as moot, noting that permission had already been granted. (Dkt. No. 23.) On July 31, 2009, Defendants requested an extension of the discovery cut-off date to allow them time to take Plaintiff's deposition. (Dkt. No. 24.) The Court granted Defendants' request and extended the discovery deadline to September 19, 2009. (Dkt. No. 27.)

On September 14, 2009, Defendants conducted Plaintiff's deposition. (Dkt. No. 30-4 at 9-17.) When defense counsel began asking Plaintiff about his criminal history, Plaintiff stated "[y]ou're browbeating me here, and I'll write to the judge and tell him why I didn't cooperate." *Id.* at 15:14-15. Plaintiff then ended the deposition. *Id.* at 15:20-22. No questions were asked or answered about the events at issue in this action.

Discovery in this case closed on September 19, 2009. Defendants did not file a motion to compel Plaintiff's deposition or for sanctions until they filed the pending motion on October 27, 2009. Because Defendants did not file their motion within ten days of the discovery cut-off date or request an extension of time in which to file a discovery motion, I recommend that their motion to dismiss the case as a sanction for Plaintiff's refusal to cooperate with his deposition be denied.

**B. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims regarding the November 3, 2008, alleged use of excessive force and the alleged failure to provide medical care after the incident must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 30-12 at 2-3.) Defendants are correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007).

**\*8** Tioga County Jail has an inmate grievance procedure. (Dkt. No. 30-10 at 8-11.) Under the procedure, the Corrections Officer assigned to the inmate's housing unit initially receives complaints either verbally or in writing and attempts to resolve the complaint informally. *Id.* at ¶ 1.2(A)(1-2). If the complaint cannot be resolved informally, the inmate files a written complaint form, which is forwarded to the Shift Supervisor. *Id.* at ¶ 1.2(A) (3-4). If the Shift Supervisor cannot resolve the complaint, the complaint is forwarded to the Grievance Coordinator, who provides the inmate with a grievance form. *Id.* at ¶ 1.2(A)(5-8). The Grievance Coordinator is responsible for investigating and making a determination on the grievance and must give a written copy of his or her decision to the inmate. *Id.* at ¶ 1.2(A)(9). This written decision must be issued within five business days of receipt of the grievance. *Id.* at 1.3(C). If the inmate does not accept the Grievance Coordinator's determination, "an appeal will be forwarded to the Jail Chief Administrative Officer." *Id.* at ¶ 1.2(A)(11). The inmate must appeal within two business days of receipt of the Grievance Coordinator's determination. *Id.* at ¶ 1.3(D). At the request of the inmate, a copy of the appeal will be mailed by the Jail Administrator to the Commission of Corrections. *Id.* at ¶ 1.2(A)(13). The Jail Administrator must make a determination within two working days. *Id.* at ¶ 1.3(E). The inmate may appeal within three business days of receipt of the decision to the Commission of Corrections. *Id.* at ¶ 1.3(F).

Here, Plaintiff did not file a grievance regarding the alleged use of excessive force on November 3, 2008. (Dkt. No. 30-11 ¶ 6.) Therefore, he did not exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN4]

> **FN4.** The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), in which the Supreme Court held that each step of an available grievance procedure must be "properly" completed before a plaintiff may proceed in federal court. *Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, at \*4, 2009 WL 1803454, at \*1 (2d Cir. June 25, 2009).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

**\*9** Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by raising it in their answer. (Dkt. No. 19 at ¶¶ 8-10.) Plaintiff appears to argue that Defendants are estopped from asserting the defense or that special

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

circumstances exist justifying the failure to exhaust. Specifically, Plaintiff states that exhausting his administrative remedies would have been futile and "may have caused more harm to the plaintiff" because the officers who allegedly assaulted him "are the persons that operate and give the decisions" regarding grievances. (Dkt. No. 32 at 1.)

Plaintiff's explanation is belied by his actual conduct. Plaintiff alleges that Defendant Marsh was involved in the use of excessive force. (Dkt. No. 1 at 9.) Despite this fact, Plaintiff filed a grievance three weeks after the incident complaining about Defendant Marsh's conduct during a disciplinary hearing. (Dkt. No. 1 at 23-24.) This indicates that Plaintiff was not, in fact, afraid to file grievances against the Defendants who allegedly assaulted him and denied him medical care. Thus, Plaintiff has not plausibly alleged that special circumstances prevented him from exhausting his administrative remedies. Therefore, I find that Plaintiff failed to exhaust his administrative remedies regarding the alleged use of excessive force and I recommend that the Court dismiss that claim.

**C. Eighth Amendment Conditions of Confinement**

Plaintiff alleges that Defendants violated his Eighth Amendment rights by removing his personal property, taking away his bedding and mattress during the day, allowing him to shower only if he remained handcuffed and shackled, and providing him with only two sheets of toilet paper. (Dkt. No. 1 at 9-10.) Defendants move for summary judgment of this claim. (Dkt. No. 30-12 at 5.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson*

*v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Specifically, an inmate must show that he was deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, Plaintiff does not allege that he was deprived of any human need. He was provided with a mattress and blankets at night, had the opportunity to shower, and received toilet paper. Although his conditions may not have been pleasant, the Eighth Amendment "does not mandate comfortable prisons." *Farmer,* 511 U.S. at 932 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's conditions of confinement claim.

**D. Due Process**

*1. Bedding*

**\*10** Defendants construe Plaintiff's complaint as asserting a claim that the removal of his bedding during the day violated his right to due process. Defendants argue that this claim should be dismissed. (Dkt. No. 30-12 at 5-6.) Defendants are correct.

An individual claiming that he was deprived of an

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

interest in property "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Plaintiff had not legitimate claim of entitlement to possessing bedding during the day. Therefore, I recommend that the Court dismiss this claim.

2. *Disciplinary Hearing*

Plaintiff appears to allege that Defendant Marsh deprived him of due process by conducting a biased disciplinary hearing. (Dkt. No. 1 at 10.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Assuming *arguendo* that the state has granted inmates in county jails an interest in remaining free from keeplock confinement, the issue is whether Plaintiff's confinement imposed an "atypical and significant hardship" on him in relation to the ordinary incidents of prison life. Courts in the Second Circuit have routinely declined to find a liberty

interest where an inmate's keeplock confinement is an "exceedingly short" period, less than thirty days, and there is no indication that the inmate suffered any "unusual conditions" during the confinement. *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) ("Confinements in ... keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons.") (Sharpe, J.) (Homer, M.J.).[FN5]

FN5. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Defendant Marsh sentenced Plaintiff to twenty-eight days of keeplock after the November 12, 2008, hearing that followed the alleged excessive force incident. (Dkt. No. 1 at 34.) Defendant Marsh sentenced Plaintiff to fourteen days of keeplock after the December 17, 2008, hearing regarding Plaintiff's alleged use of another inmate's stamps. (Dkt. No. 1 at 37.) There is no indication that Plaintiff suffered any unusual conditions during these keeplock confinements. Notably, Plaintiff's allegations regarding the removal of his bedding occurred not during these keeplock sentences, but rather during earlier administrative segregation periods in October and November. (Dkt. No. 1 at 8-10.) Thus, Plaintiff has not alleged facts plausibly suggesting, or raised a triable issue of fact, that he was deprived of a liberty interest. Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Marsh *sua sponte.*

**E. Access to the Courts**

**\*11** Defendants argue that Plaintiff's claims regarding Tioga County Jail's legal mail procedures must be dismissed because (1) Plaintiff has not alleged the

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

personal involvement of any Defendant; and (2) Plaintiff has not alleged any actual harm resulting from the procedures. (Dkt. No. 36-3 at 1.) Defendants did not raise this argument in their moving papers. Normally, due process would thus require that I disregard the argument or give Plaintiff an opportunity to file a sur-reply. Here, however, Plaintiff addressed this issue in his opposition despite Defendants' failure to raise it initially. (Dkt. No. 32 at 1.) Moreover, even if he had not, I would recommend that the Court dismiss the claim *sua sponte.*

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not raised a triable issue of fact that he suffered any actual injury. In his "notice of intention," he stated that the facility's mail policies "could

cause a great effect" and *"could* cause irreparable harm" to two pending *habeas corpus* cases. (Dkt. No. 1 at 10, emphasis added.) In his opposition to the motion for summary judgment, Plaintiff states that he "suffered the loss of one of the court actions" because he could not mail a brief. (Dkt. No. 32 at 1.) However, I note that this statement is not "evidence" because Plaintiff's opposition was not signed under penalty of perjury and does not contain any other language bringing it into substantial compliance with 28 U.S.C. § 1746. *See, LeBoeuf, Lamb, Greene & MacCrae, L.L.P. v. Worsham,* 185 F.3d 61, 65-66 (2d Cir.1999). Therefore, I recommend that Plaintiff's claim regarding legal mail be dismissed.

**F. Personal Involvement**

**\*12** Defendants argue that Plaintiff has failed to allege personal involvement by Defendants Howard or Hollenbeck. (Dkt. No. 30-12 at 11-12.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).[FN6] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN7] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN8] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN9] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). FN10

> FN6. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

> FN7. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

> FN8. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

> FN9. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

> FN10. The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* --- F.Supp.2d ----, No. 08-CV-116580, 2009 U.S. Dist. LEXIS 116580, at *32-39, 2009 WL 4824669, at*10-11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The only allegation in the complaint regarding Defendant Hollenbeck is that he issued an Inmate Rule Infraction Notice to Plaintiff on October 30, 2008. (Dkt. No. 1 at 31.) Plaintiff has not alleged any facts plausibly suggesting, or raised a triable issue of fact, that Defendant Hollenbeck's conduct violated Plaintiff's constitutional rights. Therefore, I recommend that any claims against Defendant Hollenbeck be dismissed.

The complaint's only reference to Defendant Howard is in the caption of the "notice of intention." (Dkt. No. 1 at 7.) Plaintiff could, perhaps, have argued that, as Sheriff, Defendant Howard was responsible for creating or allowing to continue unconstitutional policies. However, Plaintiff did not allege any facts plausibly suggesting, or raise a triable issue of fact, that Defendant Howard was responsible for the policies about which Plaintiff complains. Even if he had, as discussed above, Plaintiff has not provided sufficient evidence for any of his claims regarding those policies to survive summary judgment. Therefore, I recommend that any claims against Defendant Howard be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be *GRANTED;* and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Stewart v. Howard

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Jerome BELLAMY, Plaintiff,

v.

MOUNT VERNON HOSPITAL, in its official and individual capacity, Dr. Marc Janis, in his official and individual capacity, New York State Department Of Correctional Services, Dr. Lester Wright, in his official and individual capacity, and Dr. J. Pereli, in his official and individual capacity, Defendants.

No. 07 Civ. 1801(SAS).

June 26, 2009.

West KeySummary**Civil Rights 78** ☞ 1358

**78** Civil Rights

   **78III** Federal Remedies in General

      **78k1353** Liability of Public Officials

         **78k1358** k. Criminal law enforcement; prisons. Most Cited Cases

**Prisons 310** ☞ 203

**310** Prisons

   **310II** Prisoners and Inmates

      **310II(D)** Health and Medical Care

         **310k203** k. Reproductive issues. Most Cited Cases

**Sentencing and Punishment 350H** ☞ 1546

**350H** Sentencing and Punishment

   **350HVII** Cruel and Unusual Punishment in General

      **350HVII(H)** Conditions of Confinement

         **350Hk1546** k. Medical care and treatment. Most Cited Cases

   A correctional services doctor was not deliberately indifferent to a prisoner's serious medical needs under the Eighth Amendment in connection with the alleged denial of testosterone treatments. The prisoner brought a § 1983 action which alleged that he was denied the treatments which he needed after he developed hypogonadism after an epididymectomy. The doctor not liable for the alleged harm because he was not involved with any denials of the prisoner's treatment and did not create a policy that contributed to the prisoner's alleged harm. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Jerome Bellamy, Alden, NY, pro se.

Julinda Dawkins, Assistant Attorney General, New York, NY, for Defendants.

*OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

*1 Jerome Bellamy, presently incarcerated and proceeding pro se, alleges that the New York State Department of Correctional Services ("DOCS") and Dr. Lester Wright, the remaining defendants in this case [FN1], violated Bellamy's constitutional rights. His claims surround denials of requested testosterone treatment by Wright, a doctor and supervisory official for the DOCS. Wright and the DOCS now move for summary judgment. For the reasons stated below, their motion for summary judgment is granted in its entirety.

FN1. The original and amended complaints were also filed against Mount Vernon Hospital, Dr. Mark Janis, Dr. J. Pereli, in their individual and official capacities. The claims against Mount Vernon Hospital and Dr. Mark Janis were dismissed in *Bellamy I* and the claim against Dr. J. Pereli was dismissed in a subsequent order issued by this Court on January 15, 2009. Wright and the DOCS are the only remaining defendants.

## II. BACKGROUND[FN2]

FN2. For more detailed background, see *Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2008

WL 3152963 (S.D.N.Y. Aug. 5, 2008) (*"Bellamy I"*). Some of the facts recounted here are drawn from the prior opinion.

### A. Facts

#### 1. Parties

Bellamy is presently in the custody of the DOCS at the Wende Correctional Facility in Alden, New York.[FN3] The DOCS is a state agency responsible for the care, custody and control of inmates convicted of crimes under New York State laws.[FN4] Wright is both a New York-licensed medical doctor and the Deputy Commissioner and Chief Medical Officer ("CMO") of the DOCS.[FN5] As CMO, he is responsible for the development and operation of a system to provide necessary medical care for inmates in the custody of the DOCS.[FN6]

FN3. *See* Defendants' Rule 56.1 Statement of Facts ¶ 1.

FN4. *See id.* ¶ 2.

FN5. *See id.* ¶ 3.

FN6. *See id.*

#### 2. Bellamy's Surgery

In August 2004, while in DOCS custody at Sing Sing

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Correctional Facility in Ossining, New York, Bellamy underwent an epididymectomy.[FN7] Bellamy was HIV positive at the time of his surgery.[FN8] Around that time, Bellamy developed hypogonadism (a deficiency in the hormone testosterone) as well as a deficiency in the hormone Cortisol.[FN9] As a result of these conditions, Bellamy was prescribed various medications, including a testosterone patch called "Androderm." [FN10] Bellamy contends that without testosterone treatment, he suffers from mood swings, fatigue, nausea, headaches, and lack of appetite.[FN11] However, he also experiences similar symptoms even with medication.[FN12]

FN7. See *Bellamy I*, 2008 WL 3152963, at *1. An epididymectomy is defined as the surgical removal of the epididymis (the cord-like structure along the posterior border of the testicle). The epididymis is essential to the male reproductive system. See Dorland's Illustrated Medical Dictionary 639, 1342, 1770 (31st ed.2007).

FN8. See 3/6/08 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. I") at 139:15-17 (where Bellamy says that, prior to the surgery, he was on HIV medication).

FN9. See *Bellamy I*, 2008 WL 3152963, at *2. These conditions had many side effects, including sexual maladies and dramatic weight loss. See *id.* While Bellamy contends that the surgery caused the hypogonadism, his treating doctor had a "reasonable degree of medical certainty" that the hypogonadism preceded the surgery. See 4/22/08 Affidavit of Dr. Harish Moorjani ("Moorjani Aff."), Ex. J to 6/5/09 Supplemental Declaration of Julinda Dawkins, counsel to defendants, ¶ 4.

FN10. See, e.g., Amended Complaint ("Am.Compl."), Statement of Facts ¶¶ 5, 7. Androgel is a similar medication. The Amended Complaint is divided into various parts with overlapping paragraph and page numbers. As a result, references to the Amended Complaint are made by noting first the relevant topic header and then the cited or quoted paragraph number.

FN11. See 1/12/09 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. II") at 35:23-24. Bellamy's hypogonadism may have been caused by his HIV. Bellamy complained of similar symptoms before the surgery and, therefore, before any alleged denial of Androgel or similar medications. See Moorjani Aff. ¶¶ 4-5.

FN12. See Bellamy Dep. II at 43:21-24 (where Bellamy admits that some of his symptoms resumed even after using the testosterone patch). See also Am. Compl., Statement of Facts ¶ 7 ("[T]his treatment [, Androderm,] still has not proven to be effective in keeping my hormone levels elevated, even after the dosages were increased, and my levels rise high at times then suddenly drops real low.").

**3. Bellamy's Letters to Wright**

Following the surgery, Bellamy wrote to Wright on three pertinent occasions. In the first letter, Bellamy provided background into his ailments and asked Wright to provide him with a hormone treatment (Androgel) which had been provided at a previous facility.[FN13] The second letter asked Wright to force Dr. Gennovese at the Shawangunk facility to provide him with Ensure-a nutritional supplement which had been provided at a previous facility. [FN14] Bellamy's third letter to Wright concerned several matters. [FN15] In particular, Bellamy claimed, *first,* that a female officer entered his cell and retrieved his HIV medication, *second,* that an officer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

eavesdropped on a medical consultation with his doctor, and, *third,* that he went four days without HIV medication, five days without Cortisol treatment, and six days without testosterone treatment, all while undergoing a mental health evaluation.[FN16]

> **FN13.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 9. *See also* 7/5/05 Grievance Letter from Bellamy to Wright, Ex. D to 3/30/09 Declaration of Julinda Dawkins, counsel to defendants ("Dawkins Decl.").

> **FN14.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 10. *See also* 1/22/07 Grievance Letter from Bellamy to Wright, Ex. E to Dawkins Decl.

> **FN15.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 11. *See also* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Deck

> **FN16.** *See* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Decl.

Wright's office routinely receives hundreds of letters each year, addressed to him personally from inmates throughout the DOCS system and from individuals writing on behalf of inmates.[FN17] These letters are screened by staff, who then forward them to the appropriate division or bureau within the DOCS with an instruction to respond or with a notation indicating the appropriate action.[FN18] Wright never sees the actual letters or their responses.[FN19] Inmate letters concerning medical care-such as Bellamy's-are forwarded to the Regional Health Services Administrator or the Regional Medical Director, as appropriate, that oversees the facility housing the inmate.[FN20] The concerns are then investigated and addressed by the regional staff.[FN21]

> **FN17.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 12.

> **FN18.** *See id.*

> **FN19.** *See id.* ¶ 13.

> **FN20.** *See id.* ¶ 14.

> **FN21.** *See id.*

**\*2** All three of Bellamy's letters received responses. Holly A. Collet, the Facility Health Services Administrator at Elmira Correctional Facility, responded to Bellamy's July 5, 2005 letter.[FN22] Pedro Diaz, the Regional Health Services Administrator at Shawangunk Correctional Facility, responded to Bellamy's January 22, 2007 letter.[FN23] Pedro Diaz, also the Regional Health Services Administrator at Sing Sing Correctional Facility, responded to Bellamy's June 5, 2007 letter.[FN24] Wright and Bellamy have never met each other, nor have they had any other personal contact.[FN25] Bellamy admits that he has no evidence that Wright was involved in the responses to any of the three letters.[FN26]

> **FN22.** *See id.* ¶ 15.

> **FN23.** *See id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN24. *See id.*

FN25. *See id.* ¶ 16. *See also* 3/27/09 Affidavit of Dr. Lester N. Wright ("Wright Aff."), Ex. G to Dawkins Decl., ¶ 9; Bellamy Dep. II at 20:23-25.

FN26. *See* Bellamy Dep. II at 26:17-20.

**4. Bellamy's Claims**[FN27]

FN27. In addition to the claims listed here, Bellamy originally charged both the DOCS and Wright with violations of the Americans with Disabilities Act of 1990 (the "ADA") and the Rehabilitation Act of 1973 (the "RHA"). *See* Am. Compl., Legal Claims ¶ 15. However, Bellamy later conceded that "Plaintiff['s] Americans With Disabilities Act and Rehabilitation [Act] fails because those statutes are not applicable here at this junction." Plaintiff's Reply to Defendants' Summary Judgment ("Bellamy's Reply") at 7. This Court interprets Bellamy's Reply as a withdrawal of his ADA and RHA claims against the remaining defendants.

Bellamy admits that he has no evidence that Wright denied him testosterone replacement treatment.[FN28] Nonetheless, Bellamy claims that Wright "was responsible for denying plaintiff's testosterone treatment on different occasions" and "was also made aware of plaintiff's complaints, but failed to abate further injury to the plaintiff."[FN29] Bellamy charges the DOCS because he was in its custody when his claims arose.[FN30] Bellamy

specifically alleges that Wright-acting under color of state law-displayed "deliberate indifference to plaintiff's serious medical needs and violated plaintiff's rights and constituted cruel and unusual punishment under the Eight [h] Amendment of the United States Constitution."[FN31] A similar claim is lodged against the DOCS.[FN32] Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with various New York State laws.[FN33] Finally, Bellamy seeks compensatory and punitive damages.[FN34]

FN28. *See* Bellamy Dep. II at 33:14 to 34:15 (Question: "Do you have any kind of evidence that Dr. Wright denied you testosterone treatment?" Answer: "Directly, no.").

FN29. *See* Am. Compl., Defendants ¶ 6.

FN30. *See id.* Many of the claims that allegedly occurred under DOCS supervision have since been dismissed.

FN31. *See id.,* Legal Claims ¶ 13. Bellamy brings his claims pursuant to section 1983 of Title 42 of the United States Code ("section 1983").

FN32. *See id.,* Legal Claims ¶ 14 (repeating the same claim but omitting the phrase that the DOCS "violate[d] plaintiff's rights").

FN33. *See id.,* Legal Claims ¶ 18. Bellamy's original Complaint only requested injunctive

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

relief against the DOCS. However, he later asked for injunctive relief against Wright. *See* Bellamy's Reply at 1. Because Bellamy is proceeding pro se, the *factual* allegations in his Reply Memoranda are treated as if they were raised in his Complaints. *See Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering a pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim). However, it would be improper to allow a plaintiff, even one proceeding pro se, to add a defendant to a claim he had raised more than a year earlier. Thus, Bellamy's claim for injunctive relief against Wright is dismissed. *See Polanco v. City of New York Dep't of Corr.,* No. 01 Civ. 759, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002) ("It is well established that a plaintiff may not amend his pleading through papers offered in opposition to a motion to dismiss ... Plaintiff is bound by the allegations of his Amended Complaint.") (citations omitted).

FN34. *See* Am. Compl., Legal Claims ¶¶ 19-21.

**B. Procedural History**

Bellamy's first Complaint was filed on March 2, 2007, and an Amended Complaint followed on July 16, 2007. On August 5, 2008, this Court granted summary judgment to defendants Dr. Janis and Mount Vernon. The DOCS had not been properly served at that point, but it was subsequently served on August 7, 2008. Dr. J. Pereli was dismissed as a defendant on January 15, 2009, for lack of timely service of process.

**III. LEGAL STANDARD**

**A. Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FN35 An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " FN36 A fact is material when it " 'might affect the outcome of the suit under the governing law.' " FN37 "It is the movant's burden to show that no genuine factual dispute exists." FN38

FN35. Fed.R.Civ.P. 56(c).

FN36. *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

FN37. *Ricci v. DeStefano,* 530 F.3d 88, 109 (2d Cir.2008) (quoting *Anderson,* 477 U.S. at 248).

FN38. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. FN39 "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

party's case, and on which that party will bear the burden of proof at trial.' " [FN40] To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " [FN41] and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' " [FN42] However, " 'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " [FN43]

FN39. Fed.R.Civ.P. 56(c).

FN40. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). *Accord In re September 11 Litig.,* No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug.15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

FN41. *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

FN42. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

FN43. *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson,* 477 U.S. at 248-49).

**\*3** In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[FN44] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " [FN45] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." [FN46]

FN44. See *Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005)).

FN45. *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord Anderson,* 477 U.S. at 249.

FN46. *Karpova v. Snow,* 497 F.3d 262, 270 (2d Cir.2007) (citing *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486-87 (2d Cir.2006)).

Further, where the plaintiff is proceeding pro se, his or her pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," [FN47] and his or her pleadings must be "interpret[ed] ... to raise the strongest arguments they suggest." [FN48] However, a pro se plaintiff must still meet the usual requirements of summary judgment .[FN49] Thus, a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

pro se plaintiff's "failure to allege either specific facts or particular laws that have been violated renders [his or] her attempt to oppose defendants' motion [for summary judgment] ineffectual." [FN50]

> FN47. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). *Accord Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

> FN48. *Burgos,* 14 F.3d at 790.

> FN49. *See Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept.8, 2004). (" 'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' ") (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct.28, 1999)).

> FN50. *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

**B. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act (the "PLRA") mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions.[FN51] Failure to exhaust is an absolute bar to an inmate's action in federal court: "[section] 1997e(a) requires exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to

court at all." [FN52] Because the plain language of section 1997e(a) states "no action shall be brought," an inmate must have exhausted his claims at the time of the initial filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient." [FN53] Moreover, the exhaustion of administrative remedies must be proper-that is, in compliance with a prison grievance program's deadlines and other critical procedural rules in order to suffice.[FN54] The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN55]

> FN51. *See* 42 U.S.C. § 1997e(a) (providing that: "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") ("section 1997"). *See also Porter v. Nussle,* 534 U.S. 516, 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); Booth v. Churner, 532 U.S. 732, 739 (2001).

> FN52. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted, emphasis in original).

> FN53. *Id.*

> FN54. *See Woodford v. Ngo,* 548 U.S. 81, 90-92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

> FN55. *Porter,* 534 U.S. at 532.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

> when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. [FN56]

FN56. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought,' ... does not constitute proper exhaustion." [FN57] "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " [FN58]

FN57. *Marias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005) and citing *Woodford,* 548 U.S. at 94-95) (finding plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff").

FN58. *Id.* (quoting *Woodford,* 548 U.S. at 95).

**C. Eleventh Amendment Immunity**

**\*4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State ..." [FN59] "A state's Eleventh Amendment protection from suit extends to its agencies and departments." [FN60] "This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity." [FN61] To determine whether the action is an official or individual capacity suit, this Court must look behind the designation and determine whether "the State is the real, substantial party in interest." [FN62] State agencies are not immune from suits asking for injunctive relief under the Eleventh Amendment. [FN63]

FN59. U.S. Const. amend. XI.

FN60. *Morningside Supermarket Corp. v. New York State Dep't of Health,* 432 F.Supp.2d 334, 338 (S.D.N.Y.2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). *Accord Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422 (S.D.N.Y.2001) (affirming the dismissal of a section 1983 claim against the DOCS and a correctional facility because Eleventh Amendment immunity abrogated the court's subject matter jurisdiction to hear the claim).

FN61. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN62. *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945), *overruled in part by Lapides v. Board of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

FN63. *See, e.g., Perez v. Westchester County Dep't of Corr.,* No. 05 Civ. 8120, 2007 WL 1288579, at *6-8 (S.D.N.Y. Apr. 30, 2007) (considering, but then denying, injunctive relief against a county's department of corrections).

**D. Section 1983**

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." [FN64] In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. [FN65] "[N]either a State nor its officials acting in their official capacities are 'persons' under [section] 1983." [FN66] Thus, section 1983 "does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivation of rights secured by the United States Constitution." [FN67]

FN64. *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

FN65. *See Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004) (citation omitted).

FN66. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Accord Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005).

FN67. *Bryant,* 146 F.Supp.2d at 425.

Furthermore, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " [FN68] Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." [FN69] In 1995, the Second Circuit held that a supervisory official is personally involved only when that official: (1) participates directly in the alleged constitutional violation; (2) fails to remedy the violation after being informed of the violation through a report or appeal; (3) creates or allows the continuation of a policy or custom under which unconstitutional practices occurred; (4) acts with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibits deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. [FN70] However, in 2009, the Supreme Court held, "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions,* has violated the Constitution." [FN71] The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." [FN72] Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." [FN73] For example, "[t]he allegation that plaintiff sent defendant[ ] letters complaining of prison conditions is not enough to allege personal involvement." [FN74]

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN68. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

FN69. *Ford v. Conway,* No. 03 Civ. 0927S, 2004 WL 1071171, at *4 (W.D.N.Y. Mar.16, 2004).

FN70. See *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted).

FN71. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (emphasis added).

FN72. *Id.* at 1949.

FN73. *Id.*

FN74. *Laureano v. Pataki,* No. 99 Civ. 10667, 2000 WL 1458807, at *4 (S.D.N.Y. Sept.29, 2000) (granting a motion to dismiss on similar facts). See also *Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain of command for investigation").

**E. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs**

**\*5** The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.[FN75] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." [FN76] Because the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under section 1983.[FN77] "Prison officials have a duty to provide prisoners with the 'reasonably necessary medical care which would be available to him or her ... if not incarcerated.' " [FN78] However, a prison cannot be required to meet the same standard of medical care found in outside hospitals.[FN79]

FN75. U.S. Const. amend. XIII.

FN76. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). *Accord Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind .... In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ....") (quotations and citations omitted).

FN77. See *Estelle,* 429 U.S. at 105-06.

FN78. *Candeleria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *7 (S.D.N.Y. Mar.1, 1996) (quoting *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)). *Accord Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

*8 (S.D.N.Y. Mar. 7, 2002) ("A person who is incarcerated is entitled to receive adequate medical care.").

FN79. *See Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984) ("We have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital.").

" 'The deliberate indifference standard embodies both an objective and a subjective prong.' " FN80 "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." FN81 "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." FN82 "[W]hen a prisoner asserts that delay in his treatment constitutes deliberate indifference on the part of a healthcare provider, the Court looks to the severity of the consequences brought about by the alleged delay." FN83

FN80. *Morrison v. Mamis,* No. 08 Civ. 4302, 2008 WL 5451639, at *5 (S.D.N.Y. Dec.18, 2008) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

FN81. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (quoting *Estelle,* 429 U.S. at 104)).

FN82. *Id.* (citing *Estelle,* 429 U.S. 105-06).

FN83. *Pabon v. Goord,* No. 99 Civ. 5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar.28, 2003) (citation omitted).

**F. Preliminary and Permanent Injunction**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." FN84 "A preliminary injunction is an extraordinary remedy never awarded as of right." FN85 "When the movant seeks a 'mandatory' injunction-that is, as in this case, an injunction that will alter rather than maintain the status quo-[he or] she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." FN86 The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff seeking a permanent injunction must show actual success on the merits rather than a likelihood of success on the merits. FN87

FN84. *Winter v. Natural Res. Def. Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). *Accord Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund,* No. 08 Civ. 5520, 2009 WL 1528513, at *1-2 (S.D.N.Y. June 1, 2009) (discussing *Winter* approvingly). *But see Almontaser v. New York City Dep't of Educ.,* 5 19 F.3d 505, 508 (2d Cir.2008) ("A party seeking a preliminary injunction 'must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.' ") (citation omitted).

FN85. *Winter,* 129 S.Ct. at 376 (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN86. *Mitchell v. New York State Dep't of Corr. Servs.,* No. 06 Civ. 6278, 2009 WL 185757, at *2 (W.D.N.Y. Jan. 26, 2009) (quoting *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008)).

FN87. *See Winter,* 129 S.Ct. at 381.

## IV. DISCUSSION

Bellamy asserts an Eighth Amendment deliberate indifference claim against Wright and the DOCS. Defendants respond, first, by asserting Eleventh Amendment immunity with respect to all claims against the DOCS and any claims against Wright in his official capacity. As for the claim against Wright in his individual capacity, defendants argue that he was not personally involved in the alleged harm, nor did he create a policy that contributed to that harm. Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with several New York State laws. Defendants argue that Bellamy will not win on the merits, nor will he suffer irreparable harm. Defendants urge this Court to decline to exercise supplemental jurisdiction over any remaining New York State law claims. Finally, Bellamy seeks compensatory and punitive damages.

### A. Exhaustion of Administrative Remedies

**\*6** This Court determined in a previous opinion that "Bellamy did not fail to exhaust his administrative remedies because he was justified in his belief that no administrative remedy was available to him." [FN88] Thus, Bellamy's claims are not barred by the PLRA.

FN88. *Bellamy I,* 2008 WL 3152963, at *5

(citing *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004)).

### B. Eleventh Amendment Immunity

The Eleventh Amendment immunizes state agencies and state officials acting in their official capacity from suit under section 1983. Accordingly, Bellamy's deliberate indifference claims against both the DOCS and Wright, in his official capacity, are dismissed.

### C. Section 1983 Claim of Deliberate Indifference Against Wright in His Individual Capacity

The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal'* s "active conduct" standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal'* s muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated-situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.

Bellamy's remaining claim alleges that Wright, in his individual capacity, was deliberately indifferent to Bellamy's medical needs. However, Bellamy offers no evidence that any of Wright's actions fall into any of the remaining exceptions that would permit supervisory liability. *First,* Bellamy admits that Wright was not personally involved in the letter responses. Both parties agree that they have never had any form of contact. *Second,* Bellamy offers no evidence that Wright created or contributed to a policy or custom of unconstitutional practices. Bellamy also admitted that he can provide no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

evidence that Wright was responsible for making any decisions regarding his testosterone medications.[FN89] Bellamy's conclusory allegations that Wright must have known about Bellamy's plight is not enough to impute section 1983 liability.[FN90]

> FN89. *See, e.g.,* Bellamy Dep. II at 32:19-21 (Question: "Did Dr. Moorjani say anything that Dr. Wright was involved in the April of 2005 denial?" Answer: "No, he did not.")

> FN90. *See Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the pleadings "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant ... that [defendant] created or continued a policy or custom which allowed the violation to occur, or that [defendant] was grossly negligent in managing the subordinates who caused the unlawful condition").

Finally, Bellamy offers no evidence that Wright demonstrated deliberate indifference to Bellamy's serious medical needs. Bellamy does not contend that Wright unnecessarily and wantonly inflicted any pain-indeed Bellamy conceded that Wright was not involved in the alleged denials of treatment. Accordingly, Bellamy's deliberate indifference claim against Wright in his individual capacity is dismissed.

**D. Preliminary and Permanent Injunction**

Bellamy asks this Court to order the DOCS-through an injunction-to provide him with adequate medical care and to comply with New York State laws. This request is denied.

*7 *First,* Bellamy has not alleged that he is suffering irreparable harm. Instead, he has alleged a number of unrelated and sporadic problems that can be expected in the normal course of incarceration, especially when transferring from facility to facility. It cannot be inferred from his pleadings, his testimony or his letters to Wright that he has consistently been denied any form of treatment. Indeed, each of his three letters address completely different topics without re-addressing prior issues. Bellamy concedes that the disruption of his medication only occurred on a very limited or isolated basis.[FN91]

> FN91. *See* Bellamy Dep. II at 56-57, 75-76 (demonstrating that, over the course of three-years, Bellamy was denied treatment for one three-week period, for one allegedly three-month period-while he was transferring facilities-and a few alleged short-term periods, although those dates are unspecified).

*Second,* Bellamy cannot show a clear or substantial likelihood of success on the merits. Bellamy does not offer evidence that either defendant was deliberately indifferent to his serious medical needs.[FN92] For the objective prong, Bellamy offers no evidence that any deprivation of medication was sufficiently serious. Headaches and fatigue do not rise to the level of seriousness necessary to warrant a preliminary injunction-especially when Bellamy admits that he still suffers similar side-effects while receiving the requested treatment.[FN93] For the subjective prong, Bellamy does not offer any evidence that any DOCS employee acted with the requisite state of mind to be deliberately indifferent to his serious medical needs.

> FN92. While the DOCS itself is immune from section 1983 liability, the following analysis

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

surrounds the DOCS and its employees generally.

FN93. Further, the defendants' affidavits question many of Bellamy's medical propositions. *See, e.g.,* Moorjani Aff. ¶ 4 (claiming that Bellamy exhibited signs of hypogonadism and many of its symptoms, including weight loss, headaches, and fatigue, prior to the surgery).

This Court need not address the balance of equities nor the public interest factors because Bellamy has not shown irreparable harm or a substantial likelihood of success on the merits. Accordingly, Bellamy's request for both a preliminary and permanent injunction is denied.

**E. Supplemental Jurisdiction**

Bellamy asks this Court to compel the DOCS-through an injunction-to comply with New York State Public Health Laws.[FN94] To the extent that there are any remaining state law claims, this Court declines to exercise supplemental jurisdiction over those claims.[FN95]

FN94. *See* Am. Compl., Prayer for Relief ¶ 18.

FN95. *See Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."). *See also Kshel Realty Corp. v. City of New York,* No. 01 Civ.

9039, 2006 WL 2506389, at *13 (S.D.N.Y. Aug.30 2006) ("[T]he Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of on 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' ") (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986)).

**V. CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this motion (Docket # 64) and this case.

SO ORDERED:

S.D.N.Y.,2009.

Bellamy v. Mount Vernon Hosp.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

H

United States District Court,

S.D. New York.

Matthew D'OLIMPIO and Michael Kaplan, Plaintiffs,

v.

Louis CRISAFI, in his individual capacity, Brendan Vallely, in his individual capacity, Thomas D'Amicantonio, in his individual capacity, James Giglio, in his individual capacity, Michael Moffett, in his individual capacity, Paul Nadel, in his individual capacity, Jennifer Treacy, in her individual capacity, Kenneth Post, in his individual capacity, and Timothy Dewey, in his individual capacity, Defendants.

Louis Crisafi, Counterclaim-Plaintiff,

v.

Michael Kaplan, Counterclaim-Defendant.

Nos. 09 Civ. 7283(JSR), 09 Civ. 9952(JSR).

June 15, 2010.

**Background:** Arrestee and former narcotics enforcement investigator brought action against another investigator and other narcotics enforcement officials, alleging malicious prosecution, false arrest, unlawful detention, and other constitutional violations against arrestee, and First Amendment retaliation against investigator. Defendant investigator counterclaimed, alleging defamation by plaintiff investigator. Defendants moved to dismiss for failure to state a claim.

**Holdings:** The District Court, Jed S. Rakoff, J., held that:

(1) allegations were sufficient to state a claim of supervisory liability against officials;

(2) law enforcement officers lacked even arguable probable cause to make arrest;

(3) investigator's statements were not protected by First Amendment; and

(4) plaintiff investigator was not liable for defamation.

Motions denied in part and granted in part.

West Headnotes

**[1] Civil Rights 78 ⟜ 1358**

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

            78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

Arrestee was not required to show discriminatory

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

purpose on the part of law enforcement officers in order to establish the personal involvement needed to support the officers' liability on his § 1983 claim alleging that his search, arrest, and prosecution violated the Fourth Amendment. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 ☞ 1395(6)**

78 Civil Rights

   78III Federal Remedies in General

     78k1392 Pleading

     78k1395 Particular Causes of Action

       78k1395(4) Criminal Law Enforcement; Police and Prosecutors

         78k1395(6) k. Arrest, search, and detention. Most Cited Cases

Allegations against law enforcement officials were sufficient to state a claim under § 1983 that officials failed to supervise narcotics enforcement investigators; complaint incorporated by reference an investigatory report that described various acts of misconduct by investigator that took place prior to arrestee's arrest, and concluded that there was a lack of appropriate supervision by officials, and arrestee alleged that another investigator complained to official in writing regarding investigator's misconduct prior to arrestee's arrest. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[3] Arrest 35 ☞ 63.4(2)**

35 Arrest

35II On Criminal Charges

   35k63 Officers and Assistants, Arrest Without Warrant

     35k63.4 Probable or Reasonable Cause

       35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. U.S.C.A. Const.Amend. 4.

**[4] Civil Rights 78 ☞ 1376(6)**

78 Civil Rights

   78III Federal Remedies in General

     78k1372 Privilege or Immunity; Good Faith and Probable Cause

       78k1376 Government Agencies and Officers

         78k1376(6) k. Sheriffs, police, and other peace officers. Most Cited Cases

In the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show arguable probable cause. U.S.C.A. Const.Amend. 4.

**[5] Civil Rights 78 ☞ 1358**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

           78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

    Arrestee's allegations were sufficient to state a § 1983 supervisory liability claim against law enforcement officials, arising out of officials' creation of policy allowing narcotics enforcement investigators to initiate criminal charges based on a phone conversation or faxed affidavit, where arrestee alleged that his arrest for possession of a narcotic and criminal impersonation to obtain prescriptions was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of a prescription within a week, which prompted a narcotics enforcement official to call arrestee's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of arrestee's doctor. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

[6] Arrest 35 ☞ 63.4(8)

35 Arrest

    35II On Criminal Charges

        35k63 Officers and Assistants, Arrest Without Warrant

           35k63.4 Probable or Reasonable Cause

               35k63.4(7) Information from Others

                  35k63.4(8) k. Reliability of informer. Most Cited Cases

    Law enforcement officers lacked even arguable probable cause to arrest arrestee for possession of a narcotic and impersonation of a physician based solely on unauthenticated report by physician's staff denying knowledge of arrestee's prescription. U.S.C.A. Const.Amend. 4.

[7] Constitutional Law 92 ☞ 1941

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(P) Public Employees and Officials

           92k1941 k. Discipline or reprimand. Most Cited Cases

    A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee spoke as a citizen on a matter of public concern; otherwise, the employee's speech is outside the scope of the First Amendment. U.S.C.A. Const.Amend. 1.

[8] Constitutional Law 92 ☞ 1955

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(P) Public Employees and Officials

           92k1955 k. Police and other public safety officials. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

**Municipal Corporations 268** ☜    185(1)

268 Municipal Corporations

268V Officers, Agents, and Employees

268V(B) Municipal Departments and Officers Thereof

268k179 Police

268k185 Suspension and Removal of Policemen

268k185(1) k. Grounds for removal or suspension. Most Cited Cases

Law enforcement officer's complaints to supervisor about fellow officer's behavior, his workplace incident reports, and his complaint to the inspector general, was speech falling within officer's official duties, and thus was not protected under the First Amendment, as required to support employee's retaliation claim; statements were made privately though channels available through officer's employment and were made in a manner that would not be available to a non-public employee citizen, and subject of statements was that other officer was not performing his job properly. U.S.C.A. Const.Amend. 1.

**[9] Libel and Slander 237** ☜    28

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k26 Repetition

237k28 k. By others in general. Most Cited Cases

It was simply implausible that narcotics investigator in any legally relevant sense caused the republication of his statements in an investigatory report or newspaper article regarding actions of a fellow investigator, as required to state a claim of defamation under New York law.

**[10] Libel and Slander 237** ☜    28

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k26 Repetition

237k28 k. By others in general. Most Cited Cases

Under New York law, a plaintiff may not recover damages from the original author for slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication.

*342 James Brian Lebow, Sr., New York, NY, for Plaintiffs.

Christine Alexandria Rodriguez, Christine A. Rodriguez, Law Office, Ivan B. Rubin, Peter Sangjin Hyun, New York State Office of the Attorney General, New York, NY, for Defendants.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*MEMORANDUM ORDER*

JED S. RAKOFF, District Judge.

On August 18, 2009, Plaintiff Matthew D'Olimpio brought this action (docket-numbered 09 Civ. 7283) against defendants Louis Crisafi, Brendan Vallely, Thomas D'Amicantonio, James Giglio, Michael Moffett, and Paul Nadel for malicious prosecution, false arrest, unlawful detention, and various other violations of the Constitution and 42 U.S.C. §§ 1983 and 1988. An amended complaint filed on October 29, 2009 joined Michael Kaplan as a plaintiff and added a claim against defendants Nadel, Jennifer Treacy, Kenneth Post, and Timothy Dewey for unconstitutionally retaliating against Kaplan based on his reports of misconduct committed by defendant Crisafi, a fellow investigator employed by the New York State Department of Health's Bureau of Narcotics Enforcement, Metropolitan Area Regional Office ("BNE-MARO"), in violation of the First and Fourteenth Amendments and § 1983.

On December 18, 2009, defendants Giglio, Moffett, and Nadel moved to dismiss all of D'Olimpio's claims against them, and defendants Crisafi, Vallely, and D'Amicantonio moved to dismiss D'Olimpio's malicious prosecution claim. That same day, defendants Nadel, Treacy, Post, and Dewey moved to dismiss Kaplan's claims against them. Meanwhile, on December 3, 2009, Crisafi had filed what was styled as a complaint against Kaplan (docket-numbered 09 Civ. 9952) alleging that Kaplan defamed him through publication of the reports of Crisafi's misconduct discussed in Kaplan's complaint. On the parties' consent, the Court converted Crisafi's complaint into a compulsory counterclaim in the action docket-numbered 09 Civ. 7283 and consolidated the two cases. *See* Transcript, 1/14/10, *Crisafi v. Kaplan,* No. 09 **\*343** Civ. 9952. On January 22, 2010, Kaplan moved to dismiss that counterclaim.

By Order dated March 1, 2010 (the "March 1 Order"), the Court granted the motion of Nadel, Treacy, Post, and Dewey to dismiss Kaplan's retaliation claim; granted Kaplan's motion to dismiss Crisafi's defamation counterclaim; and denied all other motions to dismiss.[FN1] The Order also promised that a Memorandum would issue in due course stating the reasons for these rulings. With apologies to counsel for the extended delay, the Court here provides that Memorandum.

> FN1. Although the Order did not explicitly so state, all the dismissals were with prejudice (which, as it happens, is also the default position when an order does not state whether a dismissal is or is not with prejudice).

The Court turns first to the motions of defendants Crisafi, Vallely, and D'Amicantonio to dismiss D'Olimpio's malicious prosecution claim, as set forth in the First Amended Complaint ("FAC") filed on October 29, 2009.[FN2] The relevant allegations are as follows:

> FN2. The first five causes of action in the FAC are D'Olimpio's claims. The sixth cause of action is Kaplan's claim.

Sometime before November 16, 2007, D'Olimpio, a resident of Brooklyn, was prescribed Vicodin by his doctor. FAC ¶ 17. He called that prescription into his pharmacy and obtained the Vicodin. *Id.* ¶ 18. D'Olimpio's pharmacy contacted the BNE-MARO after it had not received a hard copy of the prescription from D'Olimpio's doctor within seven days. *Id.* ¶ 19. A MARO official called D'Olimpio's doctor's office and spoke to an unknown individual there, who either stated by phone that he was not aware of D'Olimpio's Vicodin prescription or provided a faxed affidavit purportedly signed by the doctor to that effect. *Id.* ¶ 20. Based on these occurrences, and without any further investigation, MARO investigator Crisafi began planning Crisafi's arrest. *Id.* ¶ 21.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

On or about November 16, 2007, D'Olimpio was exiting his doctor's office in Brooklyn and walking toward his car when Crisafi and defendants Vallely and D'Amicantonio, also MARO investigators, showed D'Olimpio their badges and asked to speak with him. *Id.* ¶¶ 4, 27-28. They asked D'Olimpio his name, where he was coming from, what he was doing at the doctor's office, and whether the car was his. *Id.* ¶ 29. D'Olimpio replied it was his wife's car. *Id.* ¶ 30. Crisafi asked D'Olimpio if they could search him for weapons; D'Olimpio consented to be frisked, but not to a full search. *Id.* ¶¶ 31-32. Crisafi then frisked D'Olimpio, reached into his pockets, and took out his car keys. *Id.* ¶ 33. Crisafi asked D'Olimpio whether he would consent to a search of the car; D'Olimpio refused, but Crisafi nonetheless carried out the search. *Id.* ¶¶ 34-36. During the search, Crisafi found a bag containing a bottle marked for Klonopin but containing both Vicodin and Klonopin pills, all of which were lawfully prescribed to Crisafi and which he carried in one bottle for convenience. *Id.* ¶¶ 37-38. Upon finding the bottle and discovering that there were two types of pills inside, Crisafi handcuffed D'Olimpio and moved him into the police car, without making any effort to find out whether the drugs were legally prescribed. *Id.* ¶¶ 39-40.

While D'Olimpio was being driven to the police precinct and again when he was being escorted to a bathroom prior to questioning, D'Olimpio requested an attorney, but these requests were denied. *Id.* ¶¶ 41-44. Before questioning began, D'Olimpio asked Crisafi to call an ambulance so that he could take the Klonopin that he needed; Crisafi told D'Olimpio to call his wife and ask her to come to the precinct with his medication. *Id.* ¶¶ 46-47. When **344** D'Olimpio's wife arrived, D'Olimpio was brought into a different room, and his wife was given his possessions. *Id.* ¶ 48. Crisafi then offered D'Olimpio a blue pill, which he took, but D'Olimpio now believes that pill was not a Klonopin pill, as he experienced side effects of confusion and drowsiness after taking it, which he had never felt previously when taking Klonopin. *Id.* ¶ 50. Crisafi began to interrogate D'Olimpio, and at one point

threatened to rescind his father's physician license. *Id.* ¶ 51. D'Olimpio at that point again requested an attorney, and Crisafi again denied his request. *Id.* ¶¶ 52-53.

During the interrogation, Crisafi asked D'Olimpio to confess to charges of criminal possession of a controlled substance for possessing the Vicodin and to charges of criminal impersonation for allegedly calling pharmacies and using false information to obtain prescriptions. D'Olimpio, under the influence of the pill, signed a one-page confession presented to him by Crisafi. *Id.* ¶ 54. At Crisafi's request, Vallely signed a form falsely indicating that he had seen Crisafi inform D'Olimpio of his *Miranda* rights. *Id.* ¶ 55. D'Olimpio's forged signature was also added to this "*Miranda* sheet." *Id.* ¶ 56. Crisafi, perhaps with the assistance of Vallely or D'Amicantonio, also wrote a four-page confession and forged D'Olimpio's signature and initials on it. *Id.* ¶ 57. Furthermore, Crisafi, possibly with the assistance of Vallely and D'Amicantonio, drafted an affidavit falsely attesting that D'Olimpio illegally possessed Vicodin and that he impersonated a doctor to obtain his prescriptions. *Id.* ¶ 58.

D'Olimpio was then taken to the Manhattan Detention Center, where he was held for 24 hours prior to being arraigned. *Id.* ¶¶ 59-60. Based on the four-page confession and the affidavit, he was arraigned on the criminal possession and impersonation charges and then released on his own recognizance. *Id.* ¶¶ 61-62. According to the Complaint, D'Olimpio appeared in court about seven times before the charges against him were finally dropped on September 4, 2008. *Id.* ¶ 76.

On the basis of these allegations, D'Olimpio's third cause of action claims that Crisafi, Vallely, and D'Amicantonio maliciously prosecuted D'Olimpio by initiating the criminal charges.[FN3] These defendants moved to dismiss this malicious prosecution claim, primarily on the basis that the charges against D'Olimpio remained pending against him as of the time of their motion, as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

demonstrated by a Court Action Sheet of the Criminal Court, New York County. Decl. of Ivan Rubin, 12/22/09, Ex. 1. Because the favorable termination of the prosecution is a necessary element of a malicious prosecution claim under § 1983, *Green v. Mattingly,* 585 F.3d 97, 103 (2d Cir.2009), the pendency of criminal charges would be fatal to this cause of action.

> FN3. In the first, fourth, and fifth causes of action in the FAC, D'Olimpio respectively alleges that Crisafi, Vallely, and D'Amicantonio violated various constitutional rights, falsely arrested him, and unlawfully detained him. No motions to dismiss were filed with respect to these claims.

In his opposition to the motions to dismiss, D'Olimpio asserted that the Assistant District Attorney prosecuting D'Olimpio's criminal case had committed to move orally to dismiss that case at the next court hearing, which was scheduled for February 2, 2010. Based on that representation, this Court granted leave for D'Olimpio to file a Second Amended Complaint ("SAC") following that hearing. The Second Amended Complaint, filed on February 18, 2010, did indeed include the representation that the criminal charges were dismissed on February 2, 2010. SAC **345** ¶ 110. Since D'Olimpio had now sufficiently alleged the favorable termination of the criminal charges against him, the March 1 Order therefore denied the motions to dismiss D'Olimpio's malicious prosecution claim.[FN4]

> FN4. Defendants also asserted that the malicious prosecution claim should be dismissed because D'Olimpio's allegations failed to demonstrate the element of malice-*i.e.,* that there was "some deliberate act punctuated with awareness of 'conscious falsity' " with respect to the institution of criminal proceedings. *Bradley v. Vill. of Greenwood Lake,* 376 F.Supp.2d 528,

534-35 (S.D.N.Y.2005). But D'Olimpio's allegations regarding the false affidavits and confessions were clearly more than sufficient to plead malice.

Defendants Giglio, Moffett, and Nadel moved to dismiss D'Olimpio's second cause of action, which charged them with various constitutional violations based on their supervisory authority over Crisafi and their involvement with an alleged policy leading to D'Olimpio's false arrest. In this regard, the FAC contains the following allegations with respect to these defendants: At the time of the events alleged, James Giglio was the director of the BNE, and worked in the BNE's office in Troy, New York. *Id.* ¶ 5. Michael Moffett was the BNE's Section Chief with responsibility over BNE investigators, and also worked in the Troy office. *Id.* ¶ 6. Paul Nadel was the BNE's Program Director for the MARO, and worked in the same Manhattan office as Crisafi, Vallely, and D'Amicantonio. *Id.* ¶ 7. All three of these defendants had supervisory authority over Crisafi, Vallely, D'Amicantonio, and Kaplan. *Id.* ¶¶ 5-7.

The FAC further alleges that at the time of Crisafi's arrest, MARO followed the following protocol in order to determine whether a narcotics prescription was legitimate: First, when a patient called in a prescription to a pharmacy, the pharmacy would expect to receive a hard copy of the prescription from the patient's doctor within a week. Second, pharmacies were instructed to contact the MARO if they failed to receive a hard copy by the end of the seven-day period. Third, when the MARO was contacted by a pharmacy because the pharmacy did not receive a hard copy, a MARO officer would call the doctor's office and would either speak with the doctor to inquire whether the prescription was legitimate or would ask the doctor to fax an affidavit stating that the prescription was legitimate. *Id.* ¶ 11. With respect to this last step, MARO had a practice of confirming complaints from doctors by telephone and fax without taking any other steps to verify the doctors' identities. *Id.* ¶ 12.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

The FAC also includes the following allegations regarding the failure of Giglio, Moffett, and Nadel to supervise Crisafi: On March 22, 2007, the *New York Times* published an article detailing the abuse of parking placards by government officials. This article included a photograph of a car belonging to Crisafi. *Id.* ¶ 13. Shortly after the publication of that article, the New York State Inspector General's Office began an investigation of Crisafi, which unearthed evidence of other misconduct. *Id.* ¶ 14. Sometime before November 16, 2007, plaintiff Kaplan, a MARO investigator, sent Nadel a written complaint informing him that Crisafi was violating suspects' Fifth Amendment rights. *Id.* ¶ 15. Nadel took no action in response to this complaint. *Id.* ¶ 16. Kaplan followed up with a series of other complaints, including a report to the Inspector General, which are discussed more fully below in the context of Kaplan's retaliation claim. The Inspector General's investigation culminated in a report issued on December 8, 2008, written by Inspector General Joseph Fisch (the "Fisch Report"), which found that Crisafi committed numerous abuses, including many of those alleged by Kaplan, some of **\*346** which were assisted by Vallely and D'Amicantonio. The Fisch Report also found that Giglio and Moffett failed to supervise Crisafi and the MARO office, and noted the fact that Nadel, who was responsible for approving law enforcement operations, was a licensed pharmacist with no previous law enforcement experience. *Id.* ¶¶ 78-79.

Based on the above allegations, Crisafi in his second cause of action asserted § 1983 claims against Giglio, Moffett, and Nadel arising from (1) their creation of a policy allowing MARO personnel to initiate criminal charges based on a phone conversation or faxed affidavit without confirmation of the doctor's identity or that the alleged signature on the affidavit was authentic (the "Policy"); (2) their failure to supervise Crisafi and the MARO; (3) their allowing Nadel, a pharmacist with no prior law enforcement experience, to be the MARO Program Director; and (4) their deliberate indifference to D'Olimpio's rights. *Id.* ¶¶ 122-25.

Defendants attack these claims on several grounds. First, they assert that these claims are based on a broad theory of "supervisory liability" that has been discredited by the Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Prior to *Iqbal,* well-established Second Circuit law provided five bases for showing that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a § 1983 claim. A plaintiff could plead personal involvement by showing any of the following:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Defendants argue that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* therefore rendering D'Olimpio's reliance on some of the *Colon* categories unwarranted.

By way of background, the plaintiff in *Iqbal* brought a " *Bivens* " action against several high-ranking federal officials, including the Attorney General and the Director of the Federal Bureau of Investigation, based on allegations that following the September 11 attacks, the FBI "arrested and detained thousands of Arab and Muslim men" substantially on the basis of their race, religion, or national origin, and that as a result plaintiff was unlawfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

subjected to harsh confinement conditions substantially on these discriminatory bases. 129 S.Ct. at 1951. The Supreme Court, however, held, *inter alia,* that the complaint failed to state a claim for intentional discrimination with respect to the Attorney General and FBI Director, and, as part of that discussion, observed that neither *Bivens* itself (*i.e., Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)) nor § 1983 imposes supervisory liability simply on the basis of *respondeat superior;* rather, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948; *see also id.* at 1949 ("[T]he term 'supervisory liability' is a misnomer.... [E]ach Government official ... is only liable for his or her own misconduct."). The Court went on to note that the required showing of personal involvement "will vary with the **\*347** constitutional provision at issue"; as the plaintiff's claim in *Iqbal* was for "invidious discrimination" in violation of the First Amendment and Equal Protection Clause, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 1948. Accordingly, the Court rejected the plaintiff's theory that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 1949.

[1] The defendants here note that certain courts in this District have read these passages of *Iqbal* to mean that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ... [t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated." *Bellamy v. Mount Vernon Hosp.,* 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims under *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* 2009 WL 3321011, at *15 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim Iqbal eliminated."). This Court respectfully disagrees. As *Iqbal* noted, the degree of personal involvement varies depending on the

constitutional provision at issue; whereas invidious discrimination claims require a showing of discriminatory purpose, there is no analogous requirement applicable to D'Olimpio's allegations regarding his search, arrest, and prosecution. *See, e.g., Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). *Colon's* bases for liability are not founded on a theory of *respondeat superior,* but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. 58 F.3d at 873 (internal quotation marks omitted). Thus, the five *Colon* categories for personal liability of supervisors may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

[2] Apart from this argument based on *Iqbal,* Giglio and Moffett assert that D'Olimpio's claims against them should be dismissed insofar as they allege a failure to supervise the MARO investigators. They maintain that D'Olimpio's allegations in this regard are too conclusory to state a claim. The Court disagrees. The FAC incorporates by reference the Fisch Report, which summarizes an investigation beginning in March 2007, describes various acts of misconduct by Crisafi that took place prior to D'Olimpio's arrest, contains a section headed "Lack of Supervision of Crisafi and MARO," and indeed concludes that there was a "lack of appropriate supervision by [Crisafi's] supervisors at MARO and at

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

BNE's headquarters in Troy," where Giglio and Moffett were in charge. Fisch Report, 12/8/08, at 4, 16-17, *available at http:// www. ig. state. ny. us/ *348 pd fs/Investigationöf% 20Employee% 20Misconduct% 20at% 20the% 20DOH% 20Bureau% 20of% 20Narcotics% 20Enforcement.pdf* (cited in FAC ¶ 78). These findings by the Inspector General strongly suggest that defendants Giglio and Moffett "fail[ed] to act on information indicating unconstitutional acts were occurring," or were "gross[ly] negligen[t] in failing to supervise ... subordinates who commit ... wrongful acts," or were otherwise deliberately indifferent to suspects' rights, and also demonstrate "an affirmative causal link between the supervisor's inaction and [plaintiff's] injury." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002). For the foregoing reasons, the March 1 Order held that the claims against Giglio and Moffett in this respect cannot be dismissed.

Nadel also argued that the claims against him for his failure to supervise Crisafi must be dismissed because there were no specific allegations of Nadel's personal involvement. The FAC does allege, however, that Kaplan complained to Nadel in writing of Crisafi's misconduct prior to D'Olimpio's arrest. FAC ¶ 15. The Fisch Report, although it does not dwell on Nadel's actions, cites Nadel's lack of prior law enforcement experience and describes complaints by MARO investigators that the lack of a Program Director with law enforcement experience allowed Crisafi "to attain an inappropriate degree of power within the office." Fisch Report at 1, 16. Because the Court, in ruling on a motion to dismiss, must "take all facts and draw all inferences in the light most favorable" to the plaintiff, *Gross v. Rell,* 585 F.3d 72, 75 n. 1 (2d Cir.2009), and because, as noted, the FAC incorporates by reference the allegations of the Fisch Report, the Fisch Report's conclusion that there was a general failure to supervise Crisafi must be taken for these purposes to apply to Nadel, Crisafi's immediate supervisor.[FN5] Thus, the March 1 Order denied the motion to dismiss the claim alleging Nadel's failure to supervise.

FN5. Defendants' reply memorandum asserted that contrary to what was pleaded in the FAC, Crisafi was a Senior Investigator at the time of D'Olimpio's arrest and thus did not report to Nadel at that time. In support of this, it cited to the Fisch Report, which mentions that Crisafi was temporarily promoted between 2006 and March 2008. Fisch Report at 16. The Report does not, however, state that Crisafi ceased reporting to Nadel during this period. The FAC alleges that Nadel, as MARO Program Director, had supervisory authority over all MARO investigators. FAC ¶ 7. In light of the allegations in the FAC, and taking all inferences in favor of D'Olimpio, the Court cannot conclude that Nadel lacked supervisory authority over Crisafi during this period. In any event, it is undisputed that Nadel supervised Vallely and D'Amicantonio, who are also alleged to have violated D'Olimpio's constitutional rights.

With respect to those aspects of plaintiff D'Olimpio's second cause of action that relate to the alleged "Policy," that Policy allegedly permitted BNE investigators to rely on unverified telephone communications with, or faxed affidavits from, doctors' offices to satisfy the requirement of probable cause to arrest suspects or initiate criminal charges. While defendants appear to concede that Giglio, Moffett, and Nadel were sufficiently involved with the formation and operation of this Policy to satisfy the personal involvement requirement of § 1983, they argue that the alleged Policy is not unconstitutional, or at the very least, that the doctrine of qualified immunity should bar further proceedings with respect to these allegations.

[3][4] "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is *349 committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). The probable cause determination is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

based on the "totality of the circumstances," and does not readily lend itself to being reduced to a "neat set of legal rules." *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir.2002) (internal quotation marks omitted). Furthermore, "in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Id.* (internal quotation mark omitted). The Supreme Court has held that tips from informants can provide probable cause to arrest, but only if either the informant or the information in his/her tips has been shown to be reliable or has been sufficiently corroborated. *See Illinois v. Gates,* 462 U.S. 213, 242, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[E]ven in making a warrantless arrest[,] an officer 'may rely upon information received through an informant, rather than upon his direct observations, *so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.'* " (emphasis added)); *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (anonymous call to police reporting that person was carrying a gun lacked indicia of reliability sufficient to satisfy "reasonable suspicion" standard with respect to a police officer's stop-and-frisk search, even though that standard requires a lesser showing than probable cause to arrest); *see also United States v. Elmore,* 482 F.3d 172, 179 (2d Cir.2007) ("Even a tip from a completely anonymous informant-though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable-can form the basis of reasonable suspicion or probable cause *if it is sufficiently corroborated.*" (emphasis added) (citation omitted)); *Oliveira v. Mayer,* 23 F.3d 642, 647 (2d Cir.1994) ("Information about criminal activity provided by a single complainant can establish probable cause *when that information is sufficiently reliable and corroborated.*" (emphasis added)).

[5] Defendants argue that the Policy provides BNE officers with probable cause (either on the merits or sufficient to entitle them to qualified immunity) because the information provided by the doctors' offices is sufficiently reliable to support a reasonable belief that a crime has been committed. For this proposition, the defendants rely primarily on two out-of-circuit cases,

*United States v. Fooladi,* 703 F.2d 180 (5th Cir.1983), and *Edwards v. Cabrera,* 58 F.3d 290 (7th Cir.1995). While these cases do support the proposition that it may be error to discount information provided by disinterested informants absent reason to doubt these informants' veracity, even when their names are not known to the law enforcement officer, these cases do not stand for the proposition that such information alone suffices to establish probable cause. Rather, in *Fooladi,* the probable cause determination was not based solely on information provided by a representative of a glass manufacturer, which the Fifth Circuit held that the trial court had erroneously disregarded. Instead, the arrest was based not only on the employee's tip that the manufacturer had shipped glassware to a purported business address that was in fact the arrestee's personal address, but also on, among other things, the law enforcement agent's personal observation that the arrestee's residence emanated an odor characteristic of methamphetamine manufacturing and that the arrestee left the premises "holding his gloved hands away from his body as if a chemical were on them." 703 F.2d at 181-84. Similarly, in *Edwards,* the Seventh Circuit found that probable cause existed not just because of a tip from a bus **350** driver, relayed through a dispatcher, that the driver thought he saw several men participate in a drug transaction in a bus station, but also based on the police officer's own personal observations of several men, including the arrestee and his brother, who matched the driver's description standing together outside the bus station; the officer's personal observation that the arrestee's brother was so nervous that he appeared to have urinated on himself; and the officer's subsequent consent search of the brother's garment bag, which yielded a plastic bag appearing to contain marijuana. 58 F.3d at 292.

These cases are thus consistent with the law in this Circuit, as articulated in *Caldarola v. Calabrese,* 298 F.3d 156 (2d Cir.2002). The plaintiff in *Caldarola,* a New York corrections officer challenged his arrest on charges that he was unlawfully collecting job injury benefits even though he was no longer a New York resident and thus was not qualified to receive such benefits. The arresting officer determined there was probable cause to believe the plaintiff had moved from New York to Connecticut based

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

on an investigative file containing reports from two private investigation firms that had been hired by the officer's supervisors. The reports themselves contained, among other things, summaries of investigators' personal interviews with the plaintiff's New York neighbors, surveillance tapes showing the plaintiff emerging from a home in Connecticut and dropping his children off at school, a deed and mortgage for a Connecticut home in the plaintiff's name indicating that it was his primary residence, and work attendance records indicating that the plaintiff had a Connecticut telephone number. The Second Circuit held that it was reasonable for the arresting officer to conclude that these private investigative firms hired by his supervisors were reliable and that the investigators' reports provided information corroborating their conclusions. *Id.* at 163-68. Thus, accepting *arguendo* defendants' assertion that *Caldarola* stands for the proposition that information gathered by private investigators can support probable cause even in the absence of personal knowledge by the arresting officer, the decision certainly does not suggest that an unadorned, unverified phone call or fax can, by itself, without further meaningful corroboration, satisfy probable cause or support qualified immunity.

[6] Returning to the allegations in the FAC, D'Olimpio has asserted that, consistent with the Policy, his arrest was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of the prescription within a week, which prompted a MARO official to call D'Olimpio's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of the doctor. None of the above-cited cases suggests that this information originating from an unidentifiable person in a doctor's office can even come close to satisfying probable cause to arrest, absent corroboration or other indicia of reliability. Unlike *Caldarola,* here there is no underlying data providing support for the informant's conclusion. There is no indication that the identity of the informant here could ever be determined. *Cf. J.L.,* 529 U.S. at 270, 120 S.Ct. 1375 ("Unlike a tip from a known informant whose

reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' " (citation omitted)). There is no suggestion that the MARO investigators had any reason to rely on this particular doctor's office; to the contrary, there are numerous *351 reasons why a doctor or her staff might inadvertently provide inaccurate information, especially given that the relevant information is not affirmatively provided by a tipper, but rather can be elicited by the investigator from whoever happens to pick up the phone in the doctor's office. Moreover, if the doctor herself were involved in wrongdoing with respect to the prescription of narcotics, she would have an incentive to affirmatively mislead the investigators. In sum, while a report from a doctor or her staff denying knowledge of the prescription might be a reasonable basis for further investigation, it is patently deficient as the sole ground for an arrest.

For the foregoing reasons, under the facts alleged and the clearly established law cited herein, defendants lacked even arguable probable cause to arrest D'Olimpio. Because the circumstances of this arrest were consistent with the Policy (as alleged), and because defendants do not dispute that Giglio, Moffett, and Nadel had personal involvement with the establishment and enforcement of this Policy, the March 1 Order declined to dismiss the second cause of action with respect to these allegations.

The Court turns next to those portions of the FAC that assert claims by plaintiff Kaplan, all of which the defendants moved to dismiss. Kaplan's claim of retaliation for expressing his First Amendment rights (the sixth cause of action in the FAC) is based on the following allegations: Kaplan (as noted) is a MARO investigator. FAC ¶ 3. During at least some of the times covered by the FAC, Crisafi was Kaplan's supervisor. *Id.* ¶ 64. As described above, Kaplan complained to Nadel about Crisafi prior to November 16, 2007, but Nadel took no action. *Id.* ¶¶ 15-16. On or about November 17, 2007, Kaplan again went to Nadel and raised concerns about

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Crisafi: in particular, he stated that Crisafi took prescription narcotics while on duty; that Crisafi would experience facial tics and "zone out"; that Crisafi accidentally discharged his weapon while on duty; that Crisafi lied about his previous job experience; that Crisafi had investigators perform "ill-conceived" and dangerous arrests and searches; that Crisafi was violating suspects' *Miranda* rights; that Crisafi, without authorization, put sirens and lights on his car; and that Crisafi was working outside jobs during work hours. *Id.* ¶ 63. Despite the fact that Kaplan told Nadel that he was afraid of Crisafi and Nadel assured Kaplan that the conversation would be kept confidential, Nadel reported this conversation to Crisafi. *Id.* ¶¶ 63-64. Thereafter, on or about November 20, 2007, Crisafi threatened Kaplan by walking up behind him and saying, "Bang bang, you're dead." *Id.* ¶ 65. At around that same time, Kaplan filed a Workplace Incident Report with the Department of Health's Bureau of Employee Relations detailing these threats and reporting Crisafi's other misconduct, of which he had previously complained to Nadel. *Id.* ¶ 66. In response, Crisafi sabotaged Kaplan's work product on several occasions and began to spread rumors about him, including rumors that Kaplan appeared tired and slept while at the office. *Id.* ¶¶ 67-68. Kaplan then called the Inspector General to report these concerns about Crisafi, and the Inspector General then widened his ongoing investigation of Crisafi to address these issues. *Id.* ¶¶ 69-70. Because, however, the Inspector General's investigation led to interviews with all the MARO inspectors except for Kaplan, Crisafi and Nadel were able to infer that Kaplan was the whistleblower. *Id.* ¶ 71.

Kaplan, after spraining his ankle while on duty, went on workers' compensation leave on or about February 27, 2008. *Id.* ¶ 72. A bullet was shot at Kaplan's house on April 17, 2008, and on April 25, 2008, his house was vandalized. *Id.* ¶¶ 73-74. **\*352** On August 12, 2008, after Kaplan was notified that Employee Relations never received his first Workplace Incident Report, Kaplan resubmitted it. *Id.* ¶ 75.

After publication of the Fisch Report, Giglio resigned as the director of the BNE. *Id.* ¶ 81. In December 2008, defendant Jennifer Treacy was appointed Deputy Director of the New York State Department of Health, with supervisory authority over the BNE and the MARO. *Id.* ¶ 82. The Inspector General attempted to persuade Kaplan to return to work, as Crisafi was on leave and would face discipline for his conduct. *Id.* ¶ 83. Kaplan agreed to return to work and received a physician's evaluation that he was fit to return. *Id.* ¶¶ 84-86. Nonetheless, Kaplan was required to undergo three additional physical examinations; after reviewing these, the relevant administrator concluded that Kaplan was fit to return, provided the he be closely monitored, specifically for falling asleep at work. *Id.* ¶¶ 87-90. He was scheduled to return to work on April 10, 2009. *Id.* ¶ 91. The FAC alleges that Treacy, who was romantically involved with Giglio, was upset about Giglio's resignation and blamed Kaplan for causing it; therefore, she ordered the acting director of the BNE not to allow Kaplan to return. *Id.* ¶¶ 92-93. On April 9, 2009, Kaplan was told not to return because of a lack of staff, and on April 23, the Department of Health sent him a letter informing him that he was terminated for failing to complete a study to confirm he did not have a sleep disorder. *Id.* ¶¶ 94-95. Kaplan filed a grievance and, after a hearing, was allowed to return to work. *Id.* ¶ 96.

In May 2009, defendant Kenneth Post was appointed as director of the BNE, and defendant Timothy Dewey was appointed as BNE Section Chief. *Id.* ¶¶ 97-98. In June 2009, Kaplan returned to work, and was informed that he would only be given a temporary assignment and would not perform fieldwork. *Id.* ¶ 99. After his reinstatement, Kaplan was denied access to a state car and was not given a badge, gun, or firearms training; he was confined to desk duties and menial document review. *Id.* ¶¶ 100-101. On July 14, 2009, Kaplan met with Dewey to complain about his treatment. *Id.* ¶ 102. D'Olimpio filed his original complaint in the instant action on August 18, 2009. In September 2009, Stephanie Jubic of Employee Relations confiscated the computers of Crisafi, Vallely, D'Amicantonio, and Kaplan-Kaplan believes Jubic downloaded his emails to find grounds to terminate him. *Id.* ¶ 105. On October 8, 2009, Kaplan was placed on

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

administrative leave and told not to contact anyone at the BNE. *Id.* ¶ 108. On October 16, Jubic mailed Kaplan a letter stating that he would be interrogated on October 27 and would possibly face discipline. *Id.* ¶ 109. Also on October 16, Kaplan had a grievance hearing to discuss being denied his proper job responsibilities. At this hearing, Post stated that as BNE director, it was in his discretion to decide what duties Kaplan should have. *Id.* ¶ 110.

Based on these facts, Kaplan alleges in that defendants Treacy, Post, Dewey, and Nadel retaliated against him with respect to speech that was protected by the First Amendment. These defendants have moved to dismiss Kaplan's claim on several grounds, including that Kaplan's speech was made pursuant to his official duties and hence is not protected by the First Amendment.

[7] A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee "spoke as a citizen on a matter of public concern"; otherwise, the employee's speech is outside the scope of the First Amendment. *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (internal quotation *353 mark omitted). In *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951. Though not without reluctance, the Court concludes that this "official duties" exception, as recently elaborated on by the Second Circuit in *Weintraub v. Board of Education,* 593 F.3d 196 (2d Cir.2010), is fatal to Kaplan's retaliation claim.

*Weintraub* made clear that for purposes of determining whether a public employee's speech is protected, a public employee's "official duties" are to be

construed broadly. The plaintiff in *Weintraub* was a public school teacher, and the allegedly protected speech consisted of a grievance he filed with his union challenging a school administrator's decision not to discipline a disruptive student. Quoting *Garcetti,* the Court of Appeals stated that the inquiry into whether a public employee speaks pursuant his official duties is "a practical one," and that the employee's duties should not be interpreted narrowly. 593 F.3d at 202 (internal quotation marks omitted). Thus, *Weintraub* held:

[U]nder the First Amendment, speech can be "pursuant to" a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer. In particular, we conclude that Weintraub's grievance was "pursuant to" his official duties because it was "part-and-parcel of his concerns" about his ability to "properly execute his duties," as a public school teacher-namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning.... Weintraub's speech challenging the school administration's decision to not discipline a student in his class was a "means to fulfill," and "undertaken in the course of performing," his primary employment responsibility of teaching.

*Id.* at 203 (citations omitted). The court went on to note that its conclusion was supported "by the fact that [Weintraub's] speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue." *Id.* Whereas actions like writing a letter to a newspaper or informally discussing politics with co-workers are equally available to government employees and ordinary citizens, "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens." *Id.* at 203-04.

[8] Here, the speech that Kaplan claims is protected falls within Kaplan's official duties as defined by

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*Weintraub.* In the FAC, Kaplan alleges that the retaliation he allegedly suffered was in response to the following statements: (1) his complaints to Nadel about Crisafi's behavior; (2) his Workplace Incident Reports; and (3) his complaint to the Inspector General. With the possible exception of the latter, each of these statements, as Kaplan concedes, was "made privately though channels available through his employment, and was "made in a manner that would not be available to a non-public employee citizen." Kaplan Supp. Mem., 2/5/10, at 5. Moreover, the common theme of all these statements was that Crisafi was violating suspects' rights and was not performing his job properly, and by implication that Crisafi was interfering with Kaplan's ability to perform his own duties. It is clear that Kaplan's duties as a MARO officer included ensuring that investigations and arrests of narcotics abuses are lawfully conducted. *See, e.g.,* Fisch Report at 2-3 (describing policies and training manuals **354** applicable to BNE investigators). All of Kaplan's relevant speech was therefore, either directly or indirectly, " 'part-and-parcel of his concerns' about his ability to 'properly execute his duties' " as a BNE investigator. *Weintraub,* 593 F.3d at 203. Just as the speech in *Weintraub* was in furtherance of the teacher's duty to maintain classroom discipline, Kaplan's speech here, which related to ensuring the "safety of citizens" and the "constitutional rights of suspects," Kaplan Supp. Mem. at 5, was made in furtherance of his law enforcement duties as an investigator endowed with the power to arrest. *Cf. Carter v. Inc. Vill. of Ocean Beach,* 693 F.Supp.2d 203, 211 (E.D.N.Y.2010) ( "All of plaintiffs' complaints to their superiors ... related to their concerns about their ability to properly execute their duties as police officers, as they expressed concern [that various acts] affected their ability to perform their job assignments safely and that they were told not to issue summonses to certain individuals and businesses.... Plaintiffs' speech in challenging ... defendants' alleged cover-ups of officer misconduct ... was undertaken in the course of performing one of their core employment responsibilities of enforcing the law and, thus, was speech made pursuant to their official duties."). Accordingly, Kaplan's allegations cannot support a First Amendment retaliation claim.

In addition, the speech contained in Kaplan's Workplace Incident Reports and his complaint to the Inspector General were unprotected by the First Amendment because these statements were required by law. *See* N.Y. Labor Law § 27-b(6)(a) ("Any employee ... who believes that a serious violation of a workplace violence protection program exists or that an imminent danger exists shall bring such matter to the attention of a supervisor in the form of a written notice."); N.Y. Exec. Law § 55(1) ("Every state officer or employee in a covered agency shall report promptly to the state inspector general any information concerning corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment .... The knowing failure of any officer or employee to so report shall be cause for removal from office or employment or other appropriate penalty.").[FN6] Speech made pursuant to a public employee's legal obligations is not made "as a citizen."[FN7]

FN6. It is these statutory obligations, as well as *Weintraub's* broad definition of speech made in the course of official duties, that distinguish Kaplan's speech from that of the plaintiff in *Freitag v. Ayers,* 468 F.3d 528 (9th Cir.2006). The plaintiff in *Freitag,* a California correctional officer, claimed she was retaliated against after reporting to the California Inspector General that she and other prison guards were being sexually harassed. Although the Ninth Circuit held that the plaintiff "acted as a citizen" in complaining to the Inspector General and in writing letters to a state senator regarding this harassment, the court's holding was based on the fact that "[i]t was certainly not part of [plaintiff's] official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly." *Id. at 545.* Under New York law, however, such complaints *are* within the official duties of BNE investigators.

FN7. Because Kaplan's speech was made

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

pursuant to his official duties and thus is not constitutionally protected, the Court need not reach other required elements of a First Amendment retaliation claim, including whether his speech addressed matters of "public concern," *see Sousa, 578 F.3d at 170,* and whether the complaint sufficiently alleges a causal connection between the protected speech and the retaliatory acts, *see Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir.2001).*

For the foregoing reasons, the March 1 Order denied the sixth cause of action in the FAC, and, as the Court now clarifies, the dismissal was with prejudice because it rests on a legal ground that cannot be **\*355** cured by repleading. *Cf. Oliver Schs., Inc. v. Foley, 930 F.2d 248, 252-53 (2d Cir.1991).* The Court notes, however, that the dismissal of Kaplan's First Amendment claim brought pursuant to § 1983 does not alter Kaplan's opportunity under applicable New York law to seek protection from the retaliatory acts he alleges. *See* N.Y. Labor Law § 27-b(6)(e) (prohibiting retaliation based on an employee's filing of a report of workplace violence); N.Y. Exec. Law § 55(1) (providing that employees who report "improper governmental action" to the Inspector General "shall not be subject to dismissal, discipline or other adverse personnel action").

[9] The Court comes finally to Crisafi's counterclaim for defamation, which insinuates that the aforementioned Workplace Incident Reports filed by Kaplan, Kaplan's complaint to the Inspector General, and even Kaplan's allegations in the FAC are defamatory. Crisafi subsequently conceded, however, that the only potentially actionable statements not protected by privilege or barred by the statute of limitations are those that were allegedly republished on December 8, 2008 by the Inspector General and the *New York Times.* Crisafi Mem. Opp. Kaplan's Mot. to Dismiss, 2/5/10, at 4-5. In this respect, the counterclaim, which was filed on December 3, 2009, alleges the following: Kaplan filed Workplace Incident Reports on or about November 20, 2007 and August 12,

2008 reporting various misconduct by Crisafi, and made a complaint to the Inspector General to the same effect on or about November 20, 2007. Crisafi Compl. ¶¶ 15, 17, 20, Exs. C-E. Crisafi alleges, based on information and belief, that Kaplan's report to the Inspector General "prompted an investigation" focused on Crisafi and relating to Kaplan's complaints. *Id.* ¶ 19. Also upon information and belief, Crisafi alleges that a copy of the Fisch Report was provided to Kaplan in advance of its public release. *Id.* ¶ 35. This report was also provided to the *New York Times,* which described this report in an article published on December 8, 2008. *Id.* ¶ 36 & Ex. F. Upon information and belief, Crisafi alleges that Kaplan gave the Fisch Report to the *New York Times. Id.* ¶ 37. The Fisch Report was published on the *New York Times's* and Inspector General's websites, where it remains accessible. *Id.* ¶¶ 39-40. Crisafi alleges that the contents of the *New York Times* article and the Fisch Report reflect false and defamatory statements made by Kaplan, and have caused Crisafi to be vilified and his reputation to suffer. *Id.* ¶¶ 16, 18, 21, 23-33, 41-43. Accordingly, Crisafi asserted two causes of action alleging that Kaplan defamed him. Kaplan then moved to dismiss these counterclaims on the basis that Kaplan is not responsible for the republication of his allegedly defamatory statements by the *New York Times* or the Inspector General.

[10] Under New York law, a plaintiff "may not recover damages from the original author for ... slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 59 (2d Cir.2002).* Crisafi argues that a more lenient standard applies, permitting liability based on Kaplan's mere knowledge or reasonable expectation that his allegedly defamatory statements would be republished. *See, e.g., Campo v. Paar, 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963).* The Court need not resolve which standard applies: Crisafi's counterclaim is deficient under either test because it fails to "state a claim to relief that is plausible on its face." *Iqbal, 129 S.Ct. at 1949* (internal quotation marks omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Even accepting as true Crisafi's non-conclusory factual allegations, including **356** those made only on information and belief, it is simply implausible that Kaplan in any legally relevant sense caused the republication of his statements in the Fisch Report or *New York Times* article. Crisafi alleges that Kaplan's complaint prompted the Inspector General investigation, but this allegation is contradicted by the Fisch Report itself, which indicates that the investigation began after the *New York Times* published an article in March 22, 2007 describing abuses of government-issued parking placards. Fisch Report at 3-4. In any event, even if Kaplan's complaint served to expand the scope the investigation, and included allegations consistent with what the Fisch Report eventually concluded, the Report clearly did more than merely parrot Kaplan's charges. The Report, in a section headed "Methodology," states that the investigation was based on, among other things, interviews with Crisafi himself, other BNE employees, Giglio, and Moffett, as well as other police officers and district attorneys who had interacted with Crisafi. *Id.* at 4. Indeed, the Inspector General is required by statute to "investigate," not merely repeat, allegations of malfeasance. N.Y. Exec. Law § 53. And even if, as alleged, Kaplan acted to bring the Report to the attention of the *New York Times,* the *New York Times* article, which consists entirely of a summary of the Fisch Report, reflects Kaplan's allegations only to the extent that such charges were ratified by the Report itself. *See* Crisafi Compl., Ex. F.

For these reasons, the Court concluded that there is no basis for holding Kaplan liable for the republication of his allegedly defamatory statements, even if he intended that his allegations be republished in this manner and gave the *New York Times* a copy of the Fisch Report. "The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication." *Van-Go Transp. Co. v. N.Y. City Bd. of Educ.,* 971 F.Supp. 90, 102 (E.D.N.Y.1997) (internal quotation marks omitted). Here,

the duty of the Inspector General to investigate complaints prior to publishing a written report, the fact that the Fisch Report was based on numerous sources beyond Kaplan's allegations, and the fact that the *New York Times* article merely summarized the Fisch Report together sever any causal link that might exist between Kaplan's actions and the December 8, 2008 republications. Thus, the March 1 Order dismissed Crisafi's counterclaim with prejudice. [FN8]

FN8. This result is not inconsistent with *Campo v. Paar,* 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963), which declared that "[a]nyone giving a statement to a representative of a newspaper authorizing or intending its publication is responsible for any damage caused by the publication." This broad pronouncement was made in the context of a narrower holding that the defendant, Jack Paar, could be held responsible for the *New York Post's* publication of his statement, made by him to a reporter during an interview, that the plaintiff "lacked certain qualities which would fit him to be a performer desirable to [Paar's] program." *Id.* at 365, 239 N.Y.S.2d 494. The causal link between Kaplan's statements and the findings of the Fisch Report, which were subsequently summarized by the *New York Times,* is obviously much more attenuated than the relationship in *Campo* between Paar's statement to the newspaper reporter during an interview and the reporter's publication of that statement.

For the foregoing reasons, the Court hereby confirms its decisions to dismiss the sixth cause of action (*i.e.,* all of Kaplan's claims) and to dismiss both of Crisafi's counterclaims, all with prejudice, and to otherwise deny the motions to dismiss. The Clerk of the Court is directed to close **357** the entries numbered 33, 34, 35, 42, and 47 on the docket of case number 09 Civ. 7283 and to close case number 09 Civ. 9952.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)


S.D.N.Y.,2010.

D'Olimpio v. Crisafi

718 F.Supp.2d 340


END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Gultela QASEM, Plaintiff,

v.

Luis A. TORO; Superintendent of Taconic Correctional Facility Delores Thornton; Deputy Superintendent for Security William Rogers; John Does 1-10, Defendants.

No. 09 Civ. 8361(SHS).

Aug. 10, 2010.

**Background:** Inmate brought a § 1983 suit against corrections officials regarding injuries suffered by the inmate at the hands of a corrections officer alleged to have sexually assaulted the inmate. Superintendent and deputy superintendent for security moved to dismiss claims that they were deliberately indifferent to the inmate's personal safety.

**Holdings:** The District Court, Sidney H. Stein, J., held that:

(1) inmate stated a claim against the movants for Eighth and Fourteenth Amendment violations, and

(2) movants were not entitled to qualified immunity.

Motion denied.

West Headnotes

**[1] Civil Rights 78 ⚷ 1358**

78 Civil Rights

   78III Federal Remedies in General

      78k1353 Liability of Public Officials

         78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases

**Constitutional Law 92 ⚷ 4825**

92 Constitutional Law

   92XXVII Due Process

      92XXVII(H) Criminal Law

         92XXVII(H)11 Imprisonment and Incidents Thereof

            92k4825 k. Use of Force; Protection from Violence. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

**Prisons 310** &#x1F511;    **234**

310 Prisons

    310II Prisoners and Inmates

        310II(E) Place or Mode of Confinement

            310k234 k. Duty to Protect; Protective Confinement. Most Cited Cases

**Sentencing and Punishment 350H** &#x1F511;    **1537**

350H Sentencing and Punishment

    350HVII Cruel and Unusual Punishment in General

        350HVII(H) Conditions of Confinement

            350Hk1537 k. Protection from Violence. Most Cited Cases

    Inmate's allegations against superintendent and deputy superintendent for security in a § 1983 suit, claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, stated a claim for Eighth and Fourteenth Amendment violations; complaint alleged that the officials were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with another official, the investigation and response to complaints of staff misconduct. U.S.C.A. Const.Amends. 8, 14; 42 U.S.C.A. § 1983.

[2] Civil Rights 78 &#x1F511;    1335

78 Civil Rights

    78III Federal Remedies in General

        78k1334 Persons Liable in General

            78k1335 k. In General. Most Cited Cases

    Degree of personal involvement required to overcome a motion to dismiss a § 1983 claim for failure to state a claim varies depending on the constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[3] Civil Rights 78 &#x1F511;    1355

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

            78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases

    Categories set forth in case law as supporting personal liability of supervisors under § 1983 apply as long as they are consistent the requirements applicable to the particular constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983.

[4] Sentencing and Punishment 350H &#x1F511;    1532

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

      350HVII(H) Conditions of Confinement

         350Hk1532 k. In General. Most Cited Cases

Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. U.S.C.A. Const.Amend. 8.

**[5] Sentencing and Punishment 350H ☞ 1533**

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

      350HVII(H) Conditions of Confinement

         350Hk1533 k. Deliberate Indifference in General. Most Cited Cases

Official acts with the requisite deliberate indifference for an Eighth Amendment violation when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. U.S.C.A. Const.Amend. 8.

**[6] Civil Rights 78 ☞ 1376(7)**

78 Civil Rights

   78III Federal Remedies in General

      78k1372 Privilege or Immunity; Good Faith and Probable Cause

         78k1376 Government Agencies and Officers

            78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

Superintendent and deputy superintendent for security were not entitled to qualified immunity in an inmate's § 1983 suit claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable, if not unintelligible, decisions made with respect to the inmate during the course of an investigation. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ☞ 1376(2)**

78 Civil Rights

   78III Federal Remedies in General

      78k1372 Privilege or Immunity; Good Faith and Probable Cause

         78k1376 Government Agencies and Officers

            78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

Individual defendants are shielded from liability for civil damages under § 1983 if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

Karen K. Won, Cooley Godward Kronish LLP, William O'Brien, Kronish, Lieb, Weiner & Hellman L.L.P., New York, NY, for Plaintiff.

Thomas Patrick McCloskey, Aliazzo, McCloskey & Gonzalez, LLP, Ozone Park, NY, Julia Hyun-Joo Lee, New York State Department of Law, New York, NY, for Defendants.

*OPINION & ORDER*

SIDNEY H. STEIN, District Judge.

**\*1** Plaintiff Gultela Qasem brings this action pursuant to 42 U.S.C. § 1983 against defendants Luis Toro, Delores Thornton, William Rogers, and John Does 1-10 in their individual capacities. The lawsuit arises from injuries allegedly suffered by Qasem at the hands of Corrections Officer Luis Toro while Qasem was an inmate under the custody of the New York State Department of Correctional Services ("DOCS") at Taconic Correctional Facility. The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) direct and repeated acts of sexual assault by Toro; (2) Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Defendants Thornton and Rogers have now moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for relief.

## I. BACKGROUND

The following facts are taken from the complaint and presumed to be true for the purposes of this motion.

### A. *Parties*

Plaintiff Gultela Qasem is currently an inmate at the Bedford Hills Correctional Facility. At the time of the acts alleged in the complaint, plaintiff was an inmate at the Taconic Correctional Facility. (Compl. ¶¶ 5, 21.) Defendant Toro-not a party to the present motion-is a DOCS Corrections Officer. At the time of the acts alleged in the complaint, defendant Delores Thornton was the Superintendent of Taconic and defendant Rogers was the Deputy Superintendent for Security of Taconic. (*Id.* ¶¶ 1, 8-9.)

### B. *This Action*

Qasem alleges defendants violated her Eighth and Fourteenth Amendment rights under the United States Constitution as they arise out of a repeated pattern of sexual assault and rape committed against her by Toro.

While an inmate at Taconic, Qasem was assigned to work in Building 93 from approximately February 2007 to November 2007, and for most of that time, she also lived there. (*Id.* ¶¶ 21-22.) Qasem alleges that, on or around March 27, 2007, Toro entered her cell during the afternoon "count time" [FN1] and sexually assaulted her by fondling her breasts, vaginal area, and buttocks while also exposing his penis and forcing Qasem to perform oral sex on him. (*Id.* ¶ 23.) Plaintiff alleges that later that evening Toro ordered her to the officers' station where he raped her. (*Id.* ¶ 24.) Toro then told Qasem that he would write up a disciplinary action against her if she told anyone what he had done to her. (*Id.* ¶ 24.)

Qasem alleges that a pattern of sexual assault emerged over the next eight months. Toro allegedly assaulted and raped Qasem in her cell on numerous occasions during the night count time, in the officers' station, in the shower area, and in the recreation room. (*Id.* ¶¶ 25-26.) Throughout these eight months, Qasem alleges that Toro

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

repeatedly threatened to kill her and her family if she reported his actions. As a result, she did not report Toro's conduct. (*Id.* ¶ 27.) Plaintiff alleges, however, that other corrections staff facilitated Toro's repeated sexual abuse by condoning Toro or plaintiff being in unauthorized areas and allowing Toro into plaintiff's housing area when he was not assigned there. (*Id.* ¶ 28.)

**\*2** Although Qasem did not file a report against Toro based on his conduct, others did, and on July 2, 2007, the DOCS Officer of Inspector General ("IG") commenced an investigation into Toro's actions. (*Id.* ¶¶ 31-33.) When interviewed by an IG representative, Qasem denied the allegations because of the prior threats that Toro had made; despite her denials, plaintiff was reassigned to a different building the day after her interview. (*Id.* ¶¶ 33-34.) As the IG continued its investigation, in August 2007 Qasem was transferred back to building 93, which was the building where Toro worked at that time. Plaintiff contends that by causing her to be transferred back to Toro's building, defendants Thornton and Rogers were deliberately indifferent to her safety and allowed Toro to have continued unfettered access to her, which enabled him to continue raping and sexually abusing her. (*Id.* ¶ 38.) Plaintiff alleges that once she returned to building 93 in August 2007, Toro resumed his sexual assaults, including but not limited to raping and sodomizing her. (*Id.* ¶ 40.)

During this same time period, plaintiff was transferred in and out of the "keeplock" area in building 93. (*Id.* ¶¶ 39-47.) While she was in keeplock, at least one corrections officer delivered a message from Toro to her, while other corrections staff condoned and disregarded the alleged continuing assaults by Toro. (*Id.* ¶¶ 47-48.) In addition to physical, mental, and emotional injuries she suffered from the repeated rapes and sexual abuse, Qasem alleges that in October 2007 she was diagnosed with genital herpes, a sexually transmitted disease, which she believes was transmitted to her by Toro. (*Id.* ¶¶ 61-63.)

Plaintiff alleges that sometime in November 2007, Toro became aware of the IG investigation and started harassing her by asking her what questions the IG representative had asked her and what her responses were. (*Id.* ¶ 45.) Qasem contends that on November 26, 2007, after she was once again raped by Toro, she told him that she was going to report his conduct, and Toro became violent with her-twisting her arm and wrist. (*Id.* ¶ 50.) The next day, plaintiff was transferred out of Taconic and into Bedford. (*Id.* ¶ 51.)

Plaintiff alleges that Thornton and Rogers were deliberately indifferent to her safety and well-being and that despite ample evidence of the assaults, they permitted Toro to have repeated access to her instead of removing either her or Toro from building 93. (*Id.* ¶¶ 55-60.) Plaintiff maintains that Thornton and Rogers were responsible for the inadequate polices and practices that allowed her to be repeatedly raped and assaulted over a number of months, despite the fact that other corrections officers were aware of Toro's misconduct. (*Id.*)

## II. DISCUSSION

A. *Rule 12(b)(6) Standard*

On a motion to dismiss a claim for relief pursuant to Rule 12(b)(6) a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006). A complaint will be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal, 129 S.Ct. at 1949* (quoting *Twombly, 550 U.S. at 556, 127 S.Ct. 1955).*

B. *Supervisory Liability Post-Iqbal*

**\*3** [1] The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) the direct and repeated acts of sexual assault by Toro; (2) defendant Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Thornton and Rogers respond to the claims against them on several grounds.

First, they assert that Qasem's claims are based on a broad theory of "supervisory liability" that has been discredited by the U.S. Supreme Court in *Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).* Prior to *Iqbal,* well-established Second Circuit law provided five bases for alleging that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a section 1983 claim. A plaintiff could plead personal involvement by showing any of the following five courses of conduct:

(1) the defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were

occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Sanders v. N.Y. City Dep't of Corr.,* 07 Civ. 3390, 2009 WL 222161, at \*5, 2009 U.S. Dist. LEXIS 7709, at \*17-18 (S.D.N.Y. Jan. 30, 2009). Defendants contend that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* thereby rendering Qasem's reliance on *Colon* categories unwarranted.

The Second Circuit has not yet addressed how *Iqbal* affects the five categories of conduct that give rise to supervisory liability under *Colon.* As explained in detail in *D'Olimpio v. Crisafi,* No. 09 Civ. 7283, ---F.Supp.2d ----, ---- - ----, 2010 WL 2428128, at \*4-6, 2010 U.S. Dist. LEXIS 59563, at \*14-18 (S.D.N.Y. June 15, 2010), in the wake of *Iqbal,* certain courts in this district have found that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster," and that "[t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated," because only the first and third categories allege personal involvement sufficiently to permit supervisory liability to be imposed after *Iqbal. Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2009 WL 1835939, at \*1-2, 2009 U.S. Dist. LEXIS 54141, at \*6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* No. 08 Civ. 2824, 2009 WL 3321011, at \*15, 2009 U.S. Dist. LEXIS 96952, at \*42-43 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim *Iqbal* eliminated."). This Court, as did the Court in *D'Olimpio,* disagrees with this narrow interpretation of *Iqbal.*

**\*4** [2] As *Iqbal* noted, the degree of personal involvement required to overcome a Rule 12(b)(6) motion varies depending on the constitutional provision alleged to

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

have been violated. Invidious discrimination claims require a showing of discriminatory purpose, but there is no analogous requirement applicable to Qasem's allegations of repeated sexual assaults. *See Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) (citing *Chao v. Ballista,* 630 F.Supp.2d 170, 178 n. 2 (D.Mass.2009)); *see also D'Olimpio,* --- F.Supp.2d at ----, 2010 WL 2428128, at *5, 2010 U.S. Dist. LEXIS 59563, at *16. *Colon's* bases for liability are not founded on a theory of respondeat superior, but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. *Id.* at ----, at *5, 2010 U.S. Dist. LEXIS 59563 at *17 (quoting *Colon,* 58 F.3d at 873).

[3] Thus, the five *Colon* categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *Id.;* *see also Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

Plaintiff's allegations and inferences, if proven, would entitle her to relief under the Fourteenth Amendment and Eighth Amendments. *See Breithaupt v. Abram,* 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) (sustaining substantive due process claims where state action shocks the conscience); *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the

Eighth Amendment.") (quoting *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

C. *Colon Categories*

Second and apart from their argument based on *Iqbal,* Thornton and Rogers assert that plaintiff has adequately alleged neither (1) that they were deliberately indifferent to her rights by failing to act on information that unconstitutional acts were occurring nor (2) that they were responsible for creating or maintaining policies or practices that failed to prevent Qasem from being repeatedly raped and assaulted.

[4][5] The Court finds that plaintiff has alleged sufficient facts that Thornton-the Superintendent of the DOCS facility where plaintiff resided-and Rogers-the Deputy Superintendent for Security at that same facility-were deliberately indifferent to her health and safety and that they were responsible for creating or maintaining policies and practices that failed to prevent plaintiff from being raped and assaulted. The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). "An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

*5 Specifically, the complaint alleges that defendants were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with the IG, the investigation and response to complaints of staff misconduct. Despite an investigation and what plaintiff alleges as substantial evidence of Toro's misconduct known to a variety of individuals (*id.* ¶ 56),

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

defendants Thornton and Rogers allowed plaintiff to be housed in the building where Toro worked (*id.* ¶ 58); they failed to remove him from guarding Qasem (*id.* ¶ 57); they failed to reassign Qasem to another building (*id.*); they allowed Qasem to be transferred back to the building where Toro worked (*id.* ¶ 58); and they did not increase supervision of Toro despite their knowledge of allegations of Toro's assaults and the IG's investigation of him (*id.* ¶ 59). The complaint also alleges that a number of acts occurred under defendants' supervision that were violations of DOCS rules and regulations (*id.* ¶¶ 28, 47), and that defendants Thornton and Rogers allowed those practices to take place.

Although discovery may ultimately reveal that defendants Thornton and Rogers made every reasonable effort to prevent the alleged sexual abuse, Qasem has alleged sufficient facts to allow the Court "to draw the reasonable inference" that the defendants "are liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949.

D. *Qualified Immunity*

[6] Third, Thornton and Rogers claim that qualified immunity requires dismissal of this litigation as to them. So far as the Court can ascertain, defendants contend that they are entitled to immunity principally because Qasem herself initially denied the sexual relationship when asked about it by prison security officers. In their view, her denials by themselves operate as a "reasonable" basis for the decision to place plaintiff back into the building where Toro had unfettered access to her.

[7] Individual defendants are " 'shielded from liability for civil damages' " under 42 U.S.C. § 1983 if " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d

396 (1982)); *accord Gilles v. Repicky,* 511 F.3d 239, 243 (2d Cir.2007). "A right is clearly established if (1) the law is defined with Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (quoting *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)).

This Court cannot find the defendants immune from suit on this record. It is well established that the sexual exploitation of prisoners by prison guards amounts to a constitutional violation. *See Schwenk v. Hartford,* 204 F.3d 1187, 1197 (9th Cir.2000) ("In the simplest and most absolute terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established ... and no reasonable prison guard could possibly have believed otherwise."); *Daskalea v. District of Columbia,* 227 F.3d 433, 440, 343 U.S.App.D.C. 261 (D.C.Cir.2000) (affirming prisoner's Eighth Amendment claim after prison guards sexually assaulted her); *Berryhill v. Schriro,* 137 F.3d 1073, 1076 (8th Cir.1998); *Barney v. Pulsipher,* 143 F.3d 1299, 1310 (10th Cir.1998) ("Clearly plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment."). *Cf. Farmer v. Brennan,* 511 U.S. 825, 833-34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' ") (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable-if not unintelligible-decisions made with respect to plaintiff during the course of the IG's investigation, the Court cannot say at this stage of the litigation that Thornton and Rogers are entitled to qualified immunity for their alleged actions.

III. CONCLUSION

*6 Because plaintiff has alleged enough facts to raise

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

a plausible claim to relief against the supervisory officials Thornton and Rogers and they are not entitled to qualified immunity on the basis of the record at this stage of the litigation, the motion by Thornton and Rogers to dismiss the complaint is denied.

> FN1. Count time is time during which all activity stops and essentially all inmates are locked into their cells, and corrections staff verify that no inmates are missing. (Compl. ¶ 23 n. 1.)

S.D.N.Y.,2010.

Qasem v. Toro

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3909884 (N.D.N.Y.)

(Cite as: 2010 WL 3909884 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Theodore E. LORIA, Plaintiff,

v.

Robert BUTERA and Kevin Daly, Defendants.

No. 5:09-CV-531 (FJS/ATB).

Sept. 29, 2010.

Bressler & Kunze, Melvin Bressler, Esq., of Counsel, Rochester, NY, for Plaintiff.

Office of the New York State Attorney General, Susan C. Von Reusner, AAG, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

SCULLIN, Senior District Judge.

**I. INTRODUCTION**

*1 On May 5, 2009, Plaintiff, a former inmate of the New York State Department of Correctional Services

("DOCS"), brought this action under 42 U.S.C. § 1983, alleging that (1) Defendant Butera deprived him of due process by failing to provide him notice of his parole re-release hearing or affording him the right to counsel during the same, (2) Defendants conspired to deprive him of due process, and (3) Defendant Daly retaliated against him for filing a grievance against a facility psychologist. All of these allegations result from Plaintiff's allegation that Defendant Butera, a facility parole officer, improperly rescinded his initial determination that Plaintiff, a parole violator, was suitable for a conditional parole re-release without first appearing for a Parole Board hearing.

Currently before the Court is Defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**II. BACKGROUND**

Plaintiff was convicted of Criminal Sale of a Controlled Substance in the third degree for which he received a minimum sentence of five years and an aggregate maximum sentence of ten years. On January 27, 2005, Plaintiff was released on parole. On January 17, 2007, Plaintiff's parole was revoked after a final parole revocation hearing at which the court imposed a ten-month delinquent time assessment, with an estimated expiration date of October 12, 2007.

On March 8, 2007, while at Fishkill Correctional Facility, Plaintiff received a Tier II Misbehavior Report and was found guilty of refusing a direct order. On May 11, 2007, while at Auburn Correctional Facility, Plaintiff received a second Tier II Misbehavior Report and was found guilty of causing property damage or loss.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3909884 (N.D.N.Y.)

(Cite as: 2010 WL 3909884 (N.D.N.Y.))

On May 23, 2007, Defendant Butera, a facility parole officer, reviewed Plaintiff's parole status for re-release consideration based on the calculation of his earliest release date being October 12, 2007. At the time of this review, Defendant Butera knew that Plaintiff had two Tier II Misbehavior Reports and that he had declined to participate in the Transitional Services Programs while at the Fishkill facility. Based on this review, Defendant Butera decided that Plaintiff was eligible for re-release to parole as of October 12, 2007.

On June 20, 2007, the Office of Mental Health ("OMH") conducted a mental health evaluation of Plaintiff, and the Mental Status Report that OMH produced as a result of this examination "stated that Plaintiff would benefit from outpatient psychiatric treatment which would include verbal therapy and possible medication evaluation."

On July 2, 2007, OMH's psychologist issued Plaintiff a third Tier II Misbehavior Report, and Plaintiff was found guilty of refusing facility program treatment. On that same day, Plaintiff filed a grievance against the psychologist who had issued him the misbehavior report for providing him with inadequate mental health care.

On or about August 1, 2007, a Parole Board Release Decision Notice (form 9026) was sent to Plaintiff, indicating that Plaintiff's "earliest release date" would be October 12, 2007. On August 15, 2007, during Plaintiff's quarterly review with his corrections counselor, Defendant Daly, Plaintiff refused to participate in Transitional Services Programs Phases II and III and signed a refusal form to that effect.[FN1] Thereafter, Defendant Daly informed Defendant Butera of this refusal.

FN1. Plaintiff contends that, "[o]n March 8, 2007 while at Fishkill Correctional Facility,

Plaintiff was advised by a correctional counselor that he was not required, as a parole violator, to participate in Transitional Services Programs, Phases II & III." *See* Complaint at ¶ 12. Further, he claims that he was not required to take these programs as a parole violator because he was already released on parole and because Phase II programs were not even available at the Auburn Correctional Facility. *See id.* at ¶¶ 33, 35. Moreover, he asserts that even if such programs were available, it would have only been available to "intermediate care program (I.C.P.) Level III inmates, who could attend programs in general population[,]" which he was not. *See id.* at ¶¶ 36-37.

**\*2** On August 16, 2007, Defendant Butera rescinded his decision that Plaintiff was suitable for parole re-release without prior Parole Board approval and scheduled Plaintiff for the next available Parole Board Release hearing, to be held on August 28, 2007. That same day, Plaintiff rescinded his refusal to participate in Transitional Services Programs Phases II and III. On August 28, 2007, at the Parole Board Release Hearing, the Parole Board denied Plaintiff re-release on conditional parole. Plaintiff asserts that Defendant Butera intentionally covered-up Plaintiff's release date of October 12, 2007, on the form he sent to the Parole Board and failed to inform the Parole Board that Plaintiff was scheduled to be re-released on October 12, 2007.

### III. DISCUSSION

Defendants assert that the Court should dismiss Plaintiff's complaint because (1) Plaintiff has no liberty interest in parole re-release and, therefore, cannot state a claim under 42 U.S.C. § 1983 for denial of due process; (2) Plaintiff makes only conclusory allegations of retaliation, and Defendants have established legitimate, non-retaliatory reasons for their conduct; (3) Plaintiff fails to establish the elements of a conspiracy to violate his civil rights; and (4) Defendants are entitled to qualified

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3909884 (N.D.N.Y.)

(Cite as: 2010 WL 3909884 (N.D.N.Y.))

immunity.

## A. Rule 12(b)(6) standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the legal sufficiency of the non-movant's pleading. *See Patane v. Clark,* 508 F.3d 106, 111-12 (2d Cir.2007). In considering a pleading's legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006) (quoting *Chambers v. Time Warner, Inc .,* 282 F.3d 147, 152-53 (2d Cir.2002)).

## B. Plaintiff's Due Process claim

Defendants assert that the Court should dismiss Plaintiff's first cause of action because Plaintiff has no liberty interest in parole re-release; and, therefore, he cannot state a claim under 42 U.S.C. § 1983 for denial of due process. Moreover, Defendants contend that, even if Plaintiff did have a protected liberty interest in parole re-release, based on the undisputed facts, they complied with all of the relevant regulations; and, therefore, Plaintiff's rights were not violated.

To state a sufficient claim under 42 U.S.C. § 1983 for denial of due process, a plaintiff must allege facts plausibly suggesting that he (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998) (citation omitted).

**\*3** More specifically, the first issue in this case is whether the plaintiff enjoys a protected liberty interest under New York's statutory parole scheme. *See Barna v. Travis,* No. CIV97CV1146, 1999 WL 305515, \*1 (N.D.N.Y. Apr. 22, 1999) (citation omitted). Although the presence or absence of language in a state's parole provisions mandating release was once regarded as dispositive of this issue, *see Greenholtz v. Inmates of Neb. Penal & Corr. Complex,* 442 U.S. 1, 11-13 (1979), the Supreme Court has more recently held that the focus of the inquiry should be on the nature of the interest that the state allegedly created, *see Sandin v. Conner,* 515 U.S. 472, 479-83 (1995).

The practical effect of this rule change is that, in cases involving due process challenges to parole hearings, "[i]n order for a state prisoner to have an interest in parole that is protected by the Due Process Clause, he must have a legitimate expectancy of release that is grounded in the state's statutory scheme." *Barna v. Travis,* 239 F.3d 169, 170 (2d Cir.2001) (citations omitted). "Neither the mere possibility of release ... nor a statistical probability of release ... gives rise to a legitimate expectation of release on parole[.]" *Id.* (internal citations omitted). Rather, to the extent that a New York State inmate has any liberty interest in parole that the Due Process Clause of the Fourteenth Amendment protects, that interest exists only to the extent that the Parole Board cannot deny him release "arbitrarily" or "capriciously." *See Romer v. Travis,* No. 03 Civ. 1670, 2003 WL 21744079, \*6 (S.D.N.Y. July 29, 2003) (citation and footnote omitted); *see also Morehouse v. Alexander,* No. 9:08-CV-0946, 2008 WL 4822231, \*5 (N.D.N.Y. Sept. 30, 2008) (citations omitted).

Here, Plaintiff alleges that Defendant Butera violated his due process rights by failing to provide him with prior notice of his parole re-release hearing on August 28, 2007,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3909884 (N.D.N.Y.)

(Cite as: 2010 WL 3909884 (N.D.N.Y.))

which, in turn, deprived him of the right to counsel and the right to prepare and present a defense. *See* Complaint at ¶¶ 72-73.[FN2] Nowhere in the regulations discussing parole re-release is there a requirement to provide notice of a parole re-release hearing to the potential re-releasee. *See* N.Y. Comp.Codes R. & Regs. tit. 9, § 8002.6. The parole rescission procedures, on which Plaintiff relies, are inapplicable to this case. *See* N.Y. Comp.Codes R. & Regs. tit. 9, § 8002.5. A review of that regulation makes clear that the rescission process is relevant only when the Parole Board has decided to grant parole release and thereafter decides to rescind parole. *See* N.Y. Comp.Codes R. & Regs. tit. 9, § 8002.5(a) (noting that "situations may arise which would cause the **board** to reconsider **its decision** to grant parole release" (emphasis added)); *see also id.* at § 8002.5(b)(2)(i).

> FN2. Plaintiff also contends that, "[i]f a Parole Board decides to hold a rescission hearing, the inmate must be served with a copy of the rescission report and a notice of the hearing and the charges to be considered." *See* Complaint at ¶ 84. Plaintiff continually and improperly refers to the August 28, 2007 hearing as a "rescission hearing," as opposed to a parole re-release hearing. If the August 28, 2007 hearing were a rescission hearing, Plaintiff would be correct that notice was required. In this case, however, the regulations do not require a rescission report because this was not a rescission hearing.

Section 8002.6 of title 9 of New York's Codes, Rules and Regulations governs Plaintiff's re-release to parole supervision upon the expiration of his time assessment. The Legislature amended this section in 2004 to permit an expedited process wherein a parole violator would simply be re-released upon the expiration of his time assessment without the Parole Board's involvement. Under this process, the facility parole office staff conducts an initial review to ascertain whether the parole violator may be re-released, or whether the inmate's case should be presented to the Parole Board for further review. *See* N.Y. Comp.Codes R. & Regs. tit. 9, § 8002.6(c)(1). If the facility parole office staff does not identify any of the criteria in that section that would require Parole Board consideration, the parole violator will be re-released upon the expiration of his time assessment. *See id.* If, on the other hand, the staff does identify any of the criteria, "the board of parole **will** consider the violator's re-release[.]" *See id* . (emphasis added).[FN3]

> FN3. The criteria requiring Parole Board consideration include, among others,
>
> (i) the parole violator has engaged in behavior, which constitutes a violation of facility rules or has been found guilty of having violated such rules;
>
> (iv) the board receives any information that supports a reasonable conclusion that the parole violator may not be suitable for re-release. Such information shall include, but not be limited to, information pertaining to self-destructive or threatening behavior by the parole violator.
>
> *See* N.Y. Comp.Codes R. & Regs. tit. 9, § 8002.6(c)(1) (i, iv).

**\*4** Defendant Butera prepared a Parole Violator Reappearance Worksheet in May of 2007 to determine if Plaintiff would be eligible for parole in October of 2007, the date on which he would first become eligible for re-release. On this form, Defendant Butera determined that Plaintiff would be eligible for re-release on October 12, 2007. *See id.* At the time of this review, Plaintiff had two misbehavior reports. *See* Complaint at ¶¶ 14-15. On July

Slip Copy, 2010 WL 3909884 (N.D.N.Y.)

(Cite as: 2010 WL 3909884 (N.D.N.Y.))

2, 2007, Plaintiff received a third misbehavior report for refusing mental health programming. *See id.* at ¶¶ 14-15, 26. Moreover, on August 15, 2007, during Plaintiff's quarterly review with his corrections counselor, Defendant Daly, Plaintiff refused to participate in Transitional Services Programs Phases II and III and signed a refusal form to that effect. *See id* . at ¶¶ 31, 38. On or about that same day, Defendant Daly told Defendant Butera about Plaintiff's refusal to participate in Transitional Services; and, on August 16, 2007, Defendant Butera rescinded his decision that Plaintiff was suitable for parole re-release without prior Parole Board approval.

Even assuming that Plaintiff is correct that Defendant Butera retaliated against him for filing a grievance by rescinding his initial approval of conditional re-release without requiring a Parole Board hearing, Plaintiff has failed to state a cause of action for violation of his due process rights. After Defendant Butera granted his initial approval of Plaintiff's re-release, Plaintiff was found guilty of violating facility rules. *See id.* at ¶¶ 14-15, 26. This violation, according to the regulations, required Defendant Butera to refer Plaintiff's case to the Parole Board for a re-release hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 9, § 8002.6(c)(1)(i).

Moreover, contrary to Plaintiff's assertions, the Parole Board had not granted Plaintiff parole, requiring the prison officials to comply with section 8002.5 of the regulations. By its very wording, prison officials must only comply with section 8002.5 if the **Parole Board** has granted parole, not when a prisoner has been granted re-release pursuant to the expedited re-release procedures found in section 8002.6. *See, e.g.,* N.Y. Comp.Codes R. & Regs. tit. 9, § 8002.5(a), (b)(2)(i). No Parole Board interview had yet occurred; therefore, Defendant Butera was within his authority to rescind his initial approval without complying with the procedural requirements of section 8002.5. Further, the August 28, 2007 hearing was not a "rescission hearing;" and, therefore, Defendants were not required to "serve [him] with a copy of the rescission report and a notice of the hearing and the

charges to be considered." *See* Complaint at ¶¶ 83-85. Plaintiff's argument hinges on the notion that he had been granted **parole,** as opposed to **conditional parole re-release,** and that, therefore, section 8002.5 of the regulations applies. As discussed, no "rescission" occurred, as that term is so defined; and Plaintiff was not entitled to the procedural safeguards afforded to rescission hearings. *See* N.Y. Comp.Codes R. & Regs. tit. 9, § 8002.5(a), (b)(2)(i). Accordingly, Defendants acted in accordance with the relevant regulations dealing with parole re-release; and, therefore, Defendants did not violate Plaintiff's rights by complying with the regulation mandating the actions that they took. [FN4]

FN4. Furthermore, Plaintiff's argument hinges on the presumption that, once Defendant Butera granted him his initial approval for re-release, nearly five months before Plaintiff's earliest possible re-release date, Defendant Butera was without authority to rescind that approval and recommend a full Parole Board hearing. Although the procedure for rescinding this initial approval is not set forth in the regulations, it is axiomatic that such authority must exist. If not, Plaintiff would have been free to violate the facility's rules at will, with Defendant Butera powerless to alter his initial recommendation.

**\*5** Further, even if Defendants had violated the regulations' procedural requirements, section 8002.6(c) does not create a liberty interest in conditional parole re-release because parole re-release, as with parole release, is subject to the Parole Board's discretion. *See* N.Y. Comp.Codes R. & Regs. tit. 9, § 8002.6(f) (stating that "[t]his section shall not be construed to afford any parole violator a right to release from custody upon expiration of the time assessment, but only a right to consideration by the [Parole Board] as soon as practicable"); *see also* N.Y. Exec. Law § 259-i(3)(f)(x) (stating that, "[w]here a date has been fixed for the violator's re-release on presumptive release, parole or conditional release, as the case may be, the board or board

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3909884 (N.D.N.Y.)

(Cite as: 2010 WL 3909884 (N.D.N.Y.))

member may waive the personal interview between a member or members of the board and the violator to determine the suitability for re-release; provided, however, that the board shall retain the authority to suspend the date fixed for re-release and to require a personal interview based on the violator's institutional record or on such other basis as is authorized by the rules and regulations of the board"). As such, because Plaintiff had no liberty interest in conditional parole re-release, any procedural infirmity did not give rise to a cognizable constitutional claim. *See Barna,* 239 F.3d at 171 (holding that the New York State parole process creates no legitimate expectation of release; and, therefore, an inmate seeking release is not afforded the full panoply of procedural due process protection); *see also Davis v. Dennison,* 219 Fed. Appx. 68, 70 (2d Cir.2007) (citation omitted).

Based on the foregoing, the Court dismisses with prejudice Plaintiff's claims that Defendants violated his due process rights.

**C. Plaintiff's retaliation claim**[FN5]

> **FN5.** Plaintiff asserts his retaliation claim only against Defendant Daly. *See* Complaint at ¶¶ 123-24.

Plaintiff alleges that Defendant Daly retaliated against him by bringing the form on which Plaintiff acknowledged that he refused to participate in transitional programs to Defendant Butera, so that Defendant Butera would rescind his decision to release Plaintiff. *See* Complaint at ¶¶ 38-40. This alleged retaliation was in response to Plaintiff filing a grievance, more than a month prior, against a staff psychologist. *See id.* at ¶ 40.

To state a First Amendment retaliation claim, the

plaintiff bears the burden of showing " '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (quotation and other citation omitted). "Adverse action," defined objectively, is "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Id.* at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) *superceded by* 320 F.3d 346, 2003 WL 360053 (2d Cir. Feb. 10, 2003)).

**\*6** Since filing a prison grievance is a constitutionally protected activity, Plaintiff satisfies the first prong of this test. *See Davis,* 320 F.3d at 352-53 (citations omitted). Moreover, Plaintiff has sufficiently alleged that Defendants took adverse action against him in response to Plaintiff filing a grievance, thus satisfying the second and third prongs. He has alleged that Defendant Daly misrepresented that Plaintiff was required to take the transitional programs and that, using this misrepresentation as a pretext, Defendant Butera then rescinded his previous approval for parole re-release. Although such an elaborate plan seems very unlikely, such facts are sufficient to survive a motion to dismiss.[FN6]

> **FN6.** Although Plaintiff may have alleged facts sufficient to survive a motion to dismiss, the Court has serious doubts about his ability to survive a motion for summary judgment.

Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's third cause of action for retaliation against Defendant Daly.

**D. Plaintiff's conspiracy claims pursuant to 42 U.S.C. §§ 1983 and 1985(3)**[FN7]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3909884 (N.D.N.Y.)

(Cite as: 2010 WL 3909884 (N.D.N.Y.))

FN7. Plaintiff does not specify whether he is asserting a section 1983 or section 1985 conspiracy, or both. Although Defendants have assumed that he is alleging a section 1985 conspiracy, the Court has addressed both potential causes of actions.

To sustain a cause of action for conspiracy to violate a plaintiff's civil rights under section 1985(3), a plaintiff must allege and demonstrate that the defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his equal protection of the laws, or of equal privileges and immunities secured by law. *See United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott,* 463 U.S. 825, 834-39 (1983); *see also Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994) (citations omitted). A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can be evidenced circumstantially, through a showing that the parties had a " 'tacit understanding to carry out the prohibited conduct.' " *LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir.1995) (quoting *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988)) (other citations omitted). This notwithstanding, in order to properly plead such a claim, a plaintiff must make more than "conclusory, vague, or general allegations of conspiracy [.]" *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) (citations omitted).

" 'To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.' " *Benitez v. Ham,* No. 9:04-CV-1159, 2009 WL 3486379, *18 (N.D.N.Y. Oct. 21, 2009) (quoting *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999)). A violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right. *See Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). Thus, if a

plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights. *See id.*

To withstand a motion to dismiss, the conspiracy claim must contain more than " 'conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights[.]' " *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (quotation omitted); *Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D . N.Y.1998) (holding that a mere allegation of conspiracy with no facts to support it cannot withstand a motion to dismiss). Specifically, the plaintiff must provide some factual basis supporting a "meeting of the minds," such as that the defendants "entered into an agreement, express or tacit, to achieve the unlawful end[;]" the plaintiff must also provide "some 'details of time and place and the alleged effects of the conspiracy.' " *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (quoting *Dwares [v. City of New York,* 985 F.2d 94,] 100 [ (2d Cir .1993) ] ); *see also Hickey-McAllister v. British Airways,* 978 F.Supp. 133, 139 (E.D.N.Y.1997) (holding that even though plaintiff alleged a conspiracy to present false testimony, she did not allege that defendants had any meeting of the minds (citing *San Filippo v.. U.S. Trust Co. of N.Y.,* 737 F.2d 246, 256 (2d Cir.1984)) (other citation and footnote omitted).

*7 Plaintiff's complaint is wholly devoid of specifics in connection with his conspiracy claims, aside from the assertion, in purely conclusory terms, that Defendants conspired to violate his civil rights. *See* Complaint at ¶¶ 99, 103, 104. Moreover, Plaintiff's complaint lacks any allegation regarding race-based animus or his membership in a suspect class as motivation for the alleged conspiracy to violate his civil rights. Finally, as discussed above, Plaintiff has failed to establish that he had a constitutionally protected right in parole re-release. As such, because Plaintiff has failed to allege a violation of his constitutionally protected right, he cannot now claim a conspiracy to violate that right. *See Malsh,* 901 F.Supp. at 763.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3909884 (N.D.N.Y.)

(Cite as: 2010 WL 3909884 (N.D.N.Y.))

Accordingly, the Court dismisses Plaintiff's second cause of action for conspiracy to violate his civil rights.

**E. Qualified immunity**

The doctrine of qualified immunity shields state officials from personal liability if their actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) (citations and footnote omitted). [FN8] When considering a qualified immunity defense on a motion to dismiss under Rule 12(b)(6), "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004).

FN8. A defendant may assert a traditional qualified immunity defense on a Rule 12(b)(6) motion based on the facts appearing on the face of the complaint. *See McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004). However, because the question of whether the official's conduct was reasonable "necessarily involves a fact-specific inquiry, '[i]t is generally premature to address the defense of qualified immunity' " on a Rule 12(b)(6) motion. *Bernstein v. New York City,* No. 06 Civ. 895, 2007 WL 1573910, *9 (S.D.N.Y. May 24, 2007)* (quotation and other citations omitted).

As previously set forth, Plaintiff has alleged facts that, if true, are sufficient to state a claim for retaliation against Defendant Daly. Since filing a grievance is a clearly established constitutional right, Defendant Daly is not entitled to qualified immunity at this stage.

Accordingly, the Court denies Defendants' motion to dismiss on this ground.

**IV. CONCLUSION**

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion to dismiss is **GRANTED** with respect to Plaintiff's due process claims against both Defendants and his conspiracy claims against both Defendants and is **DENIED** with respect to Plaintiff's retaliation claim against Defendant Daly; and the Court further

**ORDERS** that this action is remanded to Magistrate Judge Baxter for all further pretrial matters.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Loria v. Butera

Slip Copy, 2010 WL 3909884 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3260075 (W.D.N.Y.)

(Cite as: 2009 WL 3260075 (W.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,

W.D. New York.

Injah TAFARI, Plaintiff,

v.

Lynn PAUL, et al., Defendants.

No. 06CV0603A.

Oct. 8, 2009.

West KeySummary**Prisons 310**  124

**310** Prisons

 **310II** Prisoners and Inmates

  **310II(B)** Care, Custody, Confinement, and Control

   **310k124** k. Use of Force. Most Cited Cases

**Sentencing and Punishment 350H**  1548

**350H** Sentencing and Punishment

 **350HVII** Cruel and Unusual Punishment in General

  **350HVII(H)** Conditions of Confinement

   **350Hk1548** k. Use of Force. Most Cited Cases

Prisoner stated claim for excessive force in violation of Eighth Amendment. Prisoner alleged prison officials, without provocation, rammed prisoner's head into the corner of the bars and wall, pulled him by the hair, punched him in the face, kicked him in the mid-section, cut one of the prisoner's locks from his head and smacked him in the face with it, which allegedly resulted in prisoner receiving a laceration above his left eye, bruised shoulders, a bruise in his upper back and mid left side, and a broken tooth. Prison officials claimed that prisoner attempted to use his head to strike prison official in the cheekbone, tried to bite prison official, and began to spit at him, and that prison official grabbed prisoner's dreadlocks as a means of getting control of prisoner. U.S.C.A. Const.Amend. 8.

Andrew J. Wells, Phillips Lytle LLP, Buffalo, NY, for Plaitiff.

David Joseph State, NYS Attorney General's Office, Buffalo, NY, for Defendants.

**Decision & Order**

HUGH B. SCOTT, United States Magistrate Judge.

**\*1** Before the Court is the defendants' motion for summary judgment. (Docket No. 42).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3260075 (W.D.N.Y.)

(Cite as: 2009 WL 3260075 (W.D.N.Y.))

## Background

The plaintiff, Injah Tafari ("Tafari"), commenced this action pursuant to 42 U.S.C. § 1983 alleging that his rights were violated by defendants Lynn Paul, Mark Drews and Paul Manno, each of whom are corrections officers at the Wende Correctional Facility ("WCF"). More specifically, Tafari alleges that: (1) he was verbally harassed and abused by the defendants upon his arrival at Wende on May 26, 2003 (Docket No. 1 at ¶ 6); (2) that he was assaulted by the defendants on September 16, 2003 (Docket No. 1 at ¶¶ 7, 16-21); (3) that he was sexually molested by defendant Drews on July 23, 2003 (Docket No. 1 at ¶¶ 9-11); and (4) that defendant Drews used excessive force on July 23, 2003 (Docket No. 1 at ¶¶ 14-15).

## Summary Judgment

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Ford v. Reynolds, 316 F.3d 351 (2nd Cir.2003); Fed.R.Civ.P. 56(c). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Ford, 316 F.3d at 354. "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non moving party.' " Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1535 (2d Cir.1997) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202, (1986)). While the moving party must demonstrate the absence of any genuine factual dispute, ( Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), the party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he

nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538(1986); McCarthy v. American Intern. Group, Inc., 283 F.3d 121 (2d Cir.2002); Marvel Characters v. Simon, 310 F.3d 280, 285-86 (2d Cir.2002).

### Verbal Abuse

To the extent the plaintiff attempts to assert a claim under § 1983 for verbal harassment or abuse, the claim must be dismissed. Such allegations, without a showing of an actual injury, are insufficient to support a § 1983 claim. Lewis v. Casey, 518 U.S. 343, 349-50, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); Johnson v. Eggersdorf, 8 Fed. Appx. 140, 143 (2d Cir.2001) (citing Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir.1986) ( "allegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .") Hendricks v. Boltja, 20 Fed. Appx. 34, 36 (2d Cir.2001) (holding that "verbal harassment was not actionable" in case where officer, inter alia, to "get [his] black ass out of the library" and threatened to "smash [his] head open"); La Grande v. Town Of Bethlehem Police Dept., 2009 WL 2868231 (N.D.N.Y.2009) (plaintiff's claim for verbal harassment in the form of racial slurs and threats is not actionable under § 1983); Gill v. Hoadley, 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (collecting cases) ("verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983."); Shabazz v. Pico, 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983"); Jermosen v. Coughlin, 878 F.Supp. 444, 449 (N.D.N.Y.1995) ("Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983."); Beckles v. Bennett, 2008 WL 821827 (S.D.N.Y.2008) (alleged threatening remarks that Plaintiff was "getting no

Slip Copy, 2009 WL 3260075 (W.D.N.Y.)

(Cite as: 2009 WL 3260075 (W.D.N.Y.))

rec, only [defendant's] foot up [plaintiff's] behind" was insufficient to state § 1983 claim).

**\*2** This claim is dismissed.

### *Sexual Assault*

The plaintiff claims that he was sexually assaulted on July 23, 2003. According to the plaintiff, on that date defendants Paul and Drews FN1 came to his cell FN2 to bring him out to recreation. In connection with a pat frisk prior to being taken to recreation, Tafari alleges that he was handcuffed behind his back and that defendant Drews began "sexually molesting plaintiff by rubbing his hands between plaintiff's buttock and gently rubbing and squeezing plaintiff's penis and groin area." (Docket No. 1 at ¶ 10). Tafari alleges that he asked defendant Paul to tell Drews to stop, but she allegedly responded by saying: "shut the fuck up nigger and face the wall." (Docket No. 1 at ¶¶ 11-12).FN3

> **FN1.** Tafari has testified that Manno was not involved in this incident. (Docket No. 44, Exhibit A, Deposition of Injah Tafari dated March 23, 2009 (hereafter referred to as the "Tafari Deposition") at page 29).

> **FN2.** At the time of this incident, Tafari was housed in cell "SHU-4" in Wende's special housing unit (S.H.U.) due to a prior disciplinary action. He stated that the prior disciplinary action stemmed from a 1998 incident while the plaintiff was housed at the Green Haven Correctional Facility. Tafari was apparently convicted of "cutting an inmate" and given 120 months in S.H.U. (Docket No. 44, Tafari Deposition" at pages 12-13).

> **FN3.** The plaintiff's deposition testimony contradicts this allegation. At his deposition, Tafari stated that when he asked Paul: "What's happening around here?"; Paul responded "Comply with the pat frisk." (Docket No. 44, Tafari Deposition at page 19). Tafari was asked if Paul said anything other than "comply with the pat frisk"; to which Tafari answered: "No, sir." (Docket No. 44, Tafari Deposition at page 19).

The plaintiff admits that the pat frisk by Drews took "seconds, brief seconds." (Docket No. 44, Tafari Deposition at page 20). Drews denies the plaintiff's allegations. The defendants contend that notwithstanding such factual dispute, summary judgment would still be required as a matter of law even if the plaintiff's allegations were believed to be true. "Sexual abuse may violate contemporary standards of decency and can cause severe physical and psychological harm. For this reason, there can be no doubt that severe or repetitive sexual abuse of an inmate by a prison officer can be 'objectively, sufficiently serious' enough to constitute an Eighth Amendment violation." *Boddie v. Schnieder,* 105 F.3d 857, 861 (2d. Cir.1997). However, in *Boddie,* the Second Circuit made it clear that not every allegation of sexual harassment is sufficient to articulate a claim of constitutional dimension. Indeed, in *Boddie,* the Second Circuit dismissed as inadequate a prisoner's claim that a female corrections officer made a possible pass at him, squeezed his hand, touched his penis, called him a "sexy black devil," pressed her breasts against his chest, and pushed her vagina against his penis. *Boddie,* 105 F.3d 857, 859-861("The isolated episodes of harassment and touching alleged by Boddie are despicable and, if true, they may potentially be the basis of state tort actions. But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court."). See also *Morales v. Mackalm,* 278 F.3d 126 (2d. Cir.2002) ("Because Morales' allegations do not even rise to the level of those made by the plaintiff in *Boddie,* they do not state a claim for sexual harassment in violation of the Eighth Amendment to the United States Constitution.");

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3260075 (W.D.N.Y.)

(Cite as: 2009 WL 3260075 (W.D.N.Y.))

*Wylie v. Bedford Hills Correctional Facility of New York,* 2008 WL 2009287 *2 (S.D.N.Y.2008) (While there can be no doubt that severe or repetitive sexual abuse of an inmate by a prison officer can constitute an Eighth Amendment violation, where the alleged conduct is limited to isolated episodes of harassment, and no single incident is severe, a plaintiff does not state a claim under the Eighth Amendment.); *Williams v. Fitch,* 2008 WL 1947024 *2 (W.D.N.Y.2008) (An Eighth Amendment claim under § 1983 will not lie, however, where an inmate alleges only minor, isolated incidents which are neither singly nor "cumulatively egregious in the harm they inflicted."); *Davis v. Castleberry,* 364 F.Supp.2d 319, 321 (W.D.N.Y.2005) (allegation that corrections officer grabbed inmate's penis during pat frisk is insufficient to state constitutional claim); *Morrison v. Cortright,* 397 F.Supp.2d 424, 425 (W.D.N.Y.2005) (allegations that a corrections officer touched plaintiff's buttocks, and that another "rubbed up against plaintiff['s] buttocks with [the officer's] private part" during a strip search describe an isolated incident unaccompanied by physical injury, and therefore are not sufficiently serious to establish a constitutional claim); *Montero v. Crusie,* 153 F.Supp.2d 368, 373, 375 (S.D.N.Y.2001) (allegation that corrections officer squeezed inmate's genitalia during pat-frisks on several occasions does not show sufficiently serious deprivation to establish Eighth Amendment violation, particularly when inmate did not allege that he was physically injured by such conduct); *Nelson v. Michalko,* 35 F.Supp.2d 289, 293 (W.D.N.Y.1999) (allegation that inmate's anal area was touched by a metal detector during a search does not describe sufficiently serious conduct to raise an Eighth Amendment claim); *Williams v. Kane,* 1997 WL 527677 at *11 (S.D.N.Y.1997) (allegation that correctional officer put his hand down inmate's pants and fondled inmate's genitals during pat frisk fails to state constitutional claim).

*3 The alleged conduct by Drews, if plaintiff's allegations [FN4] were accepted as true, is no more egregious than the conduct found to be insufficient to rise to the level of a constitutional violation in *Boddie* and its progeny. Based on the above, the plaintiff's claim of sexual harassment are dismissed.

FN4. Other than the plaintiff's testimony, Tafari's allegations regarding the alleged conduct by Drews are unsubstantiated in the record.

### Assault on September 16, 2003

The plaintiff alleges that he was assaulted by the defendants on September 16, 2003. According to the plaintiff, he was being escorted by defendants Paul, Drews and Manno to his cell after a visit to the facility hospital. Tafari asserts that without provocation, defendant Drews "rammed plaintiff's head into the corner of the bars and wall" (Docket No. 1 at ¶ 16). The plaintiff contends that defendant Drews then pulled the plaintiff by the hair, and began punching plaintiff in the face. Tafari asserts that Manno also punched the plaintiff in the left side of his face and that Drews and Manno "took the plaintiff down to the floor." (Docket No. 1 at ¶¶ 16-17). The plaintiff further alleges that defendant Paul began to kick the plaintiff in the midsection and that Paul "took out a pocket-knife, and cut one of the plaintiff's locks from his head." (Docket No. 1 at ¶ 18). Tafari states that Paul "smacked" him in the face with the dread-lock that she had just cutoff his head and stated: "you don't write me up or none of my officers, you got P.L.S. and the F.B.I. coming in the building doing investigations, this is why we are whipping your ass." (Docket No. 1 at ¶ 18). The plaintiff claims that he received a laceration above his left eye, bruised shoulders, a bruise in his upper back and mid left side, and a broken tooth as a result of the alleged assault. (Docket No. 1 at ¶ 20).

The defendants assert that while returning from the hospital on September 16, 2009, Tafari became agitated and stated to the defendants: "you fucking punks, you aint' noting but fucking punks" (Docket No. 44, Exhibit B, Declaration of Mark Drews (hereafter "Drews Declaration") at ¶ 6). Drews states that Tafari then used his head to strike Drews in the left cheekbone area of his face. Further, Drews stated that Tafari attempted to bite

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3260075 (W.D.N.Y.)

(Cite as: 2009 WL 3260075 (W.D.N.Y.))

him and began to spit at him. Drews asserts that he attempted to get control of Tafari by grabbing him by one of his dread locks and pulling him away from Drews. (Drews Declaration at ¶ 6). Drews, along with Manno and Paul subdued Tafari. (Docket No. 44, Exhibit C, Declaration of Lynn Paul (hereafter "Paul Declaration") at ¶¶ 6-7; Exhibit D, Declaration of Paul Manno (hereafter "Manno Declaration") at ¶¶ 5-6). The defendants deny using excessive force.

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255 (2d. Cir.2009) citing *Hudson v. McMillian,* 503 U.S. 1, 7-8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). In *Wright,* the Second Circuit explained the subjective and objective standards:

*4 The subjective component of the claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' " in light of the particular circumstances surrounding the challenged conduct.... When prison officials are accused of using excessive force, the "wantonness" issue turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." ...

The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of "contemporary standards of decency." ... In assessing this component, the court must ask whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." ... But when prison officials use force to cause harm maliciously and sadistically, "contemporary standards of decency always are violated.... This is true whether or not significant injury is evident." ... Accordingly, where a prisoner's

allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically, our Court has reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak....

*Wright,* 554 F.3d. at 268-269.

Notwithstanding, the Second Circuit made it clear that the Eighth Amendment's prohibition against cruel and unusual punishment does not extend to *'de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.' " *Id.* citing *Hudson v. McMillian,* 503 U.S. 1, 10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal quotation marks omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Wright,* 554 F.3d. at 269 citing *Hudson,* 503 U.S. at 9 and *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973).

In the instant case, significant issues of fact exist between the plaintiff's and the defendants' allegations regarding the September 16, 2003 incident. If the plaintiff's version of the facts were to be proven true, a trier of fact could conclude that the defendants did not act in a good-faith effort to maintain or restore discipline, but instead acted maliciously and sadistically to injure the plaintiff. Similar questions of fact exist as to whether the injuries the plaintiff allegedly suffered as a result of the altercation meet the objective standard under *Hudson* and its progeny. Inasmuch as the Court cannot conclude that the use of force in this case was *de minimus* as a matter of law, these questions of fact preclude the entry of summary judgment as to the plaintiff's claims based upon excessive force on September 16, 2003. The Court notes that the instant motion does not address the plaintiff's claims of excessive force on July 23, 2003 (Docket No. 1 at ¶

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3260075 (W.D.N.Y.)

(Cite as: 2009 WL 3260075 (W.D.N.Y.))

14).[FN5]

> FN5. At his deposition, Tafari stated that he believed the incident in which his thumbs were twisted and his arms pulled occurred on July 22, 2003, not July 23, 2003. (Docket No. 44, Tafari Deposition at pages 25-27).

### Retaliation

*5 The plaintiff also asserts a vague retaliation claim by use of the heading "Retaliatory" just prior to paragraph 12 of the complaint. At his deposition, the plaintiff testified that this claim was asserted against Drews. (Docket No. 44, Tafari Deposition at page 36). Tafari stated that he did not think Manno was retaliating against him, but that Manno just took part in the September 16, 2009 incident to assist Drews. (Docket No. 44, Tafari Deposition at page 38). In his Statement of Disputed Facts (Docket No. 47), Tafari alleges that he filed a complaint against Paul on July 22, 2003; and that on July 23, 2003, Paul "recruited" Drews to sexually assault him. (Docket No. 47 at ¶ 2). This is inconsistent with Tafari's deposition testimony in which he testified that prior to the September 16, 2003 incident, defendant Paul had never threatened to take action against the plaintiff. (Docket No. 44, Tafari Deposition at page 38).[FN6]

> FN6. The plaintiff does not set forth a conspiracy claim in the complaint. To the extent the newly stated allegations in his Statement of Disputed Facts attempt to assert a conspiracy claim, they are insufficient. In order to establish a § 1983 conspiracy claim, a plaintiff must demonstrate: (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on him; and (2) "an overt act [was] done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999); see also *Walker v.*

*Jastremski,* 430 F.3d 560, 564 n. 5 (2d Cir.2005) ("conclusory or general allegations are insufficient to state a claim for conspiracy under § 1983"); *Headley v. Fisher,* 2008 WL 1990771 (S.D.N.Y.2008). "[C]omplaints containing only 'conclusory,' 'vague,' or 'general allegations' of a conspiracy to deprive a person of constitutional rights will be dismissed." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Allah v. Poole,* 506 F.Supp.2d 174 (W.D.N.Y.2007) (conclusory allegations insufficient to maintain of conspiracy of defendants to retaliate against plaintiff); *Young v. Shipman,* 2007 WL 1064316, at *1 (D.Conn.2007) ("The conspiracy claim is dismissed because plaintiff's vague, unsupported allegations of conspiracy are insufficient to withstand a motion for summary judgment"). It is well-settled that "[a] plaintiff is not required to list the place and date of defendants['] meetings and the summary of their conversations when he pleads conspiracy, [however] the pleadings must present facts tending to show agreement and concerted action." *Concepcion v. City of New York,* 2008 WL 2020363 at *3 (S.D.N.Y.2008) citing *McIntyre v. Longwood Central School Dist.,* 2008 WL 850263, at *11 (E.D.N.Y.2008). In the instant case, other than his own conclusory allegations, the plaintiff has presented no evidence on concerted activity by these defendants. Further, these new self-serving allegations are contradicted by the plaintiff's own deposition testimony.

It is well-established that prison officials may not retaliate against inmates for exercising their constitutional rights. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). To survive summary judgment, "a plaintiff asserting First Amendment retaliation claims must demonstrate the existence of a question of fact that (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001); *Morales v. Mackalm,* 278 F.3d 126, 132 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3260075 (W.D.N.Y.)

(Cite as: 2009 WL 3260075 (W.D.N.Y.))

Cir.2002); *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Furthermore, a prisoner's retaliation claim must also be examined with "skepticism and particular care." *Colon,* 58 F.3d at 872. The Second Circuit has cautioned that retaliation claims by prisoners are "prone to abuse" as "[v]irtually every prisoner can assert such a claim as to every decision which he or she dislikes." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983); *Dawes,* 239 F.3d 489, 491. Thus, a prisoner's claim of retaliation must be supported by specific and detailed factual allegations. ( *Colon,* 58 F.3d at 872; *Flaherty,* 713 F.2d at 13) and must demonstrate that challenged conduct was a substantial or motivating factor in adverse actions taken by the prison officials. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). The alleged retaliation must be more than *de minimis;* that is, it must be sufficient to deter a similarly situated person of ordinary firmness from exercising his or her rights. *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation. *Dawes,* 239 F.3d at 492-493 citing: *Suppan v. Dadonna,* 203 F.3d 228, 235 (3d Cir.2000); see also *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999); *Crawford-El v. Britton,* 93 F.3d 813, 826 (D.C.Cir.1996) (en banc), rev'd on other grounds, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982). Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection. *Dawes,* 239 F.3d. 493, citing *Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999) (per curiam). This objective inquiry is "not static across contexts," but rather must be "tailored to the different circumstances in which retaliation claims arise." *Dawes,* 239 F.3d. at 493 citing *Thaddeus-X,* 175 F.3d at 398. "Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [ retaliatory] action taken against them is considered adverse." *Id.*

**\*6** Allegations of adverse actions alone, however, are insufficient to establish retaliation absent facts supporting an inference of a causal connection between the adverse actions and the protected conduct. See *Dawes,* 239 F.3d at 492; *Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (2d Cir.2000). The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action. In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation. See *Colon,* 58 F.3d at 872-73.

In the instant case, at his deposition the plaintiff contended that the alleged assault on September 16, 2003 was in retaliation for the complaints he filed against Drews in the summer of 2003. (Docket No. 44, Tafari Deposition at page 36). Tafari testified that on September 14, 2003, "federal marshals" came to interview him regarding his complaints against Drews. (Docket No. 44, Tafari Deposition at page 29-31). If, in fact, law enforcement agents came to Wende on September 14, 2003 to investigate Tafari's complaints against Drews, the plaintiff has sufficiently articulated the basis for a retaliation claim: that he engaged in protected speech (his complaint against Drews); that a specific adverse action taken against him (the alleged assault by the defendants); and a causal connection between the protected speech and the alleged assault (the alleged assault took place two days after federal marshals purportedly came to Wende to investigate Tafari's claims against Drews). If the plaintiff's assertions were proven true, a trier of fact may conclude that the incident of September 16, 2003 was sufficient to sustain a claim of retaliation. Thus, the defendants' motion for summary judgment as to the retaliation claim must be denied based upon the record before the Court.

## Qualified Immunity

The defendants also contend that they are entitled to qualified immunity. Qualified immunity shields government officials performing discretionary functions

Slip Copy, 2009 WL 3260075 (W.D.N.Y.)

(Cite as: 2009 WL 3260075 (W.D.N.Y.))

"from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396, (1982); *Mitchell v. Forsyth,* 472 U.S. 511, 524, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Coons v. Casabella,* 284 F.3d 437, 440-41 (2d Cir.2002); *Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001) ("Cerrone"). Where the right at issue-here, the right not to be subjected to excessive force-was clearly established but was violated, the defendants will nonetheless be entitled to qualified immunity "if ... it was objectively reasonable for them to believe their acts did not violate those rights." *Oliveira v. Mayer,* 23 F.3d 642, 648 (2d Cir.1994), cert. denied, 513 U.S. 1076 (1995); *Anderson v. Creighton,* 483 U.S. 635, 639-40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

**\*7** The qualified immunity test is an objective one. "[I]f officers of reasonable competence could disagree" as to whether probable cause existed, "immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). But "if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that" probable cause existed, "[d]efendants will not be immune...." *Id.* Whether a defendant's conduct was objectively reasonable is a mixed question of law and fact. " *Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir.2007); *Kerman v. City of New York,* 374 F.3d 93, 109 (2d Cir .2004); *Lennon v. Miller,* 66 F.3d 416, 420-21 (2d Cir.1995); *Oliveira,* 23 F.3d at 649-50; *Warren v. Dwyer,* 906 F.2d 70, 76 (2d Cir.), cert. denied, 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990). The ultimate question of whether it was objectively reasonable for the defendant to believe that his conduct did not violate a clearly established right, i.e., whether correction officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court. However, "[a] contention that-notwithstanding a clear delineation of the rights and duties of the respective parties at the time of the acts complained of-it was objectively reasonable for the official to believe that his acts did not violate those rights 'has its principal focus on the particular facts of the case.'

" *Kerman,* 374 F.3d at 109 quoting *Hurlman v. Rice,* 927 F.2d 74, 78-79 (2d Cir.1991).

If there is no dispute as to the material historical facts, the matter of whether the officer's conduct was objectively reasonable is an issue of law to be determined by the court. *Zellner,* 494 F.3d at 368; *Lennon,* 66 F.3d at 421; *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987). "[I]f there is such a dispute," however, "the factual questions must be resolved by the factfinder." *Zellner,* 494 F.3d at 368 quoting *Kerman,* 374 F.3d at 109. Once the jury has resolved any disputed facts that are material to the qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court. *Stephenson v. Doe,* 332 F.3d 68, 81 (2d Cir.2003) (after the district court receives the jury's decision as to what the facts were that the officer faced or perceived, the court then may make the ultimate legal determination of whether qualified immunity attaches on those facts); *Lennon,* 66 F.3d at 421 (the ultimate question of entitlement to qualified immunity is one of law for the court to decide "[o]nce disputed factual issues are resolved"); *Warren,* 906 F.2d at 76 ("If there are unresolved factual issues which prevent an early disposition of the defense, the jury should decide these issues.... The ultimate legal determination whether ... a reasonable police officer should have known he acted unlawfully" should be made by the court "on the facts found" by the jury.) [FN7]

FN7. "[B]ecause qualified immunity is an affirmative defense, it is incumbent upon the defendant to plead, and adequately develop, a qualified immunity defense during pretrial proceedings so that the trial court can determine ... which facts material to the qualified immunity defense must be presented to the jury to determine its applicability once the case has gone to trial. .... To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3260075 (W.D.N.Y.)

(Cite as: 2009 WL 3260075 (W.D.N.Y.))

to request that the jury be asked the pertinent question. See, e.g., *id.* If the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding." *Zellner, 494 F.3d. at 368* (citations omitted). See also *Kerman, 374 F.3d at 120; Warren, 906 F.2d at 76* ("the jury should decide these issues on special interrogatories").

**\*8** In the instant case, questions of fact preclude the grant of qualified immunity. Although the defendants assert that the "facts establish that the defendants used at most necessary and reasonable force and only the amount of force that was necessary to control inmate Tafari," the plaintiff has disputed this contention. Thus, in this case, the Court can make a determination as to whether the defendants are entitled to qualified immunity after the trier of fact resolves the factual issues relating to the circumstances surrounding the September 16, 2003 altercation between the plaintiff and the defendants. With respect to this issue, the motion for summary judgment is denied without prejudice.

*Trial*

The trial in this matter shall proceed on October 29, 2009 with jury selection at 9:00 a.m. and the trial to follow immediately. The trial shall concern the plaintiff's claims of excessive force on July 23, 2003 and September 16, 2003, as well as his claim of retaliation. Pretrial statements including a list of witnesses, a list of exhibits and proposed jury instructions shall be filed by October 21, 2009.

So Ordered.

W.D.N.Y.,2009.

Tafari v. Paul

Slip Copy, 2009 WL 3260075 (W.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 498144 (N.D.N.Y.)

(Cite as: 2009 WL 498144 (N.D.N.Y.))

**c**

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

James MURRAY, Plaintiff,

v.

C.O. BUSHEY, Defendant.

No. 9:04-cv-00805.

Feb. 26, 2009.

West KeySummary**Prisons 310** ☞ **137**

310 Prisons

   310II Prisoners and Inmates

      310II(B) Care, Custody, Confinement, and Control

         310k134 Search, Seizure, and Confiscation

            310k137 k. Strip Searches. Most Cited Cases

   An inmate stated a claim that his Fourth Amendment rights were violated when he was strip frisked. The officer allegedly frisked him without permission from higher officers, in front of other inmates, and in a filthy area with insufficient protection for his bare feet. Strip searches conducted in a prison setting were constitutional if related to a legitimate penological goal and were conducted in a reasonable manner. The complaint sufficiently alleged that the search was conducted in an unreasonable manner. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

James Murray, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of Attorney General-Syracuse Office, Senta B. Siuda, Esq., Ass't Attorney General, of Counsel, Syracuse, NY.

*DECISION and ORDER*

DAVID N. HURD, District Judge.

   **\*1** Plaintiff brought this civil rights action pursuant to 42 U.S.C. § 1983. On February 2, 2009, the Honorable George H. Lowe, United States Magistrate Judge, advised, by Report-Recommendation, that defendant's motion for summary judgment be granted, and the complaint be dismissed in its entirety. Both parties timely filed objections to the Report-Recommendation.

   Based upon a de novo determination of the portions of the report and recommendations to which both parties objected, the Report-Recommendation is accepted in whole. *See* 28 U.S.C. 636(b)(1). Accordingly, it is

   ORDERED that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 498144 (N.D.N.Y.)

(Cite as: 2009 WL 498144 (N.D.N.Y.))

1. Defendants' motion for judgment on the pleadings (Docket.No.43) is **DENIED** as to Plaintiff's Fourth Amendment claim;

2. **GRANTED** as to Plaintiff's Eighth Amendment claim; and

3. Plaintiff's Eighth Amendment claim is DISMISSED.

IT IS SO ORDERED.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff James Murray alleges that Defendant C.O. Bushey [FN1] violated his rights under the Fourth and Eighth Amendments when he strip frisked Plaintiff on or about July 1, 2001. (Dkt. No. 9.) Currently pending before the Court is Defendant's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Dkt. No. 43.) For the reasons that follow, I recommend that Defendant's motion be denied as to Plaintiff's Fourth Amendment claim and granted as to Plaintiff's Eighth Amendment claim.

FN1. Plaintiff also named the New York State Department of Correctional Services ("DOCS") as a defendant in both the original and the amended complaint. (Dkt. Nos. 1 and 9.) This Court dismissed DOCS as a defendant upon initial review of both the original and the amended complaint. (Dkt. Nos. 4 and 10.)

### I. BACKGROUND

#### A. Summary of Plaintiff's Complaint

The operative complaint is the amended complaint filed on March 2, 2005 [FN2]. (Dkt. No. 9.) Liberally construed, it alleges as follows:

FN2. The original complaint, filed on July 12, 2004, named many more defendants and included allegations about incidents that occurred in the aftermath of the July 1, 2001, strip frisk. (Dkt. No. 1.)

On or about July 1, 2001, Plaintiff was housed in the Special Housing Unit at Clinton Correctional Facility. (Dkt. No. 9 at ¶¶ 1-2.) During recreation period, Defendant Correctional Officer Bushey accused Plaintiff of possessing contraband. (Dkt. No 9 at ¶¶ 3-4.) After Plaintiff told Defendant that he did not have any contraband, Defendant ordered Plaintiff to submit to a strip frisk. (Dkt. No. 9 at ¶¶ 5-7.) Plaintiff complied with the order. (Dkt. No. 9 at ¶ 8.) Defendant frisked Plaintiff in front of numerous other inmates. (Dkt. No. 9 at ¶ 17.) The strip frisk occurred "outside in the recreation cages where feces, urine and spit are thrown daily." (Dkt. No 9 at ¶ 20.) During the strip frisk, Plaintiff cut his foot on a jagged edge of black top and the wound became infected. (Dkt. No. 9 at ¶ 21.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 498144 (N.D.N.Y.)

(Cite as: 2009 WL 498144 (N.D.N.Y.))

Plaintiff alleges that Defendant ordered the strip frisk "for no reason but to harass Plaintiff." (Dkt. No. 9 at ¶ 11.) He claims that Defendant's actions violated DOCS' directives regarding the strip frisks, the Fourth Amendment and the Eighth Amendment. (Dkt. No. 9 at ¶¶ 11-19.) Plaintiff requests $10 million in compensatory damages, $1 in nominal damages, and $10 million in punitive damages. (Dkt. No. 9 at 7.)

**B. Summary of Grounds in Support of Defendant's Motion**

**\*2** Defendant moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) (Dkt. No. 43.) Defendant argues that (1) the alleged violations of DOCS' directives do not constitute constitutional violations actionable under 42 U.S.C. § 1983; (2) harassment is not an actionable constitutional violation; and (3) Plaintiff's allegations are vague. (Dkt. No. 43-2.)

**C. Summary of Plaintiff's Response to Defendant's Arguments**

In response, Plaintiff cites and summarizes several cases and argues that the public strip frisk was not justified or reasonable, that a violation of DOCS' policy can constitute a constitutional violation, that the strip frisk was performed in retaliation [FN3] for the filing of previous lawsuits, and that the complaint is not vague. (Dkt. No. 49.)

FN3. Plaintiff's complaint does not allege that Defendant acted out of retaliatory motives.

**II. LEGAL STANDARD GOVERNING MOTIONS FOR JUDGMENT ON THE PLEADINGS**

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule

12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enter. .,* 448 F.3d 518, 521 (2d Cir.2006). Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [FN4] or (2) a challenge to the legal cognizability of the claim. [FN5]

FN4. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN5. *See* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ( "There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 498144 (N.D.N.Y.)

(Cite as: 2009 WL 498144 (N.D.N.Y.))

12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8 [a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN6] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN7] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the

sufficiency of [plaintiff's] claims." [FN8]

FN6. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

FN7. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

FN8. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 498144 (N.D.N.Y.)

(Cite as: 2009 WL 498144 (N.D.N.Y.))

*Technol., LLC v. Smartlens Corp.*, 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.*, 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[FN9] However, it is well established that even this liberal notice pleading standard "has its limits."[FN10] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard.[FN11]

FN9. *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

FN10. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

FN11. *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8(a)[2]'s liberal requirement); *accord, Dura Pharm.,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack*

*Park Agency of the State of N. Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007).[FN12] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

FN12. The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of

Slip Copy, 2009 WL 498144 (N.D.N.Y.)

(Cite as: 2009 WL 498144 (N.D.N.Y.))

opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

**\*3** More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id* .

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Twombly* ).FN13 The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).FN14

FN13. *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its

face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that *"Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....'") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ( "We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." ) [emphasis in original].

FN14. *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

It should be emphasized that Rule 8's plausibly standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a) (2). *Erickson v. Pardus,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 498144 (N.D.N.Y.)

(Cite as: 2009 WL 498144 (N.D.N.Y.))

551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing Conley v. Gibson, 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever.[FN15] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

FN15. For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Twombly,* all that is required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." Id. at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment

involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alves,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."[FN16] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* "[FN17] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.[FN18]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 498144 (N.D.N.Y.)

(Cite as: 2009 WL 498144 (N.D.N.Y.))

FN16. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN17. *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

FN18. *See, supra,* note 4 of this Report-Recommendation.

**\*4** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN19] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN20] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN21] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.[FN22] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[FN23]

FN19. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at \*1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

FN20. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

FN21. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 498144 (N.D.N.Y.)

(Cite as: 2009 WL 498144 (N.D.N.Y.))

FN22. *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN23. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05-CV-0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07-CV-0166, 2008 WL 3582743, at *2 (D.Vt. Aug.13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in

nature, rendering repleading futile); *Sundwall v. Leuba,* 00-CV-1309, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed),[FN24] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[FN25] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN26] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[FN27]

FN24. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

FN25. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 498144 (N.D.N.Y.)

(Cite as: 2009 WL 498144 (N.D.N.Y.))

forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord,* *Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691] [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord,* *Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN26. *See* *McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf.* *Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN27. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

**III. ANALYSIS**

**A. Fourth Amendment claim**

Plaintiff argues that the public strip frisk violated his Fourth Amendment rights. (Dkt. No. 9 at 7.) He alleges that Defendant violated DOCS' directives regarding strip frisks by conducting the search without permission from a higher ranking officer, in front of other inmates, and in a filthy area with insufficient protection for Plaintiff's bare feet. (Dkt. No. 9 at ¶¶ 12-19.) Defendant argues that Plaintiff has failed to state a Fourth Amendment claim because "[a]n alleged violation of a state regulation or department directive is not sufficient to state a claim for a violation of Constitutional rights." (Dkt. No. 43-2 at 2.)

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches ... shall not be violated." U.S. Const. amend IV. "What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) [internal quotation marks and citation omitted]. "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests ." *Skinner,* 489 U.S. at 619 [internal quotation marks and citations omitted]. In so doing, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) [citations omitted], *accord, Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 498144 (N.D.N.Y.)

(Cite as: 2009 WL 498144 (N.D.N.Y.))

**\*5** Strip searches conducted in a prison setting are constitutional if they are reasonably related to a legitimate penological goal and are conducted in a reasonable manner. *Frazier v. Ward,* 528 F.Supp. 80, 81 (N.D.N.Y.1981); *Duamutef v. Leonardo,* No. 91-CV-1100, 1993 WL 428509, at \*3 (N.D.N.Y. Oct.22, 1993); *Davidson v. Kyle,* No. 01-CV-706S, 2004 WL 941458, at \* 4 (W.D.N.Y. Mar.30, 2004) (strip frisks performed pursuant to prison policies and procedures at direction of Deputy Superintendent to search for contraband were reasonably related to legitimate penological goal and conducted in reasonable manner). "However, a strip search is unconstitutional if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish. *See, e.g., Iqbal v. Hasty,* 490 F.3d 143, 172 (2d Cir.2007) (pretrial detainee alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino,* 967 F.2d at 80 (strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley,* 712 F.2d 34, 35-36 (2d Cir.1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort); *Jean-Laurent v. Wilkerson,* 438 F.Supp.2d 318, 323 (S.D.N.Y.2006)." *Miller v. Bailey,* No. 05-CV-5493, 2008 WL 1787692, at \*9 (E.D.N .Y. Apr. 17, 2008).

Relying solely on the argument that "an alleged violation of a state regulation or department directive is not sufficient to state a claim for a violation of Constitutional rights," Defendant has not argued that he had a legitimate penological reason for conducting the strip frisk. (Dkt. No. 43-2 at 2-3.) Indeed, Defendant's brief does not even cite *Bell v. Wolfish,* the leading Supreme Court case on point, or any of the Second Circuit's strip frisk precedents. However, a legitimate penological goal is evident from the face of the complaint: Defendant was searching for contraband. *Davidson,* 2004 WL 941458, at \* 4.

Plaintiff's Fourth Amendment claim should survive this motion for judgment on the pleadings, however, because the complaint sufficiently alleges that Defendant conducted the search in an unreasonable manner. The complaint alleges that Defendant never sought permission from a higher ranking officer for the search, searched Plaintiff in front of other inmates rather than moving him to a more private area, and conducted the search under filthy conditions. If these facts are proved, a finder of fact could find that the search was unreasonable. Therefore, I recommend that Defendant's motion for judgment on the pleadings with respect to Plaintiff's Fourth Amendment cause of action be denied.

**B. Eighth Amendment claim**

Plaintiff claims that Defendant's conduct violated the Eighth Amendment because the strip frisk was an "unreasonable search used as a means of harassment." (Dkt. No. 9 at 7.) Defendant moves for judgment on the pleadings with respect to Plaintiff's Eighth Amendment claim, arguing that the "harassment" Plaintiff alleges is insufficiently severe to constitute cruel and unusual punishment. (Dkt. No. 43-2 at 3-4.) Defendant is correct.

**\*6** "[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A prison strip frisk is not sufficiently serious to constitute a violation of the Eighth Amendment even where the frisk is accompanied by sexual conduct. *Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997) (allegation that correctional officer touched inmate's penis during one strip search and pressed against him sexually on another occasion insufficient to state Eighth Amendment claim); *Morrison v. Cortright,* 397 F.Supp.2d 424 (W.D.N.Y.2005) (allegation that correctional officer shone light up inmate's anus, ran his middle finger between inmate's buttocks causing inmate to urinate on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 498144 (N.D.N.Y.)

(Cite as: 2009 WL 498144 (N.D.N.Y.))

himself, and rubbed his penis against inmate's buttocks during strip frisk insufficient to give rise to constitutional claim); *Davis v. Castleberry,* 364 F.Supp.2d 319, 321 (W.D.N.Y.2005) (allegation that correctional officer grabbed inmate's penis during pat frisk insufficient to state constitutional claim); *Montero v. Crusie,* 153 F.Supp.2d 368 (S.D.N.Y.2001) (allegation that, on several occasions, correctional officer squeezed inmate's genitalia while pat-frisking him did not show sufficiently serious deprivation to establish Eighth Amendment violation, particularly when inmate did not allege that he was physically injured by such conduct); *Williams v. Keane,* No. 95 Civ. 0379, 1997 WL 527677, at *11 (S.D.N.Y. Aug. 25, 1997) (allegation that correctional officer put his hand down inmate's pants and fondled inmates genitals during pat frisk failed to state constitutional claim).

Here, Plaintiff's allegations are insufficiently serious to state an Eighth Amendment claim. Although he alleges some irregularities in the conduct of the strip frisk, those irregularities, as discussed above, raise a Fourth Amendment claim rather than an Eighth Amendment claim. Plaintiff has not even alleged behavior as reprehensible as the sexual conduct alleged in the cases cited above. Therefore, I recommend that Plaintiff's Eighth Amendment claim be dismissed.

**C. Vagueness**

Defendant argues that Plaintiff's claim that he "sustained a painful and irritating laceration" as a result of the strip frisk is vague and should be dismissed. (Dkt. No. 43-2 at 4-5.) Defendant's argument is without merit. It is true that "[t]he Second Circuit has repeatedly held that complaints based on violations of constitutional rights must contain more than conclusory allegations to avoid dismissal." *Id.,* citing *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir.1990) and *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). However, the complaint here contains more than conclusory allegations. Rather than merely making the conclusory allegation that he was injured by Defendant's conduct, Plaintiff has specifically alleged that his foot was injured because Defendant forced him to

submit to a strip frisk on jagged black top. (Dkt. No. 9 at ¶¶ 18, 21.) Therefore, I recommend that Defendant's motion for judgment on the pleadings on the basis of vagueness are denied.

**D. Other motions**

**\*7** Plaintiff alleges that Defendant and the Court have failed to respond to a motion to compel discovery, a request for counsel, and a motion for injunctive relief. (Dkt. No. 49-2 at ¶¶ 9-10, 13.) The docket shows that no such motions are pending in this case. I note that Plaintiff has four other cases pending in this Court: *Murray v. Palmer,* Case No. 9:03-CV-1010 (GTS/GHL); *Murray v. Goord,* Case No. 9:05-CV-1113 (FJS/DRH); *Murray v. Wissman,* Case No. 9:05-CV-1186 (GTS/RFT); *Murray v. Goord,* Case No. 9:05-CV-1579 (FJS/DEP). There is a motion to compel discovery pending in *Murray v. Goord,* Case No. 9:05-CV-1113 (FJS/DRH) (Dkt. No. 25.) That case has not been referred to the undersigned, and I do not have authority to take action on it.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for judgment on the pleadings (Dkt.No.43) be **DENIED** as to Plaintiff's Fourth Amendment claim and vagueness and **GRANTED** as to Plaintiff's Eighth Amendment claim. It is thus **RECOMMENDED** that Plaintiff's Eighth Amendment claim be dismissed.

**A N Y   O B J E C T I O N S   t o   t h i s Report-Recommendation** must be filed with the Clerk of this Court within **TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS** from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day). *See* 28 U.S.C. § 636(b)(1);

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 498144 (N.D.N.Y.)

(Cite as: 2009 WL 498144 (N.D.N.Y.))

Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [FN28]

FN28. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case

before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2009.

Murray v. Bushey

Slip Copy, 2009 WL 498144 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



550 F.Supp.2d 413

(Cite as: 550 F.Supp.2d 413)

C

United States District Court,

W.D. New York.

Shawn WILLIAMS, Plaintiff,

v.

Officer D. FITCH and Sergeant Laurence Buehler,
Defendants.

No. 04-CV-6440L.

May 5, 2008.

**Background:** State inmate filed § 1983 action alleging
that corrections officers sexually abused him. Officers
moved to dismiss complaint.

**Holding:** The District Court, David G. Larimer, J., held
that officers did not violate inmate's Eighth Amendment
rights by searching and handling his penis on three
occasions while searching for contraband.

Motion granted.

West Headnotes

**[1] Sentencing and Punishment 350H** ⚷ **1548**

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

      350HVII(H) Conditions of Confinement

         350Hk1548 k. Use of Force. Most Cited Cases

     Severe or repetitive sexual abuse of inmate by prison
officer can be objectively, sufficiently serious enough to
constitute Eighth Amendment violation. U.S.C.A.
Const.Amend. 8.

**[2] Sentencing and Punishment 350H** ⚷ **1548**

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

      350HVII(H) Conditions of Confinement

         350Hk1548 k. Use of Force. Most Cited Cases

     Eighth Amendment claim for sexual abuse of inmate
by prison officer will not lie where inmate alleges only
minor, isolated incidents that are neither singly nor
cumulatively egregious in harm they inflicted. U.S.C.A.
Const.Amend. 8.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

550 F.Supp.2d 413

(Cite as: 550 F.Supp.2d 413)

[3] Prisons 310 ☞ 137

310 Prisons

    310II Prisoners and Inmates

        310II(B) Care, Custody, Confinement, and Control

            310k134 Search, Seizure, and Confiscation

                310k137 k. Strip Searches. Most Cited Cases

    (Formerly 350Hk1545)

Sentencing and Punishment 350H ☞ 1548

350H Sentencing and Punishment

    350HVII Cruel and Unusual Punishment in General

        350HVII(H) Conditions of Confinement

            350Hk1548 k. Use of Force. Most Cited Cases

    (Formerly 350Hk1545)

    State corrections officers did not violate inmate's Eighth Amendment rights by searching and handling his penis on three occasions while searching for contraband, where X-rays showed presence of metal object in foreskin of inmate's penis, and searches were undertaken in private location, without undue physical intrusion, humiliation, or physical injury. U.S.C.A. Const.Amend. 8.

**\*413** Shawn Williams, Dannemora, NY, pro se.

Gary M. Levine, New York State Office of the Attorney General, Rochester, NY, for Defendants.

*DECISION AND ORDER*

DAVID G. LARIMER, District Judge.

*Introduction*

    Plaintiff Shawn Williams ("Williams"), an inmate at the Attica Correctional Facility ("Attica") proceeding *pro se*, brings this action against defendants, Attica Sergeant Laurence Buehler ("Buehler") and Corrections Officer D. Fitch ("Fitch"). Williams alleges that Buehler and Fitch sexually abused him, in violation of 42 U.S.C. § 1983.

    On December 13, 2001, Williams was transferred from incarceration at Southport Correctional Facility to Attica. Upon arrival, Williams was placed in a metal detector chair, which sounded an alarm. Williams was scanned with a handheld metal detector, which also sounded an alarm.

    Williams was brought to an observation room, where he remained for two or three days. X-rays were taken of Williams, which showed the presence of a metal **\*414** object in Williams' abdominal area: specifically, the foreskin of his penis. On December 14, 2001, Buehler and Fitch visited Williams. Fitch performed a body cavity search, which included pulling down Williams' pants and handling the tip of Williams' penis. Williams alleges that Fitch returned to the observation room later and lifted Williams' penis up and down. Williams further relates that prior to his release from the observation room, Fitch "flipped" his penis a third time.

    From December 28, 2001 to January 4, 2002, Williams attended a disciplinary hearing related to his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

550 F.Supp.2d 413

(Cite as: 550 F.Supp.2d 413)

attempt to smuggle contraband into Attica, including but not limited to rubber bands and electrical tape which he had secreted in his anus. Williams also testified that he had disassembled a disposable lighter, apparently hiding its component parts in the foreskin of his penis, but had covertly thrown it away during his stay in the observation room. The hearing officer found Williams guilty and sentenced him to eighteen months in a special housing unit.

On June 17, 2002, Williams filed a grievance against Buehler and Fitch, which was denied as untimely. On September 13, 2004, Williams initiated the instant action. Defendants now move for summary judgment pursuant to Fed. R. Civ. Proc. 56 to dismiss Williams' claims in their entirety. For the reasons set forth below, the defendants' motion to dismiss (Dkt. # 34) is granted, and the complaint is dismissed.

***Discussion***

**I. Summary Judgment**

Summary judgment will be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Where, as here, the party opposing summary judgment is proceeding *pro se*, the Court must "read the pleadings ... liberally and interpret them to raise the strongest arguments that they suggest." *Corcoran v. New York Power Auth.,* 202 F.3d 530, 536 (2d Cir.1999). Nevertheless, "proceeding *pro se* does not otherwise relieve [the opposing party] from the usual requirements of summary judgment." *Fitzpatrick v. N.Y. Cornell Hosp.,* 2003 WL 102853 at *5, 2002 U.S. Dist. LEXIS 25166 at *5 (S.D.N.Y.2003). Those requirements include the obligation not to rest upon mere conclusory allegations or denials, but instead to set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984).

**II. Williams' Claims of Sexual Abuse**

In order to maintain a claim under Section 1983, Williams must show that the defendants violated his Constitutional or federal statutory rights-here, Williams' Eighth Amendment right against cruel and unusual punishment-and did so while acting under color of state law. *See Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

[1][2] "[T]here can be no doubt that severe or repetitive sexual abuse of an inmate by a prison officer can be 'objectively, sufficiently serious' enough to constitute an Eighth Amendment violation." ***415****Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997). *See also LaRocco v. New York City Dep't of Corr.,* 2001 WL 1029044, 2001 U.S. Dist. LEXIS 13839 (S.D.N.Y.2001). An Eighth Amendment claim under § 1983 will not lie, however, where an inmate alleges only minor, isolated incidents which are neither singly nor "cumulatively egregious in the harm they inflicted." *See Boddie,* 105 F.3d 857 at 861 (plaintiff's claim of sexual abuse was properly dismissed despite the fact that he had alleged several "despicable" incidents in which he had been "verbally harassed, touched, and pressed against without his consent" by a female correctional officer, because such isolated episodes "do not involve a harm of federal constitutional proportions as defined by the Supreme Court"), *citing Farmer v. Brennan,* 511 U.S. 825, 833-834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). *See*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

550 F.Supp.2d 413

(Cite as: 550 F.Supp.2d 413)

*also Davis v. Castleberry,* 364 F.Supp.2d 319, 321 (W.D.N.Y.2005) (allegation that corrections officer grabbed inmate's penis during pat frisk is insufficient to state constitutional claim); *Morrison v. Cortright,* 397 F.Supp.2d 424, 425 (W.D.N.Y.2005) (allegations that a corrections officer touched plaintiff's buttocks, and that another "rubbed up against plaintiff['s] buttocks with [the officer's] private part" during a strip search describe an isolated incident unaccompanied by physical injury, and therefore are not sufficiently serious to establish a constitutional claim); *Montero v. Crusie,* 153 F.Supp.2d 368, 373, 375 (S.D.N.Y.2001) (allegation that corrections officer squeezed inmate's genitalia during pat-frisks on several occasions does not show sufficiently serious deprivation to establish Eighth Amendment violation, particularly when inmate did not allege that he was physically injured by such conduct); *Nelson v. Michalko,* 35 F.Supp.2d 289, 293 (W.D.N.Y.1999) (allegation that inmate's anal area was touched by a metal detector during a search does not describe sufficiently serious conduct to raise an Eighth Amendment claim); *Williams v. Keane,* 1997 WL 527677 at *4, 1997 U.S. Dist. LEXIS 12665 at *11 (S.D.N.Y.1997) (allegation that correctional officer put his hand down inmate's pants and fondled inmate's genitals during pat frisk fails to state constitutional claim).

[3] The conduct alleged by Williams is similar to the conduct alleged in *Boddie.* Williams claims, *inter alia,* that he was subjected to excessive and intrusive body searches-specifically, searching and handling of his penis-on three occasions by Fitch, while Fitch was under Buehler's supervision. It is undisputed that no verbal sexual harassment was employed, and Williams does not allege that he suffered any physical injuries. Furthermore, the fact that the conduct was slightly more physically invasive and repetitive than that confronted in *Boddie* and some of its progeny was warranted by Williams' particular *modus operandi* of smuggling contraband in the folds of his foreskin, of which Fitch and Buehler were aware because of the X-rays. While alleging that more than one search was unnecessary, Williams does not dispute that the searches of his genitalia were made for the purpose of locating contraband. *See e.g., Davis,* 364 F.Supp.2d 319 at 321 (a legitimate frisk may involve touching inmate's

genital area). However, regardless of the officers' motivation, the three incidents alleged by Williams, which were undertaken in a reasonable manner, in a private location, without undue physical intrusion, humiliation or physical injury, and for the purpose of locating the contraband shown on Williams' X-rays, simply are not "objectively, sufficiently serious" enough to raise a constitutional claim. *Boddie,* 105 F.3d 857 at 861.

### *Conclusion*

For the foregoing reasons, I find that there are no material issues of fact, that **\*416** the conduct Williams alleges that defendants engaged in was not sufficiently serious to raise a constitutional claim, and that defendants are entitled to judgment as a matter of law. Accordingly, defendants' motion for summary judgment dismissing the complaint (Dkt. # 34) is granted, and the complaint is dismissed, with prejudice.

IT IS SO ORDERED.

W.D.N.Y.,2008.

Williams v. Fitch

550 F.Supp.2d 413

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 963465 (S.D.N.Y.)

(Cite as: 2010 WL 963465 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

S.D. New York.

Larry WILLIAMS, Plaintiff,

v.

UNITED STATES of America, et al., Defendants.

No. 07 Civ. 3018(RJS)(THK).

March 16, 2010.

*ORDER ADOPTING REPORT AND RECOMMENDATION*

RICHARD J. SULLIVAN, District Judge.

***1** On February 28, 2007, Plaintiff Larry Williams, who is incarcerated and proceeding *pro se,* initiated this suit by delivering a complaint to prison officials for them to file on his behalf. The complaint was received by the court's Pro Se Office on March 9, 2007 and docketed on April 14, 2007. (Doc. No. 1.) The case was originally assigned to the Honorable Kenneth M. Karas, District Judge, and reassigned to the docket of the undersigned on

September 4, 2007. (Doc. No. 3.)

The only Defendants named in the complaint were "John Does 1-11, sued in their individual capacities," whom Plaintiff described as United States Marshals. Accordingly, on October 30, 2007, the Court ordered the United States Attorney's Office for the Southern District of New York ("the USAO") to identify the officers described in the complaint. After an extended investigation period, four Marshals were eventually identified by name: Luis Figueroa, Donny LaRosa, Thomas Ventiere, and A.J. Krause. Plaintiff then filed an amended complaint on January 2, 2009-more than twenty-two months after the original complaint was filed-adding the named defendants, in their individual and official capacities, and other parties. (Doc. No. 19.) The Court ordered Plaintiff to serve the amended complaint by April 1, 2009 (Doc. No. 20), which was later extended until May 15, 2009 at Plaintiff's request (Doc. No. 22). Plaintiff mailed service packages to the Marshals Service on May 12, 2009, and process was effectuated on June 2 and 4, 2009. On August 21, 2009, Defendants moved to dismiss the amended complaint. The motion was fully submitted on September 22, 2009, and was subsequently referred to the Honorable Theodore H. Katz, Magistrate Judge, for a Report and Recommendation.

On February 25, 2010, Judge Katz issued a Report recommending that Defendants' motion be granted in its entirety. Specifically, Judge Katz recommended (1) dismissing claims against the remaining John Doe defendants for lack of personal jurisdiction; (2) dismissing claims against the United States, the United States Marshals Service, and the individual defendants in their official capacities as barred by the doctrine of sovereign immunity; (3) dismissing as time-barred all claims against the individual defendants that are based on events that took place before January 2, 2006; and (4) dismissing the remaining timely claims for failure to state a claim on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 963465 (S.D.N.Y.)

(Cite as: 2010 WL 963465 (S.D.N.Y.))

which relief can be granted. In the Report, Judge Katz advised the parties that failure to file timely objections within fourteen days from service of the Report would constitute a waiver of those objections. *See* 28 U.S.C. § 636(b) (1)(C); Fed.R.Civ.P. 72(b). No party has filed objections to the Report, and the time to do so has expired. *Cf. Frank v. Johnson, 968 F.2d 298 (2d Cir.1993).*

When no objections to a report and recommendation are made, the Court may adopt the report if there is no clear error on the face of the record. *Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005); *La Torres v. Walker,* 216 F.Supp.2d 157, 159 (S.D.N.Y.2000). After conducting a thorough review of the record, the Court finds that Judge Katz's well-reasoned and persuasive Report and Recommendation is not facially erroneous. Accordingly, the Court adopts the Report and Recommendation in its entirety. For the reasons set forth therein, IT IS HEREBY ORDERED THAT Defendants' motion to dismiss is granted. The clerk of the court is respectfully directed to terminate the motion found at Doc. No. 35 and to close this case.

**\*2** SO ORDERED.

S.D.N.Y.,2010.

Williams v. U.S.

Slip Copy, 2010 WL 963465 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Shawn MONCRIEFFE, Plaintiff,
v.
Linda WITBECK, Corrections Officer at Coxsackie
Correctional Facility; B. Schwebler; Dominic Mantello,
Superintendent; C.O. Weeks; C.O. Jensen; and C.O.
McFarlene, Defendants.
**No. 97-CV-253.**

June 29, 2000.

Shawn Moncrieffe, Auburn Correctional Facility, Auburn,
New York, Plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General for the State of
New York, Steven H. Schwartz, Assistant Attorney
General, Department of Law, the Capitol, Albany, New
York, for Defendants.

MEMORANDUM-DECISION AND ORDER

MORDUE, J.

*INTRODUCTION*

**\*1** Plaintiff moves and defendants cross-move for
summary judgment under Section 56(b) of the Federal
Rules of Civil Procedure in this *pro se* action pursuant to
42 U.S.C. § 1983 alleging violations of his rights under
the Fourth, Eighth and Fourteenth Amendments to the
United States Constitution.

Presently before the Court is the Report-Recommendation
of the Hon. Magistrate Judge David R. Homer dated
December 23, 1998, recommending that plaintiff's motion
be denied and defendants' cross-motion be granted in part
and denied in part.

Plaintiff filed timely objections to the
Report-Recommendation.

*FACTS*

In his complaint, plaintiff alleges that between August and
November, 1996, while he was housed in the Special
Housing Unit of Coxsackie Correctional Facility,
defendant Correctional Officer Linda Witbeck deprived
him of a food tray six times; that Witbeck deprived him of
things such as recreation and supplies six times; that
Witbeck laughed at him four times while he was in the
shower; that Witbeck sexually harassed plaintiff once
"when she felt [plaintiff's] genitals and rear end during a
regular recreation pat frisk;" that Witbeck ransacked his
cell; and that in some unspecified manner Witbeck gave
him a death threat. Plaintiff further alleges that during the
same period defendant Correctional Officer Weeks
sexually harassed him during a routine pat frisk when
Weeks "felt [plaintiff's] genitals a few times." Plaintiff
claims that on two occasions defendant Correctional
Officer McFarlene entered his cell and ransacked it while
plaintiff was in the shower and once confiscated "a few of
[plaintiff's] things." Plaintiff also claims that defendant
Correctional Officer Jensen threatened him once and
assaulted him once by kicking him in the back. Plaintiff
states that the grievance supervisor, defendant Schwebler,
did not log and number plaintiff's grievances as required
and that Superintendent Dominic J. Mantello disregarded
plaintiff's numerous complaints.

Magistrate Judge Homer recommended denial of plaintiff's
motion for summary judgment and dismissal of all of
plaintiff's claims except his Eighth Amendment claim
against Witbeck for denial of food.

*DISCUSSION*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

Pursuant to 28 USC § 636(b)(1)(C), this Court must make a de novo determination of those portions of the Magistrate Judge's Report-Recommendation to which plaintiff has specifically objected. Here, plaintiff objects to Magistrate Judge Homer's recommendations except with respect to the issues of verbal harassment, threats and denial of recreation. He erroneously states that the Report-Recommendation does not address the claim that Witbeck laughed at him while he was in the shower; however, this allegation amounts to a claim of verbal harassment, which is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Accordingly, the Court will address all issues de novo.

Summary Judgment is appropriate when the pleadings, affidavits, and any other supporting papers demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). Facts, inferences therefrom and ambiguities must be examined in a context which is most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

**\*2** The movant bears the initial burden of showing that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has met this burden the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita* at 586. The moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.56(e); *Liberty Lobby* at 250.

Where summary judgment is sought against a *pro se* litigant the Court must afford him special solicitude. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

A. *Defendant Mantello*

Plaintiff alleges that defendant Mantello is liable because, as Superintendent of the Coxsackie Correctional Facility, he "disregarded" numerous complaints made to him by plaintiff. More specifically, plaintiff alleges that (1)

Mantello failed to remedy a wrong after having learned of it and (2) that Mantello was negligent in his supervision of subordinate employees.

Magistrate Judge Homer concluded in his Report-Recommendation that plaintiff failed to demonstrate a claim against Mantello. With respect to plaintiff's first allegation that Mantello failed to remedy a wrong, the Magistrate Judge determined that either Mantello or his subordinates investigated plaintiff's grievances. Because plaintiff's complaints were investigated and it was concluded that the grievances were without merit, Mantello satisfied his obligations with respect to plaintiff's grievances.

The Magistrate Judge similarly rejected plaintiff's second claim that Mantello negligently supervised subordinate employees who were allegedly violating his constitutional rights. Magistrate Judge Homer concluded that no claim was stated because, whereas the law requires gross negligence to impose supervisor liability, plaintiff merely alleged negligence. In addition to determining that plaintiff's claim was without merit for failure to plead and prove gross negligence, Magistrate Judge Homer also concluded that plaintiff had failed to establish even ordinary negligence on the part of Mantello.

Plaintiff objects to Magistrate Judge Homer's conclusion that he failed to establish supervisor liability. Plaintiff argues that the record establishes gross negligence in that Mantello was aware that plaintiff's rights were being violated but chose to ignore them by failing to investigate or remedy same.

In order to establish a successful § 1983 claim, a plaintiff must establish that a defendant was personally involved in the alleged rights violation. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). An official is not liable in a section 1983 action under the doctrine of respondeat superior. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981). However, an individual who occupies a supervisory position may be found personally involved by: (1) direct participation; (2) failing to remedy a wrong after learning of the violation through a report or appeal; (3) creating a policy or custom under which unconstitutional practices occurred or

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

allowing the policy or custom to continue; or (4) gross negligence in managing subordinates whose conduct caused the unlawful condition or event. *See Wright,* 21 F .3d at 501.

**\*3** With respect to plaintiff's objection arguing that Mantello was grossly negligent, plaintiff simply reiterates his original arguments and relies on evidence already in the record and considered by the Magistrate Judge. Plaintiff merely reiterates in his objections to the Report-Recommendation that he has established a case

which includes gross negligence as evidence [sic] in plaintiff's motion. (See plt. motion for summary judgment, memo. Of law pg. 23 with annexed exibits [sic] and plt. Reply decl. Pg. 11 with attached exibits [sic] ). Moreover, the record is legally sufficient to establish and impose supervisory liability. (See exibits [sic] attached to plt. motion for summary judgment and Reply motion).

As Magistrate Judge Homer correctly stated, the record clearly reveals that Mantello or his subordinate employees investigated plaintiff's grievances and rejected them as being without merit. As such, there is nothing in the record indicating that Mantello either turned a blind eye to plaintiff's complaints. Simply stated, plaintiff's assertion that Mantello ignored his complaints is refuted by the investigations conducted regarding the complaints. Similarly, plaintiff's allegation that Mantello failed to remedy a wrong is without merit because the record reflects that the investigation of the complaints came to the conclusion that no wrongs were being committed.

Aside from reiterating his initial arguments, plaintiff has failed to provide the Court with anything further in his objection which would warrant disturbing the sound conclusion of the Magistrate Judge. Accordingly, this Court accepts Magistrate Judge Homer's determination to dismiss plaintiff's claim with respect to defendant Mantello.

B. *Verbal Threats and Harassment*

Plaintiff alleges that he was subjected to verbal threats and

harassment in that corrections officers laughed and insulted him while he showered. Plaintiff also maintains that he was subjected to threats of violence. Magistrate Judge Homer recomended that defendants were entitled to summary judgment because plaintiff failed to establish an actual injury resulting from the alleged threats or harassment.

A claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). As correctly noted by the Magistrate Judge, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Picco* 994 F.Supp. at 474. Similarly, "threats do not amount to violations of constitutional rights." *Malsh,* 901 F.Supp. at 763.

Even assuming that the alleged verbal harassment and threats occurred, plaintiff has failed to plead or prove that there were any accompanying actual injuries. Furthermore, plaintiff does not object to the findings of the Magistrate Judge with respect to verbal threats and harassment. After a thorough review of the Report-Recommendation the Court adopts the recommendation of the Magistrate Judge.

C. *Excessive Force*

**\*4** Plaintiff alleges that defendant Jensen kicked him once in the back on November 9, 1996. He states that he suffered pain but does not claim that he sought medical assistance. Plaintiff does not allege that Jensen acted maliciously or sadistically.

Magistrate Judge Homer found that plaintiff had failed to annunciate an actionable claim for excessive force. More particularly, he concluded that the alleged kick, even if true, was of limited duration and that there was no malicious intent on the part of the corrections officer.

It is well settled that "the unnecessary and wanton

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian,* 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers,* 475 U.S. 312 (1986))(internal quotation marks omitted). In reviewing a prisoner's claim a Court must consider whether the prison official acted with a sufficiently culpable state of mind and whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. *Hudson* at 8. In considering whether the prison official possessed a culpable state of mind while engaging in the use of force, the inquiry is whether the prison official applied force maliciously and sadistically to cause harm. *Id.* at 7. The extent of an inmate's injuries is relevant to this inquiry, as is the nature and duration of the act. *James v. Coughlin,* 13 F.Supp.2d 403, 409 (W.D.N.Y.1998); *Reyes v. Koehler,* 815 F.Supp. 109, 113-14 (S.D.N.Y.1993). Important in considering the alleged wrongdoing is determining whether the force was applied in a good faith effort to maintain or restore prison discipline or maliciously and sadistically to cause harm. *Hudson* at 7.

With respect to the nature of the wrongdoing, a prisoner must demonstrate that the deprivation alleged is sufficiently serious or harmful enough to reach constitutional dimensions. *Romano v. Howarth,* 998 F.2d 101, 104-05 (2d Cir.1993). A prisoner is not required to demonstrate that he sustained a serious injury; *de minimis* use of force does not, however, give rise to an Eighth Amendment claim. *Hudson* at 9-10.

Plaintiff's allegations, even if true, do not support a determination that Jensen acted maliciously or sadistically. Interestingly, in his objections to the Report-Recommendation, plaintiff admits that the kick was of limited duration. In the balance of his objection plaintiff merely reiterates his opinion that the evidence submitted supports an inference of malice. The Court concludes that the conduct alleged is not sufficiently serious or harmful to reach constitutional dimensions. Accordingly, defendants are entitled to summary judgment dismissing plaintiff's excessive force claim.

D. *Access to the Courts*

Plaintiff alleges that he was denied access to the courts as

a result of cell searches, confiscation of documents and denial of supplies between August and November 1996. Plaintiff alleges that these actions were motivated to frustrate his efforts to litigate.

**\*5** Magistrate Judge Homer recommended that the defendant's motion to dismiss this claim should be granted. The Magistrate Judge found that plaintiff's claim of denial of access to the courts was unsubstantiated with any evidence which demonstrated that plaintiff had suffered any actual injuries from any alleged wrongful conduct. To the contrary, Magistrate Judge Homer concluded that plaintiff's claims were supported by a thirty-five page memorandum of law containing both case and statutory authority as well as an exhibit related to state court proceedings-all of which demonstrated plaintiff's full and adequate ability to litigate his claims.

It is well established that prisoners have a constitutional right to access the courts. "To state a claim that his constitutional right to access the court was violated, plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue." *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995); *see Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987). In other words, in order to establish a violation of his right of access to the courts, an inmate must demonstrate that he has suffered or imminently will suffer actual harm in presenting a claim to the court. *Lewis v. Casey,* 518 U.S. 343 (1996).

In his objections to the Report-Recommendation, plaintiff restates arguments already considered by Magistrate Judge Homer. He states that "[p]laintiff further reiterates that he has incurred irreparable harm and injury as a result of the lack of legal services he received while confined in Coxsackie SHU." Plaintiff goes on to note that his complaints would not have been able to have been brought had he not been transferred to the Elmira Correctional Facility. Implicit in this statement is that plaintiff was in fact allowed to bring his claims. Assuming *arguendo* that plaintiff was not allowed to bring his claims until after transfer, the fact still remains that plaintiff did in fact have the ability to air his grievances. Therefore, at best, plaintiff's hardship was delay in bringing his claims. As plaintiff has not established how such an alleged delay has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

prejudiced his rights or amounted to an injury, he fails to make the requisite showing of actual injury for a successful claim. As such, the Court accepts Magistrate Judge Homer's recommendation and grants defendant's motion as to this claim.

E. *Sexual Harassment*

With respect to plaintiff's sexual harassment claim, Magistrate Judge Homer concluded that plaintiff failed to establish an actionable case. Magistrate Judge Homer found that the conduct involved was *de minimus* and, therefore, did not violate a constitutionally protected right.

Sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim. *Boddie v. Schnieder,* 105 F.3d 857, 859 (2d Cir.1997). When reviewing an Eighth Amendment claim stemming from an allegation of sexual abuse, a Court must consider whether the conduct alleged is sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. *Id* at 861. The Court must further consider whether the prison official involved possessed a sufficiently culpable state of mind. Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may be sufficient evidence of a culpable state of mind. *Id.* at 861.

**\*6** As set forth above, plaintiff claims that defendants Weeks and Witbeck, each on one occasion, conducted pat frisks in an improper manner. Assuming the truth of these allegations for the purposes of these motions, they are not sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. Plaintiff has failed to demonstrate any severe physical or psychological harm that he has suffered as a result of the alleged harassment. Thus, plaintiff's allegations of sexual abuse fail to state a claim cognizable under the Eighth Amendment. Defendants are therefore entitled to summary judgment dismissing this claim.

F. *Cell Searches*

Plaintiff alleges that he was subjected to cell searches which were designed to harass. Plaintiff's initial pleadings merely allege same with no evidence to support the claim. As a result, Magistrate Judge Homer concluded that plaintiff's claim was without merit and recommended that defendant's motion be granted.

"[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer,* 468 U.S. 517, 526 (1984), even where the search is retaliatory in nature. *Higgins v. Coombe,* 1997 WL 328623, at *7 (S.D.N.Y.1997). Prisoners do, however, enjoy Eighth Amendment protection from searches that lack any legitimate penological interest and are intended solely to harass. *Nilsson v. Coughlin,* 1987 WL 129823, at *4 (S.D.N.Y.1987), see also *Hudson* at 530.

Plaintiff fails to raise anything in his objections to the Magistrate Judge's Report-Recommendation which would warrant disturbing the sound conclusion and recommendation found therein. As Magistrate Judge Homer correctly stated the law with respect to plaintiff's claim, and since plaintiff fails to provide any evidence to support his argument that the alleged searches were improper, the Court concludes that this claim is without merit and grants defendant's motion.

G. *Deprivation of Food and Recreation*

Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement: adequate food, clothing, shelter and medical care. Denial of a minimal civilized measure of life's necessities violates the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825 (1994). Depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment. *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Odom v. Sielaff,* 1995 WL 625786, at *5 (E.D.N.Y.1995); *see also Rhodes v. Chapman,* 452 U.S. 337, 348 (1981).

Plaintiff alleges that corrections officer Witbeck denied him food on six occasions and on at least two occasions contaminated his food with spit or perfume. In support of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

their motion to dismiss, defendants rely on an affidavit from Witbeck denying the allegations. Defendants also rely on copies of logbook entries for the SHU in which plaintiff was housed. Because these logbooks do not contain clear entries for some of the dates in issue and would not likely reflect the wrongful denial of meals to an inmate by a corrections officer, they do not establish as a matter of law that defendants never denied plaintiff food. Credibility assessments and choices between conflicting versions of events are matters for a fact-finder at trial, not for the Court on a summary judgment motion. *Fischl v.. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). Thus, plaintiff's motion and defendants' cross-motion for summary judgment are denied with respect to the issue of whether plaintiff's Eighth Amendment rights were violated by deprivation of food.

**\*7** Plaintiff further alleges that he was deprived of his Eighth Amendment rights where he was allegedly denied recreation on a single occasion. Magistrate Judge Homer concluded that denial of recreation on a single occasion was not sufficiently serious to support a constitutional claim. Plaintiff does not object to these recommendations.

Although prisoner's have a constitutional right to exercise, a claim alleging deprivation of this right requires a showing of a serious deprivation and deliberate indifference on the part of prison officials. *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996); *Barnham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996). As illustrated by the Report-Recommendation, denial of recreation for eighteen out of nineteen days has been upheld in the Second Circuit and denials of up to seventy-five days have been upheld elsewhere. *Arce v. Walker,* 907 F.Supp. 658 (W.D.N.Y.1995), *aff'd in part, vacated in part* 139 F.3d 329 (2d Cir.1998); *Green v. Ferrell,* 801 F.2d 765 (5th Cir.1986).

Based on the foregoing, the Court concludes that the alleged denial of recreation on a single occasion does not support a claim for deprivation of constitutional rights. Accordingly, defendant's motion is granted with respect to this element of plaintiff's claim.

*CONCLUSION*

After a careful review of the file, party submissions and applicable law, it is hereby

ORDERED that Magistrate Judge Homer's Report-Recommendation dated December 23, 1998 is ACCEPTED IN FULL; and it is further

ORDERED that plaintiff's motion for summary judgment is DENIED in all respects; and it is further

ORDERED that defendant's cross-motion for summary judgment be DENIED with respect to plaintiff's claim against defendant Witbeck regarding the alleged deprivation of food and GRANTED in all other respects.

IT IS SO ORDERED

N.D.N.Y.,2000.
Moncrieffe v. Witbeck
Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Robert del CARPIO, Plaintiff,

v.

Hans WALKER, Superintendent; Edward Dann, Deputy
Superintendent; Lt. Battle, Officer of the Adjustment
Committee; Officer York; Officer Kimak, Auburn Corr.
Facility, Defendants.
**No. Civ.A.95CV1502RSPGJD.**

Oct. 15, 1997.

Robert del Carpio, Federal Medical Center, Lexington,
Kentucky, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol, Albany, New York, for defendants, Lisa Renee
Harris, Assistant Attorney General, of Counsel.

**ORDER**

POOLER, J.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge Gustave J.
Di Bianco, duly filed on the 18th day of September, 1997.
Following ten days from the service thereof, the Clerk has
sent me the entire file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report-Recommendation, and no
party having submitted objections [FN1] thereto, it is

FN1. I note that the magistrate judge's report

recommendation was returned to the court
undelivered because the plaintiff is no longer at
the address listed in the court's file, which is the
last address plaintiff instructed the court to use.
By Order filed November 22, 1995, Magistrate
Judge Gustave Di Bianco ordered that plaintiff
"promptly notify the Clerk's Office of any change
in his address." Dkt. No. 3 at 4. The same order
provided that "failure to keep such office
apprised of [plaintiff's] current address will result
in the dismissal of the instant action." *Id*. I do not
rely on plaintiff's failure to notify the court of his
current address as a basis for dismissing the
action; I merely note that plaintiff cannot in the
future claim, in reliance on his failure to receive
a copy of the report-recommendation, that he
was deprived of the opportunity to file objections
due to any fault of the court.

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The defendant's motion is granted and the action
dismissed for the reasons set forth in the Magistrate
Judge's Report.

3. The Clerk serve a copy of this Order on the parties by
regular mail.

IT IS SO ORDERED.
GUSTAVE J. DI BIANCO, Magistrate J.

**REPORT-RECOMMENDATION**

This matter has been referred to the undersigned for
Report and Recommendation by the Honorable Rosemary
S. Pooler, United States District Judge pursuant to 28
U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In the instant civil rights complaint, the plaintiff alleges that while he was incarcerated, defendants York and Battle harassed plaintiff and filed false misbehavior reports against him in retaliation for the exercise of his right to redress grievances and the right to practice his religion in violation of the First and Fourteenth Amendments of the Constitution. Plaintiff also alleges Eighth Amendment violations as a result of defendants' actions.

The complaint seeks both injunctive and monetary relief.

Presently before the court is the defendants' motion for summary judgment pursuant to FED.R.CIV.P. 56. For the following reasons, the undersigned will recommend granting the defendants' motion and dismissing the complaint.

### DISCUSSION

**1. Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED.R.CIV.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

**2. Facts**

In his complaint, plaintiff alleges a chronology of events, commencing in May of 1995. Plaintiff states that he wrote letters to Superintendent Walker about defendants York and Kimak. Plaintiff alleges that these two defendants constantly harassed plaintiff. Plaintiff then alleges that after he complained of their actions to prison officials, defendants York and Kimak participated in filing false misbehavior reports against plaintiff in retaliation for his complaints. Plaintiff also alleges that defendant York forced plaintiff to continue working when York knew that plaintiff's heart condition would not permit him to do as York asked. Plaintiff also claims that defendant York refused to feed the plaintiff. Plaintiff refers to three misbehavior reports that he alleges were fabricated.

**\*2** Plaintiff states that he has written to Superintendent Walker many times, but Walker has failed to remedy the situation. Plaintiff states that due to Walker's failure to remedy the problem, York and Kimak believe that they can continue to harass the plaintiff without adverse consequences. Plaintiff claims that Deputy Superintendent Dann failed to properly investigate plaintiff's allegations against York and Kimak. Plaintiff states that Lieutenant Battle was a hearing officer involved in the allegedly retaliatory misbehavior charges.[FN1] Plaintiff claims that defendant Battle did not properly evaluate or credit the plaintiff's testimony or the testimony of plaintiff's witnesses.

> FN1. The court notes that Lieutenant Battle was the hearing officer in only *one* of the plaintiff's disciplinary hearings. Lieutenant Perkins presided over the other two disciplinary hearings. Plaintiff did not sue Lieutenant Perkins.

**3. Respondeat Superior**

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), and that the doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

Defendants Walker and Dann argue that the plaintiff has not alleged sufficient personal responsibility to survive a motion for summary judgment. Clearly, neither Walker nor Dann directly participated in the alleged violations. Plaintiff seeks to establish personal responsibility by claiming that these defendants failed to remedy the violations after learning of them through a report or appeal.

Plaintiff alleges that he began writing to defendant Walker in May of 1995 about harassment by defendant York. It is true that personal responsibility of a supervisory official may be established if the official learns of the violation through a report or appeal and fails to remedy the situation. *Williams, supra.* However, the letter or complaint must alert the supervisory official to the constitutional violation of which the plaintiff complains. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Watson v. McGinnis,* 964 F.Supp. 127, 129-30 (S.D.N.Y.1997).

**\*3** In the instant case, the plaintiff's complaints to defendant Walker about York and Kimak relate to the alleged harassment that the plaintiff was suffering. There is no evidence that the Superintendent or Deputy Superintendent Dann knew anything about the plaintiff's allegation of retaliatory misbehavior reports. Thus, they could not be held liable for any claims of retaliation. The grievances that the plaintiff submitted were all investigated as shown by the defendants' exhibits. One of the grievances dealt with an allegation of "false keeplock."

[FN2] Defendants' Exhibit C. A review of the documents relating to the grievance and all the appeals associated therewith, shows no evidence that defendants Walker or Dann were ever informed of the situation. In fact, the grievance is signed by an individual named Duncan in the space reserved for the Superintendent's signature. Defendants' Exhibit C at p. 6. Attached to the grievance papers are all the memoranda regarding the investigation of the issue.

FN2. This was the June 6, 1995 grievance mentioned in plaintiff's complaint.

Defendants' Exhibit J contains plaintiff's June 11, 1995 letters [FN3] to defendant Walker. The letters stated that defendants York and Kimak were trying to cause the plaintiff to have a heart attack by their harassment. The harassment included not releasing the plaintiff for "chow" and preventing plaintiff from timely visits to the law library. Plaintiff mentioned a false misbehavior charge, but stated that this allegation was being handled in the Cayuga County Court.

FN3. There are two letters in Exhibit J. Both are dated June 11, 1995. One is typed and one is handwritten.

One of plaintiff's June 11 letters was given to Deputy Superintendent Dann, who asked Lieutenant Jackson to investigate the issues raised. Defendants' Exhibit K includes documents relative to Lieutenant Jackson's investigation of the matter, including memoranda of interviews of the officers involved. Although the investigation did not achieve the result desired by the plaintiff, this does not constitute the requisite personal involvement by Walker or Dann in any alleged constitutional violations.

In fact, defendant Dann wrote plaintiff a memorandum stating the results of Lieutenant Jackson's investigation. Defendants' Exhibit K. The memorandum stated that although no merit had been found in plaintiff's claims, Sergeant Lupo was told to speak with the plaintiff to make sure his concerns were addressed. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**4. Due Process**

The complaint in this action focuses upon defendant York and Kimak's retaliatory misbehavior reports, however, in passing, the plaintiff also states that Lieutenant Battle "closed his eyes to the evidence," did not properly evaluate the plaintiff's testimony, and "covered" for the officers. These claims could be interpreted as raising a procedural due process claim in addition to the substantive retaliation claim.

The court would first point out that there were three allegedly retaliatory misbehavior reports. Lieutenant Battle was the hearing officer only at *one* of the hearings. Lieutenant Perkins was the hearing officer for the other two hearings. Plaintiff does not mention Perkins in the complaint at all. Thus, the undersigned will consider a procedural due process claim on the one hearing over which defendant Battle presided which took place on July 17, 1995. Defendants' Exhibit S. The formal charge was served on plaintiff on July 13, 1995, and charged plaintiff with refusing a direct order and being out of place. *Id.* at p. 3 (transcript of disciplinary hearing). Officer Kimak was the individual signing the misbehavior report. Defendants' Exhibit R.

**\*4** In order for a plaintiff to be awarded damages under section 1983 for an alleged violation of procedural due process, the court must find that as a result of conduct performed under color of state law, plaintiff was deprived of life, liberty, or property without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In the instant case, there is no dispute that the defendants acted under color of state law. In *Bedoya,* the Second Circuit indicated that "[w]hat remains is a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined in keeplock ...; and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Id.* at 351-52 (citing *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460-61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

In order to determine whether a liberty interest existed, courts, until recently, were relying on the Supreme Court decision in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Supreme Court

noted that a state could create a liberty interest through a statute or regulation by utilizing language of unmistakably mandatory character, limiting the discretion of the decision maker. *Id.* After the decision in *Hewitt,* lower courts, as well as the Supreme Court, focused more upon the language of the statute or regulation, rather than upon the character of the deprivation. *See e.g., Kentucky Dep't of Corrections, supra; Hernandez v. Coughlin,* 18 F.3d 133 (2d Cir.1994) (finding no liberty interest after examining regulations associated with the Family Reunion Program), *cert denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994); *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.1988) (finding liberty interest in remaining free from administrative segregation based on New York regulations); *Gittens v. LeFevre,* 891 F.2d 38, 41 (2d Cir.1989) (finding a liberty interest in remaining free from keeplock based on language of the regulations).

The Supreme Court has held that the *Hewitt* analysis is not applicable and has led to undesired results in prison cases. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Courts may no longer rely *solely* upon the language of the regulations when determining whether a liberty interest exists. *Id.* at 2300. The Court stated in Sandin that "the search for a negative implication from mandatory language in prison regulations has strayed far from the real concerns under-girding the liberty protected by the Due Process Clause." *Id.* The court also stated that it was *returning* to the principles established in *Wolff* and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). *Id.* Ultimately, the court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

**\*5** *Sandin* rejected the notion that any action taken by prison personnel for punitive reasons encroaches on a liberty interest. *Id.* at 2301. The court referred to as "dicta" statements in other cases implying that solitary confinement automatically triggers due process protections. *Sandin,* 115 S.Ct. at 2301 (citing *Wolff,* 418 U.S. at 571 n. 19; *Baxter v. Palmigiano,* 425 U.S. 308, 323, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). Applying this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

standard to the facts in *Sandin,* the court determined that Conner's discipline in segregated confinement for 30 days did ***not*** present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

In determining what constituted "atypical and significant" deprivations, the *Sandin* court compared disciplinary segregation with other forms of segregation; compared the plaintiff's confinement with conditions in general population to see whether the inmate had suffered a major disruption in his environment; and examined whether the ***length*** of the inmate's sentence was affected. *Id.*

The Second Circuit has not yet squarely addressed the issue of whether after *Sandin* an inmate facing a disciplinary hearing has a liberty interest, protected by due process. The Second Circuit has *implied* that whether a deprivation is atypical and significant involves fact finding. *See Frasier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) ("[t]he extensive fact-finding of the district court permits us to measure Frasier's SHY claim by the standard of *Sandin* ); *Samuels v. Mockry,* 77 F.3d 34, 38 (2d Cir.1996) (assessment as to whether inmate had a protected liberty interest may require fact finding).

Some courts in New York have also read *Sandin* narrowly and have distinguished the holding when applying the *Sandin* factors and distinguishing the situation experienced by inmate Conner to that experienced by New York inmates who face Tier III disciplinary hearings. *See Campo v. Keane,* 913 F.Supp. 814, 820-21 (S.D.N.Y.1996); *see Moolenaar v. Finn,* No. 94 Civ. 6778 n. 4 (S.D.N.Y. March 14, 1996) (commenting that the case involved a Tier II hearing with no ***possibility*** of loss of good time and contrasting Tier III hearings where such loss is possible). As noted by the courts in *Campo* and *Moolenaar,* a recognized Second Circuit principle is that due process rights must be determined with respect to the "potential penalty". *Campo,* 913 F.Supp. at 821 (citing *McKinnon v. Patterson,* 568 F.2d 930, 939 (2d Cir.1977), *cert denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). Some courts, however, have squarely rejected the potential penalty theory, opting instead to examine the facts and length of each confinement to determine whether the confinement was atypical and significant. *See Marino v.. Klages,* No. 95-CV-1475 (N.D.N.Y. March 27, 1997) (declining to adopt the

potential penalty approach); *Delany v. Selsky,* 899 F.Supp. 923, 927-28 (N.D.N.Y.1995) (considering length of confinement together with plaintiff's unusual physical problems).

**\*6** In the instant case, the plaintiff was subjected only to a ***Tier II*** hearing, in which the maximum possible penalty he could receive was 30 days of segregated housing or keeplock. *See* N.Y.Comp.Codes R. & Reg. Tit. 7 § 254.7(a)(iii) and (vi). There is no possibility in a Tier II hearing of a loss or even a recommended loss of good time. Regardless of the disposition, the length of an inmate's sentence cannot be affected as a result of a Tier II hearing. Even under the potential penalty approach, this plaintiff, who was only sentenced to five days of keeplock for the hearing that he is challenging would not have a liberty interest in being free from that confinement. Thus, any procedural due process claim against Lieutenant Battle, based on the July 17, 1995 disciplinary hearing may be dismissed.

## 5. Verbal Harassment

Plaintiff states that defendants York and Kimak harassed him "to death." Verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997). Thus, any claims of general verbal harassment by either defendant may be dismissed.

## 6. Retaliation

Even after the Sandin decision, a claim that a false misbehavior report was filed in retaliation for the exercise of a constitutional right, is still actionable as a violation of ***substantive due process.*** The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

Cir.1988). In cases where the defendants' actions are taken for both retaliatory and legitimate reasons, ultimately the defendants must show that they would have taken the same action absent the retaliatory motive. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir .1994). Courts recognize, however, that claims of retaliation may be prone to abuse. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). The court in Flaherty described three situations where retaliation is claimed, each situation requiring a different approach by the court. *Id.* The court stated that a retaliation claim supported by specific and detailed allegations must be pursued with full discovery. *Id.* Whereas, a claim that contains "completely conclusory" allegations may be dismissed on the pleadings alone. *Id.* The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.*

In the instant case, the plaintiff alleges that officers York and Kimak filed the false misbehavior reports in retaliation for plaintiff's complaints and grievances against them. Plaintiff also alleges that defendant York retaliated against plaintiff for the exercise of a First Amendment right to practice his religion. This latter claim is not explained by the plaintiff. He does not allege specifically what First Amendment right he was exercising or how the defendants' actions were in retaliation for the exercise of that right.

*7 Defendants have submitted all the records relating to the disciplinary hearings. With respect to the charges, a review of the transcripts of the disciplinary hearings shows that the plaintiff was given the opportunity to explain his behavior at the disciplinary hearing. *See e.g.* Defendants' Exhibit M at p. 4. Exhibit M is the transcript of the disciplinary hearing that took place on June 11, 1995 for a misbehavior that occurred on June 7, 1995. The misbehavior involved the plaintiff failing to obey an order to continue working. The plaintiff admitted that he did not continue working when defendant York told him to continue. *Id.* Plaintiff stated that his medical condition was preventing him from continuing. *Id.* Essentially, the plaintiff admitted his behavior, but alleged a defense that his medical condition prevented him from following the officer's order.

Thus, the misbehavior report was not *false.* Rather, the plaintiff had an explanation for his misbehavior that the hearing officer did not believe. In fact, hearing officer Perkins adjourned the hearing to "check into [[[plaintiff's] medical profile." *Id.* at p. 5. The hearing was reconvened on July 12, 1995, and Lieutenant Perkins had reviewed the plaintiff's medical record. *Id* . at p. 6. Perkins determined that although the plaintiff did have a health problem, there was no indication that he could not work. *Id.* Whether the hearing officer made the correct decision is not the issue. It is clear that at worst, there could have been a dual motivation for defendant York's misbehavior report, and plaintiff did admit failing to obey the officer's order, albeit with reason.

The misbehavior report of July 8, 1995 resulted in a hearing on July 12, 1995. First, the officer fling the misbehavior report was Officer Hoey. The misbehavior report involved unauthorized legal assistance and unauthorized legal exchange. Defendants' Exhibit P (transcript of July 12 hearing). A frisk of the plaintiff's cell resulted in finding 81 pages of legal work that belonged to other inmates. Plaintiff did not dispute that the legal papers were in his cell, but argued that he was using the other individuals' papers to work on his own legal matters. *Id.* at p. 3. The hearing officer simply did not believe the plaintiff's explanation. *Id.* at p. 5.

Neither defendant York nor defendant Kimak was directly involved in the search or the misbehavior report of July 7, 1995. Thus, there is no evidence that this misbehavior report was false and in retaliation for any constitutional right exercised by the plaintiff.

The final misbehavior report was authored by defendant Kimak and involved refusal to obey an order and being out of place. The disciplinary hearing was held on July 17, 1995. Defendants' Exhibit S (transcript of disciplinary hearing). The misbehavior report stated that when plaintiff was returning from his shower, he refused to obey Officer Kimak's order get back into plaintiff's cell. Defendant Kimak stated in the report that plaintiff had stopped at one of the cells and placed his hands inside. *Id.* at p. 3. Plaintiff alleged at the hearing that he was returning from the shower, but he did not stop at anyone's cell and did not disobey any orders. *Id.* at p. 4. Plaintiff also told the hearing officer that defendant Kimak's actions were in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

retaliation for plaintiff's complaints against Kimak. *Id.* at pp. 4-5. Plaintiff called two inmate witnesses to testify at the hearing. *Id.* at p. 7. His first witness was very unclear, but essentially testified that he did not hear the officer give plaintiff an order. *Id.* The second inmate was more articulate and stated that after plaintiff exited the I shower, he always went straight back to his cell. *Id.* at p. 12. Moore testified that he did not hear any order given. *Id.* However, Lieutenant Battle found the witnesses incredible and found plaintiff guilty of the misbehavior. It would appear that the only evidence of retaliation is the plaintiff's allegation of complaints against Kimak and York. A review of the documents I relating to the misbehavior reports shows that even if the plaintiff's statements are credited, the misbehavior reports could have been written for valid reasons as well as invalid reasons. Thus, the plaintiff cannot maintain an action for retaliation in the instant case.

**7. Eighth Amendment**

**\*8** Plaintiff makes some vague allegations that the defendants forced him to work when he was not capable. Plaintiff admitted at his disciplinary hearing that he wanted to work but needed to take a break. Lieutenant Perkins looked through the plaintiff's medical records and found no limitations with respect to the work he could do. The medical record did note a heart condition.

The Eighth Amendment prohibits the infliction of cruel and unusual punishments, including punishments that involve the unnecessary and wanton infliction of pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). In order to state a claim based on inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A plaintiff must allege that his access to physicians for necessary medical care was unreasonably delayed or denied or that prescribed medical treatment was not administered. *Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982) (citing *Todaro v. Ward,* 431 F.Supp. 1129, 1133 (S.D.N.Y.), *aff'd,* 565 F.2d 48 (2d Cir.1977)). Plaintiff's claims, although not specifically involving medical care, do involve allegations that the defendants violated the doctor's orders, and are governed by the same

deliberate indifference standard. Deliberate indifference, whether evidenced by medical staff or by officials who allegedly disregard the instructions of the medical staff requires more than negligence, but less than conduct taken for the very purpose of causing harm. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). In order for a prison official to act with deliberate indifference, the official must know of and disregard an excessive risk to inmate health and safety. *Id.* at 1979. The official must both be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* In the instant case, defendant York allegedly told the plaintiff to keep working when plaintiff stated that he needed a break. The defendant could not have been deliberately indifferent since there was no medical limitation on plaintiff's work in his medical file. Thus, York could not have known about and disregarded a serious risk to plaintiff. Additionally, according to the misbehavior report, the plaintiff had already taken a break when defendant York told plaintiff to keep working. Thus, based on the undisputed facts, there is no evidence that defendant York violated the plaintiff's Eighth Amendment rights relating to his medical condition. Plaintiff also indicated in his complaint that defendant York refused to let plaintiff out of his cell to be fed. Plaintiff wrote a grievance on June 29, 1995 regarding being released "for chow." Defendants' Exhibit D. However, it does not appear that Officer York was involved in the incident. In fact, the grievance was resolved informally. Thus, the plaintiff does not state any Eighth Amendment claim for a retaliatory denial of food or for any denial of food.

**\*9 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the defendants' motion for summary judgment (docket # 15) be **GRANTED,** and the complaint be **DISMISSED.**

Pursuant to 28 1 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))


Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R .Civ.P. 6(a), 6(e), 72.


N.D.N.Y.,1997.
Carpio v. Walker
Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp., 1996 WL 204494 (N.D.Ind.)

(Cite as: 1996 WL 204494 (N.D.Ind.))

Only the Westlaw citation is currently available.

United States District Court, N.D. Indiana.

Jose Angel TAPIA, Plaintiff

v.

Michael THORTON, Defendant

No. 3:94-CV-197RM.

March 19, 1996.

Jose Angel Tapia, Michigan City, IN, pro se.

David A. Arthur, Indiana Attorney General, Indianapolis, IN, for defendant.

## MEMORANDUM AND ORDER

MILLER, District Judge.

*1 No objection having been filed, the court now ADOPTS the magistrate judge's March 19, 1996 report and recommendation. The clerk shall enter judgment for the defendant on all of the plaintiff's claims.

SO ORDERED.

## REPORT AND RECOMMENDATION

PIERCE, United States Magistrate Judge.

The plaintiff, Jose Angel Tapia, is an inmate at the Indiana State Prison ("ISP") in Michigan City, Indiana. On March 11, 1994, he filed a *pro se* complaint under 42 U.S.C. § 1983, alleging that defendant Michael Thornton, a correctional officer at the ISP, violated his constitutional rights under the Eighth Amendment by spraying him with a fire extinguisher and then refusing his request for medical care. Pursuant to an Order of Referral entered by Judge Miller on July 13, 1995, the undersigned conducted a bench trial in this cause on March 13, 1996. This Report and Recommendation constitutes the court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

### Pretrial Contentions

Tapia's contentions, as set forth in the final pretrial order, state as follows:

Plaintiff contends that on October 16, 1993, Michael Thornton walked down the East 100 range of I-Cellhouse Detention Unit (IDU) at the Indiana State Prison with a fire extinguisher and pointed it into Tapia's cell (1-E-23) and sprayed Tapia in the face and body with it.

Tapia further contends that on October 16, 1993, Thornton denied him proper medical attention by refusing to allow him (Tapia) to go to the infirmary.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 204494 (N.D.Ind.)

(Cite as: 1996 WL 204494 (N.D.Ind.))

Tapia further contends that Thornton threatened him through Officer E. Moore, Jr., by saying that Tapia had 'better not strat [sic] no shit and there wouldn't be none.' Tapia contends that this was in reference to his (Tapia's) request for some grievance forms.

Officer Thornton's contentions are as follows:

Defendant contends that Plaintiff's rights were in no way violated. On October 16, 1993, Thornton was informed of a fire on the east range. Tapia was complaining about being in cell 1-E-23 but he himself had requested that cell after being informed about water leaking into that cell from the shower. Thornton and two other officers proceeded to the range with a fire extinguisher. Several rolls of toilet paper had been set afire and were burning in front of Tapia's cell. Tapia had started the fire. Tapia continued to stand at the front of the cell. As Thornton extinguished the fire, water may have splashed off the floor and made contact with Tapia but the fire extinguisher was not pointed at Tapia. The fire extinguisher was filled with water and did not contain chemicals. The medical records show no complaints at any time on or after October 16, 1993, that are or could be the result of being sprayed with the fire extinguisher.

Thornton denies that he threatened Tapia as alleged. As a legal matter, even were there such 'threats' no actionable claim would be stated.

*Findings of Fact*

At all times relevant, Tapia was an inmate at the ISP in Michigan City, Indiana. Following a disciplinary violation for battery upon another inmate, Tapia was placed in the prison's I-Cellhouse Detention Unit ("IDU"), a disciplinary segregation unit. On or about October 11, 1993, Tapia was moved into cell 1-E-23. The cell, which

measured approximately six feet by nine feet, was the last cell at the north or back of the range and was adjacent to a shower area. (Pltf's Ex. 1A.) On the morning of October 12 or 13, water in the IDU, as well as throughout the ISP, was turned off. When the water was restored later in the day, Tapia noticed that a "big puddle" of water had formed on the floor on the side of his cell by the bed. Over the next two or three days, he complained to the ISP "administration" about the flooding problem, and various correctional officers came to his cell to look at the water.

*2 At about 3:30 p.m. on October 16, inmates housed on the back portion of the range began yelling for an officer to come and help with the water problem while Tapia waved toilet paper out the front of his cell. Officer Edward Moore, Jr., who had been in the officers' station at the south end of the unit, proceeded down a catwalk which extended along the east side of the range and observed the water on the floor in Tapia's cell. Worried that his legal papers would be damaged, Tapia complained to Moore about the flooding. Moore, in turn, informed the officer in charge, Sgt. Baugher, about the problem. It was Sgt. Baugher's last day working at the ISP and, according to Moore, Baugher "made the decision to do nothing."

By around 3:40 p.m., inmates had started several fires on the back of the range and Tapia or some other inmate had started a fire with toilet paper in the area immediately in front of Tapia's cell. Upon noticing the fire in front of Tapia's cell, defendant Thornton obtained an air pressurized water-filled fire extinguisher and proceeded with Officer Edwards down the range to the scene. The fire, which Officer Moore described as primarily designed to attract attention, was located about 2 feet to the front of Tapia's cell and the flames were approximately 1 foot to 18 inches high. When Thornton arrived with the fire extinguisher, Tapia came to the front of his cell and stood by the bars. While facing Tapia's cell, Thornton was able to quickly put out the fire with the extinguisher, but then raised the nozzle and proceeded to spray Tapia in the face. Upon being sprayed, Tapia went to the back of his cell, removed his glasses, and returned to the front where he

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 204494 (N.D.Ind.)

(Cite as: 1996 WL 204494 (N.D.Ind.))

was again sprayed by Officer Thornton.

After he was sprayed, Tapia noticed that his eyes and face were itching. Not knowing what was in the extinguisher and whether its contents would hurt him, Tapia asked Thornton to be allowed to take a shower and go to sick call. According to Tapia, Thornton responded by smiling and telling him that he wasn't going anywhere. After the fire was put out and Officers Thornton and Edwards had returned to the guard station at the south end of the unit, Officer James entered the range and went back to check on Tapia. He noticed that the floor inside Tapia's cell was wet and saw a few ashes. During his trial testimony, James stated that he did not "recall" if Tapia was wet but added that he probably was a little wet from the water that was sprayed on the floor.

At about 3:55 p.m., the officers who had been working in the IDU at the time of the incident, Baugher, Thornton, Moore, James and Edwards, were relieved by the next shift. At about 4:15 p.m., Tapia was moved to 2-E-12, a cell on the upper tier of the IDU's east range. He was not issued a conduct report because it could not be determined who had started the fire.

On the following morning, Tapia asked Officer Moore for grievance forms so he could register a complaint against Thornton for spraying him. Upon learning of Tapia's request, Thornton told Moore to tell Tapia, "Don't start anything and there won't be anything." Moore relayed the message to Tapia. Later in the day, as Tapia was returning from a visit, he encountered Thornton near the IDU's sallyport and "asked him why he done that last night." Thornton replied, "it just happened" and then informed Tapia that he did not write him up (issue him a conduct report) over the incident.

**\*3** Except for the itching which Tapia noticed, there

is no indication that he suffered any injury as a result of being sprayed. Nor is there any indication that Tapia felt any pain at the time he was sprayed, or thereafter. Although he had a preexisting allergy condition, he acknowledged that he experienced no lasting problems due to the incident. The evidence indicates that nurses would enter the unit on every shift (3 times in each 24-hour period) in order to pass out medication to the inmates in their cells, but there is no indication that Tapia made any request for medical treatment while the nurses were making their rounds. Except for Thornton's initial refusal to allow Tapia to go on sick call following the incident, there is nothing to suggest that Tapia was prevented from obtaining medical treatment after the officers' 4:00 p.m. shift change or at any subsequent time. Although Tapia apparently complained to Moore the next day that his eyes were giving him some problem, there is no indication that he complained to any of the officers on the two intervening shifts, and there is nothing to suggest that he ever sought further medical treatment.

Although Officer Thornton denied that he sprayed Tapia, the court finds that his testimony concerning the incident was not credible. He stated initially that he saw Tapia start the fire and passed that information along to the sergeant in charge of the unit. At another point, he testified that he saw Tapia throw paper into the range and "saw him light it." Later, he stated that Tapia was not issued a conduct report because "we didn't actually see Tapia start the fire." However, Thornton's testimony that he did not issue Tapia a conduct report is inconsistent with his answer to one of Tapia's interrogatories. In Interrogatory No. 23, he was asked: "What time did the fire take place?" He responded: "That information is on the Conduct Report and I do not have a copy, however, Plaintiff does." Thornton also testified that he was standing on the stairway leading to the upper tier of cells as he extinguished the fire, but Officer James stated that he saw Thornton standing a foot "at the most" from the fire. No other witness placed Thornton on the stairway. Officer Moore testified that he went inside the guard office and did not see Thornton extinguish the fire. Officer James, who observed Thornton spray the fire, testified that he did not see Thornton point the extinguisher nozzle up toward

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 204494 (N.D.Ind.)

(Cite as: 1996 WL 204494 (N.D.Ind.))

Tapia's cell, but acknowledged that he may not have seen "everything." The court also considers it significant that Officer James, who was nearing the end of his shift, apparently felt some need to check on Tapia after he knew that the fire was out and after Officers Thornton and Edwards had returned to the guard station. In addition, the scenario described by Tapia and his witnesses is plausible considering what Officer Moore described as the "chaos" which was occurring on the east side of the unit in the vicinity of the fire. Having had an opportunity to hear the witnesses testify and observe their demeanor, the court is forced to conclude that Officer Thornton did spray Tapia with the fire extinguisher but did not intend to cause him any harm.

*Conclusions of Law*

**\*4** To prevail under § 1983, a plaintiff must prove a violation of a constitutional right by a person or persons acting under color of state law. 42 U.S.C. § 1983; *Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1249 (7th Cir. 1994); *McNabola v. Chicago Transit Auth.,* 10 F.3d 501, 513 (7th Cir. 1993). Absent a violation of a constitutional right, the plaintiff cannot prevail on his claim under § 1983. *Graham v. Connor,* 490 U.S. 386, 393-94, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (Section 1983 "is not itself a source of substantive rights") (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n.3, 99 S.Ct. 2689, 2695 n. 3, 61 L.Ed.2d 433 (1979); *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1349 (7th Cir. 1985). The threshold inquiry, therefore, is whether Tapia can prove that the defendant deprived him of a constitutional right.

The Eighth Amendment prohibits "cruel and unusual punishment" and applies to the states through the Fourteenth Amendment. When evaluating claims for cruel and unusual punishment, the court makes a two-part inquiry: (1) whether the defendants acted with a sufficiently culpable state of mind (subjective component), and (2) whether, in light of "contemporary standards of decency," the alleged deprivation was sufficiently serious

to rise to the level of a constitutional violation (objective component). *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992); *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991); *Thomas v. Stalter,* 20 F.3d 298, 301 (7th Cir. 1994); *Lunsford v. Bennett,* 17 F.3d 1574, 1579 (7th Cir. 1994).

In the excessive force context, the two components collapse into a single inquiry because "'[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency ... are always violated.'" *Thomas,* 20 F.3d at 301 (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000). The ultimate test, as set forth in *Whitley v. Albers,* 475 U.S. 312, 320-21, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986), is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Thomas,* 20 F.3d at 301 (quoting *Hudson,* 503 U.S. at 6, 112 S.Ct. at 999); *see also Del Raine v. Williford,* 32 F.3d 1024, 1031 (7th Cir. 1994); *Lunsford,* 17 F.3d at 1581. The standard is strict and sets a fairly high threshold. *Lunsford,* 17 F.3d at 1581. When determining whether the force used was excessive, the court should consider the need for force, the threat to the safety of the staff and inmates, and the nature and extent of any injury inflicted on the prisoner. *Lunsford,* 17 F.3d at 1581. (citing *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999; *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085). It must also be noted that not every malevolent touch by a prison guard constitutes cruel and unusual punishment. "The Eighth Amendment's prohibition on cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (quoting *Whitley,* 475 U.S. at 327, 106 S.Ct. at 1088).

**\*5** In the present case, the evidence shows that during the afternoon of October 16, Tapia and his fellow inmates on the back half of the IDU's east range were yelling and causing "chaos." Several fires had been started by inmates.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 204494 (N.D.Ind.)

(Cite as: 1996 WL 204494 (N.D.Ind.))

It was against this background that Officers Thornton and Edwards entered the range and proceeded with a fire extinguisher to the scene of the fire which had been started in front of Tapia's cell. After extinguishing the fire, Officer Thornton raised the fire extinguisher's nozzle and sprayed Tapia with water as he stood in his cell. There is no indication that Tapia suffered any significant injury or even any pain. There is also no indication that Officer Thornton intended to harm or injure Tapia by spraying him with water.

The act of squirting Tapia with water from the fire extinguisher, while unprofessional, did not amount to a constitutional violation. It was certainly no more egregious than the incident described in *Lunsford,* in which correctional officers poured a bucket of water over the head of a prisoner who was already standing in ankle-deep water while shackled to the bars of his cell. In that case, the Seventh Circuit characterized the officers' action as "a minor use of force that does not offend the conscience." *Lunsford,* 17 F.3d at 1582. Here, as in *Lunsford,* the use of force was *de minimis* and the act of spraying Tapia with water is not something which would be considered repugnant to the conscience of mankind.

It is also clear that Officer Thornton's refusal of Tapia's request for medical attention did not amount to a constitutional violation. A plaintiff claiming an Eighth Amendment violation based upon the denial of medical care must, among other things, establish the existence of a serious medical need. *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000; *Estelle v. Gamble,* 429 U.S. 97, 103-04, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976). A medical condition is "serious" if it may be "life threatening or pose[s] a risk of needless pain or lingering disability if not treated at once." *Davis v. Jones,* 936 F.2d 971, 972 (7th Cir. 1991); *Roberts v. Samardvich,* 909 F.Supp. 594, 605 (N.D. Ind. 1995); *see also Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1186-87 (11th Cir. 1994) (observing that "'[a] "serious" medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would

easily recognize the necessity for a doctor's attention."') In this instance, Tapia's only problem after being sprayed was an itching sensation on his face and in his eyes. He suffered no injury and no pain, and he clearly did not have a serious medical need.

For the foregoing reasons, it is RECOMMENDED that plaintiff, Jose Angel Tapia, take nothing by his complaint, and that final judgment be entered in favor of defendant, Michael Thornton, on all of plaintiff's claims.

ANY OBJECTIONS to this report and recommendation must be filed with the Clerk of courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. See *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Lockert v. Faulkner,* 843 F.2d 1015 (7th Cir. 1988); *Video Views, Inc. v. Studio 21 Ltd.,* 797 F.2d 538 (7th Cir. 1986).

N.D.Ind.,1996.

Tapia v. Thornton

Not Reported in F.Supp., 1996 WL 204494 (N.D.Ind.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.